# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>NEW STREAM SECURED CAPITAL FUND (U.S.), L.L.C.,<br><br>              Debtor. | Chapter 11<br><br>Case No. 11-10690 (MFW)<br><br>**Hearing Date:  To be determined**<br>**Objections Deadline:  To be determined** |
| In re:<br><br>NEW STREAM SECURED CAPITAL FUND K1 (Cayman), LTD.,<br><br>              Debtor. | Chapter 11<br><br>Case No. 11-10696 (MFW)<br><br>**Hearing Date:  To be determined**<br>**Objections Deadline:  To be determined** |
| In re:<br><br>NEW STREAM SECURED CAPITAL FUND P1 (Cayman), LTD.,<br><br>              Debtor. | Chapter 11<br><br>Case No. 11-10694 (MFW)<br><br>**Hearing Date:  To be determined**<br>**Objections Deadline:  To be determined** |

## MOTION OF CERTAIN U.S. AND CAYMAN INVESTORS FOR ENTRY OF AN ORDER PURSUANT TO SECTIONS 1104 AND 105 OF THE BANKRUPTCY CODE (I) APPOINTING A CHAPTER 11 TRUSTEE PRIOR TO ENTRY OF ORDER FOR RELIEF OR, IN THE ALTERNATIVE, (II) APPOINTING AN EXAMINER

# TABLE OF CONTENTS

Page

I.    JURISDICTION, VENUE AND STATUTORY PREDICATE ............................................3

II.   PRELIMINARY STATEMENT ..................................................................................3

     A.    INTRODUCTION.............................................................................................3

     B.    THE NEW STREAM ENTERPRISE – ITS STRUCTURE AND OPERATIONS ...............................................................................................5

        1.    Before the 2007 Master/Feeder Restructuring........................................5

        2.    The 2007 Master/Feeder Restructuring: What Was Promised vs. What Was Delivered ...................................................................................6

        3.    New Stream's Subsequent Misrepresentations, Dishonesty, and Other Wrongful Acts ..........................................................................11

        4.    The 2009 Restructuring and The Gottex Judgment Voiding It ............14

     C.    THE URGENT NEED TO APPOINT A CHAPTER 11 TRUSTEE ...........16

        1.    Conflicts Preclude Pursuit of Claims....................................................16

        2.    New Stream's Prepackaged Plan and Disclosure Statement ................17

III.   FACTUAL BACKGROUND....................................................................................22

IV.   BASIS FOR RELIEF REQUESTED .......................................................................23

     A.    APPOINTMENT OF A TRUSTEE BEFORE ENTRY OF ORDER FOR RELIEF IS APPROPRIATE...............................................................................23

     B.    THE FACTS SUPPORT APPOINTMENT OF A CHAPTER 11 TRUSTEE ............27

        1.    The Statute, Its Purposes, and the Applicable Standards.....................27

        2.    Appointment Of Chapter 11 Trustee Is Compelled For Cause.............28

           (a)    Prepetition Fraud, Dishonesty, Incompetence and Gross Mismanagement are "Cause" to Appoint a Trustee .....................31

              (1)    The Debtors' Fraudulent Failure to Disclose the Bermuda Fund's Continuing Existence and Security Interest, and Misrepresentations About *Pari Passu* Treatment Among All Investors Constitute "Cause" ..............................................31

              (2)    The Debtors' Other Misrepresentations, Including Those Made to Induce Investors Not to Redeem, Constitute "Cause"....................44

                 a.    Misrepresentations About Redemptions and Liquidity..............45

                 b.    Misrepresentations About Revised Life Expectancy Tables .......................................................................................50

                 c.    Misrepresentations About Investment Performance .................52

i

          d.     Other Misrepresentations ............................................................55

(3) The Debtors' Delay in Writing Down Deteriorating Assets Constitute "Cause" ....................................................................58

(4) The Debtors' Incompetence and Gross Mismanagement Constitute "Cause"....................................................................61

          a.     Implementing the 2009 Restructuring Without Gottex's Consent, Statutory Authority, or the Advice of Counsel, Was Found in the Gottex Proceeding to be Gross Mismanagement Warranting the Appointment of Joint Receivers for the Bermuda Fund.................................................62

          b.     De Facto Substantively Consolidating NSSC, NSI, The US/Cayman Feeders, and Subsidiaries and Affiliates...............63

          c.     Payment of Above-Market Terms to the Bermuda Fund At the Cost of the US/Cayman Investors ...................................67

          d.     Overvaluing Life Insurance Assets In Order To Appear Profitable .....................................................................................69

          e.     Enabling Gottex to Wield Undue Influence ...............................73

(5) The Debtors' Misuse of Funds Raised During the 2007 Restructuring in Violation of the Offering Documents Constitutes "Cause" ................................................................76

(b) Conflicts and Inappropriate Relationships Constitute "Cause" to Appoint a Trustee as No Impartial Fiduciary Exists to Investigate and Pursue Claims Against Affiliates, the Bermuda Fund, and Gottex ....................................................................................77

(1) Claims for Substantive Consolidation of NSSC and NSI Estates Must be Pursued...............................................................82

(2) Claims for Equitable Subordination of Gottex's Claims And/or Avoidance of its Liens Must be Pursued .............................................87

(3) Unjust Enrichment and Constructive Trust Causes of Action Must be Pursued Against the Bermuda Investors And Their Collateral.......................................................................................92

(4) Fraudulent Conveyance Causes of Actions Against NSI and Gottex Must be Pursued........................................................................95

(5) Whether the Bermuda Fund Properly Perfected its Alleged Security Interest in NSI's and NSSC's Life Insurance Policies Must Be Examined..............................................................................98

      (c)   The Proposed Disclosure Statement and the Prepackaged Plan, A Sweetheart Deal Among New Stream Management, the Bermuda Investors, and MIO, by Which All Malfeasance is Released but Claims Are Not Disclosed, is Further Evidence of the Need for a Chapter 11 Trustee .................................................................................100

   3.   Even if the Court Determines that "Cause" Does Not Exist, Appointing a Chapter 11 Trustee is in the Creditors' Best Interests Under Section 1104(a)(2) of the Code....................................................................................103

C.   ALTERNATIVELY, THE COURT SHOULD APPOINT AN EXAMINER UNDER 11 U.S.C. § 1104(C) ..................................................................................105

The Latta Family Trust, Christiane L. Latta Trust, Jean Y. Rose Revocable Trust,

Irwin D. Yalom and Marilyn Yalom, Robert Shostak and Nancy Shostak, Consulta Collateral

Fund PCC Ltd., Consulta Alternative Strategy Fund PCC Ltd., Kas Trust Bewaarder Finles

Alternative Bond Fund B.V., Kas Trust Bewaarder Finles European Selector Fund B.V.,

Guernoy Limited, SPL Private Finance (PF2) IC Ltd, The Stillwater Market Neutral II, LP, The

Stillwater Matrix Fund, L.P., The Stillwater Market Neutral Fund III SPL – Stillwater Matrix

PC, Stratos Non-Directional Fund, LP, ZAM Asset Finance Limited ("ZAM AF"), Toledo Fund

LLC, ZCALL, LLC, Mont Blanc Fund – Select, Absolute Return Partners, LLP, and Lillian

Kling Trust (collectively, the "Movants")[1], investors in New Stream Secured Capital Fund

(U.S.), L.L.C. (the "US Feeder") and New Stream Secured Capital Fund B2 (Cayman), Ltd.;

---

[1] Each Movant is a beneficial holder of a claim against or interest in the entities against an involuntary debtors in the above-captioned cases or other entities in the New Stream group (defined below). The registered owner of such claim or interest may be an agent of such Movant (such as a custodian). Thus, the involuntary petitioner is sometimes an agent of Movant who is the registered owner of the claim. The relationships of the Movants to the involuntary petitioners who represent them are explained below.

All of the involuntary petitioners in these cases are either Movants or agents of the Movants. Particularly, The Latta Family Trust, Jean Y. Rose Revocable Trust, Robert and Nancy Shostak and Irvin and Marilyn Yalom, all involuntary petitioners against New Stream Secured Capital Fund (US), LLC, are among the Movants; Daiwa Securities Trust & Banking (Europe) plc as custodian for KBCZAF, the involuntary petitioner against New Stream Secured Capital Fund P1 (Cayman), Ltd., is an agent for ZAM AF; and Banco Nominees (Guernsey) Limited, A/C 7074552, the involuntary petitioner against New Stream Secured Capital Fund K1 (Cayman), Ltd., is an agent for The Consulta Collateral Fund PCC Ltd. Also included among the Movants are Christiane L. Latta Trust, The Stillwater Matrix Fund, L.P., The Stillwater Market Neutral II, L.P., ZCALL, L.L.C., Toledo Fund, L.L.C., Stratos Non-Directional Fund, L.P., Guernoy Limited (account # G2075117; Guernoy Limited is also invested in a Cayman Feeder (defined herein)), and Lillian Kling Trust, each of which holds claims against or interests in New Stream Secured Capital Fund (US), LLC, although they are not involuntary petitioners. Also included among the Movants are Kas Trust Bewaarder Finles Alternative Bond Fund B.V., Kas Trust Bewaarder Finles European Selector Fund B.V., Mont Blanc Fund – Select, SPL Private Finance (PF2) IC Ltd., The Stillwater Market Neutral Fund III SPL – Stillwater Matrix PC, and Absolute Return Partners, LLP, holding claims against or interests in New Stream Secured Capital Fund B2, D1, F1, G1, M1, T1 and AC1 (Cayman), Ltd, seven Cayman Feeders against which involuntary petitions have not yet been filed. Consulta Alternative Strategy Fund PCC Ltd. is also a Movant , although it is not an involuntary petitioner, holding an interest in New Stream Secured Capital Fund (K1), one of the involuntary debtors.

Additional details concerning unnamed parties recently added as Movants will be provided.

All Movants are parties in interest in all cases, however, since, among other reasons set forth in the Motion, it is their position that the New Stream enterprise (defined herein) should be substantively consolidated, reflecting the acknowledged *de facto* substantive consolidation of the New Stream enterprise since no later than 2007 and the use of funds from all Cayman Feeders for the benefit of bankruptcy-remote entities within the New Stream enterprise. *See* discussion at ¶¶ 137-46 below.

New Stream Secured Capital Fund D1 (Cayman), Ltd.; New Stream Secured Capital Fund F1 (Cayman), Ltd.; New Stream Secured Capital Fund G1 (Cayman), Ltd.; New Stream Secured Capital Fund K1 (Cayman), Ltd.; New Stream Secured Capital Fund M1 (Cayman), Ltd.; New Stream Secured Capital Fund P1 (Cayman), Ltd.; New Stream Secured Capital Fund T1 (Cayman), Ltd., New Stream Secured Capital Fund AC1 (Cayman), Ltd. (collectively, the "Cayman Feeders"; together, with the US Feeder, the "US/Cayman Feeders"), move the Court to enter an order:  (i) appointing a Chapter 11 trustee for the three above-captioned US/Cayman Feeders prior to the entry of an order for relief pursuant to 11 U.S.C. §§ 1104(a) and 105 and Fed. R. Bankr. P. 2007.1; or, in the alternative, (ii) appointing an examiner pursuant to 11 U.S.C. § 1104(c) and Fed. R. Bankr. P. 2007.1 (the "Motion").  In support of the Motion, the Movants respectfully represent as follows:

## I.  JURISDICTION, VENUE AND STATUTORY PREDICATE

1.  The Bankruptcy Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

2.  The statutory predicates for the relief requested herein are §§ 105(a) and 1104 of title 11, United States Code, 11 U.S.C. §§ 101 1532 (as amended, the "Code") and Rule 2007.1 of the Federal Rules of Bankruptcy Procedures (the "Rules").

## II.  PRELIMINARY STATEMENT

### A.  INTRODUCTION

3.  Movants, investors in the New Stream investment enterprise, are collectively owed over $90 million, representing roughly 28% of the approximately $320 million owed to all U.S. and Cayman investors (individually, the "US Investors" and "Cayman Investors";

collectively, the "US/Cayman Investors").[2] They are not a disgruntled group of unsophisticated investors unable to face the painful reality of a difficult investment climate and depressed asset valuations. They are mostly sophisticated investors, including so-called "funds of funds," whose moneys have been fraudulently funneled to bankruptcy-remote entities in the New Stream enterprise to preserve and even augment the collateral of purported senior lien holders in a Bermuda feeder fund, a fund which U.S. and Cayman investors had been assured would be eliminated in a restructuring of the New Stream group in 2007. The U.S. and Cayman investors were further misled with a costly 2009 "Restructuring Plan" that was a failure from the inception because, despite New Stream's misrepresentations that over 90% of investors had approved, the largest investor and the most significant assets were excluded from its scope. Now, through a proposed prepackaged plan for which votes are currently being solicited by only four strategically-selected prospective debtor entities of the New Stream group, the New Stream debtors and management, and the principal beneficiaries of purported senior liens, seek to obtain the Bankruptcy Court's imprimatur for their scheme and to obtain releases for their improprieties by majority vote obtained through woefully inadequate and misleading disclosure. This plan offers a mere pittance to the US/Cayman Investors, funded primarily with "gifts" from allegedly senior classes traceable to funds supplied by the US/Cayman Investors in the first place; gives the Bermuda feeder fund, the purported senior lien holder, the vast majority of all plan distributions; and grants releases to all wrongdoers; this after admitting to losing almost $500 million on assets that the Fund Manager (defined below) valued at $800 million less than three years ago.

---

[2] The undersigned attorneys are appearing on behalf of the named US/Cayman Investors. The number of Movants and amounts owed them is not fixed as new clients were added as Movants too recently to include in this Motion. Details will be provided in a statement pursuant to Bankruptcy Rule 2019 to be filed promptly.

**B. THE NEW STREAM ENTERPRISE –
ITS STRUCTURE AND OPERATIONS**

**1. Before the 2007 Master/Feeder Restructuring**

4. The New Stream enterprise is an interrelated group of companies that collectively constitute an investment fund. The primary operating entity for this enterprise is New Stream Secured Capital, L.P. ("NSSC"), a Delaware limited partnership, the so-called Master Fund.[3] All management, investment and administrative functions for NSSC (and its subsidiaries and affiliates) are provided by its general partner, New Stream Capital, LLC ("NSC" or the "Fund Manager"), a Delaware limited liability corporation. The New Stream entities have no employees of their own. New Stream Insurance, LLC ("NSI"), a Delaware limited liability company, one of the directly-owned subsidiaries of NSSC, owns a significant portfolio of insurance-related investments, including life insurance policies that the policy holder has sold to a third party investor, in this case, NSI (the "Life Settlement Assets").

5. NSSC, until 2006 known as Porter Secured Capital Partners, LP ("Porter Capital"), began marketing direct limited partnership interests only to U.S. investors in March 2003, as the fund documents prohibited foreign investment. *See* discussion at n.76 below. In October 2005, to circumvent this prohibition, New Stream organized what is now New Stream Capital Fund, Limited. (the "Bermuda Fund") as a Bermuda segregated accounts mutual fund company to enable foreign entities to invest in NSSC and later NSI. Investors in the Bermuda Fund (the "Bermuda Investors") made their investments in the new Bermuda Fund by purchasing shares in any of ten different segregated account classes (individually or

---

[3] This collection of investment vehicles is referred to as the "New Stream entities," the "New Stream group," "New Stream," or the "New Stream enterprise." In some self-evident contexts, "Debtors" is used to refer to the four New Stream entities not yet debtors in bankruptcy which are currently soliciting votes for a prepackaged plan of reorganization, and intend to file chapter 11 proceedings no later than March 11, 2011. *See* discussion at ¶¶ 34-45, 236-43 below.

collectively, the "Class(es)").  In turn, each Class used the proceeds to enter into a loan transaction with either the Master Fund or NSI.  As a result, each Class of the Bermuda Fund owned notes issued by NSSC or NSI and which were secured by a first lien on the issuer's assets.

6.  In June 2007 NSI became a wholly-owned subsidiary of NSSC, allegedly making the Life Settlement Assets NSSC's indirectly held assets[4].

**2.  The 2007 Master/Feeder Restructuring: What Was Promised vs. What Was Delivered**

7.  On or about November 28, 2007, in response to an avalanche of redemption requests in 2007 prompted by the Bermuda Fund's swelling senior secured debt, New Stream's failures to obtain institutionally-priced leverage (*i.e.*, well below the 10-10.5% paid to the Bermuda Fund) despite easy credit market conditions, and the resulting inability to raise additional investment funds, the Fund Manager announced that it was launching a new fund structure (the "2007 Restructuring") effective as of January 1, 2008, through the establishment of onshore and offshore feeder funds, each of which would invest directly into a master fund.  In particular, existing investors in the Master Fund (NSSC) were advised that under the new fund structure, they would have to redeem their existing investment in NSSC and use their existing direct investments to purchase new interests in the new onshore feeder fund, New Stream Secured Capital Fund (U.S.), LLC (the "US Feeder"), or any of several offshore feeder funds, one for each investor, named New Stream Secured Capital Fund (Cayman), Ltd. (collectively,

---

[4]  Whether NSSC and NSI have already been consolidated into one entity or whether the Court should substantively consolidate these entities is raised throughout this Motion.  By referring to the Life Settlement Assets as "indirectly held" by NSSC, by referring to NSSC and NSI as distinct entities (or similar language implying that NSI and NSSC are distinct entities or that the Life Settlement Assets are owned by NSI and only indirectly by NSSC), or by failing to preface all references with "allegedly" or "purportedly" (or similar language questioning the separateness of NSI and NSSC and the ownership of the Life Settlement Assets), Movants do not acknowledge the separateness of NSI and NSSC or NSI's ownership of the Life Settlement Assets and expressly reserve all objections and causes of action related to these issues.

the "Cayman Feeders").[5] In turn, the US/Cayman Feeders would invest directly into the Master

Fund or acquire its equity, directly or indirectly, based on a fixed debt/equity ratio.[6]

8. Under the new master/feeder fund structure, the Fund Manager (or its Cayman

counterpart; *see* n.22 below) would serve as the manager of all feeder funds and would continue

to serve as the fund manager and general partner of the Master Fund and NSI.

9. To induce all existing U.S. investors to use their direct investments in NSSC

to purchase indirect investments through the US Feeder, and to induce foreigners to invest in the

Cayman Feeders, the Fund Manager represented in the offering documents and reiterated in

correspondence and conversations that all existing investors in the new fund structure, both U.S.

and non-U.S., would share the "same risk-reward profile," the "same portfolio exposures," and

the "same pre-tax return," and that the US/Cayman Feeders would be the only investors in the

Master Fund.

10. Significantly, New Stream represented that the non-US investors who had

been invested in the Master Fund through the Bermuda Fund would no longer exist in the new

fund structure. This was confirmed with an attached organizational chart from which the

Bermuda Fund was wholly missing, a chart whose immediate predecessor issued only months

earlier had boldly trumpeted the Bermuda Fund's integral position among the New Stream

entities. Nothing written or spoken disclosed that the Bermuda Fund would continue to exist in

the new fund structure.

---

[5] The consecutively-named Cayman Feeders, each owned by a sole investor, differ by only one letter (A1, B1, C1, and so forth) and investor. For example, New Stream Secured Capital Fund A1 (Cayman), Ltd. was created first, and is owned by the first investor; New Stream Secured Capital Fund B1 (Cayman), Ltd. was next, owned by the next investor.

[6] The US and Cayman Feeders lent directly to NSSC. The Cayman Feeders acquired NSSC equity indirectly through New Stream Secured Capital, Inc. ("NSCI"), a Delaware corporate intermediary between the Cayman Feeders and NSSC, while the US Feeder acquired NSSC equity directly.

11.   Also significant was that New Stream failed to disclose to existing or new investors that the Bermuda Fund debt had swollen to more than a half billion dollars and had been given a senior secured position against NSSC's and NSI's assets.

12.   Assured that the senior secured position of the Bermuda Investors would be eliminated under the 2007 Restructuring, that all investments under the 2007 Restructuring in all New Stream feeder funds would be *pari passu*, and that new investments would be used by New Stream only as capital to acquire new investment assets, US Investors agreed to use $152 million in existing direct investments in the Master Fund to purchase investments in the US/Cayman Feeders and advanced $200 million in new money.  Investors in the Bermuda Fund converted at least $24.7 million to indirect investments through the Cayman Feeders.

13.   In fact, the senior secured positions of the Bermuda Fund in NSSC's and NSI's assets were not eliminated by the 2007 Restructuring.[7]  Most Classes of the Bermuda Fund refused to participate in the 2007 Restructuring and retained their senior security interests in NSSC's and NSI's assets, giving them a claim to priority in repayment over the US/Cayman Investors, whose indirect security interests in NSSC's assets held nominally by the US/Cayman Feeders were junior according to certain collateral agency agreements executed by NSC, as agent for both lender and borrower, after the 2007 Restructuring became effective. Exacerbating the original fraudulent misrepresentations was New Stream's subsequent concealment and failure to disclose that most of the Bermuda Investors had refused to participate in the 2007 Restructuring in investor materials dated as late as July 2008.  The

---

[7]   The existence, validity, enforceability, and perfection of the security interests held by the Bermuda Fund and its component segregated classes, issues not relevant to this Motion nor ripe for decision, are in doubt.  By referring to security interests "held" or "retained" (or similar language implying validity, enforceability and perfection by the Bermuda Fund and its segregated classes in NSI's and NSSC's property), or by failing to preface all references with "allegedly" or "purportedly" (or similar language questioning validity, enforceability and perfection), Movants do not acknowledge the existence, validity, enforceability, or perfection of those interests and expressly reserve all objections.

Bermuda Fund and its investors were no more forthcoming, disclosing nothing to the US/Cayman Investors while reaping the ongoing improvement of their collateral enabled by their silence.

14. The following three charts show the basic structure of the New Stream enterprise (i) immediately preceding the 2007 Restructuring; (ii) immediately following the 2007 Restructuring (January 1, 2008) *as represented*, with the Bermuda Fund eliminated and its senior secured debt converted to Cayman Feeders, and all investors *pari passu*; and (iii) immediately following the 2007 Restructuring (January 1, 2008), in *actual* form despite New Stream's misrepresentations concerning the elimination of the Bermuda Fund and its senior secured debt, with the Bermuda Fund and its seniors secured debt still in existence and the US/Cayman Feeders' debt subordinated.



## New Stream Secured Capital, LP
### Structure Under 2007 Restructuring (as Represented)
### As of January 1, 2008 (*without* Bermuda Fund)



## New Stream Secured Capital, LP
### Actual Structure Under 2007 Restructuring
### As of January 1, 2008 (*with* Bermuda Fund)



10

**3.** **New Stream's Subsequent Misrepresentations,**
   **Dishonesty, and Other Wrongful Acts**

15.   Holding a position junior to the Bermuda Fund despite New Stream's representations of *pari passu* treatment and the elimination of the Bermuda Fund under the 2007 Restructuring was bad enough.  Even more outrageous was that the Life Settlement Assets owned by NSSC and NSI which served as collateral securing the senior secured debt to the Bermuda Fund were preserved by the ongoing payment of millions of dollars of premiums every month and augmented by the acquisition of *new* Life Settlement Assets, largely with cash *from the US/Cayman Investors*, cash which upon transfer from the US/Cayman Feeders to NSSC was used to support the obligations of NSSC's woefully insolvent subsidiary NSI, which owned many of the Life Settlement Assets.

16.   New Stream's misrepresentations and failure to disclose the Bermuda Fund's senior security interest was not atypical, for dishonesty and fraud permeated many New Stream transactions.  A Ponzi-like element of New Stream's scheme was the misuse of new investments induced by the 2007 Restructuring.  Despite New Stream's assurances that new investments would be used solely for the acquisition of new investment assets, by the end of September 2008, new investment proceeds of over $200 million had been used substantially to satisfy what were 2008 redemption payments totaling over $170 million.  Those getting out just in time were paid with the funds of those defrauded into getting in too late.

17.   Another fraudulent component of New Stream's operations was the inflated values New Stream attributed to its Life Settlement Assets, NSI's principal asset and collateral for the debt owed to Gottex Funds AB ("Gottex"), a Swiss-based fund of funds and owner of the Bermuda Fund's Classes C and I.  On March 13, 2008, long-anticipated revisions to actuarial life expectancy tables were released, reflecting extended longevity and thus a material

diminution in the value of Life Settlement Assets.  Other US life settlement funds, long

anticipating the revisions, had accounted for them well before their formal issuance, enabling

the fund sector as a whole to show a positive return in 2008 of 3.99% despite the formal

issuance of the tables that year.  Yet NSC failed to take the bulk of the write-down of the value

of New Stream's Life Settlement Assets until December 31, 2008, nine months after the revised

tables were released, when it belatedly recognized a diminution in value of over 40%.

18.  New Stream's motive for failing to write down its insurance assets timely

could have been grounded in one or more of (i) *fraud*, since delaying the write-down delayed

the redemptions which would have inexorably followed, (ii) *greed*, since NSC's compensation

was a direct function of assets under management, or (iii) *incompetence and gross

mismanagement*.  Nowhere on the spectrum between gross mismanagement and fraud will New

Stream find a defense to the appointment of a Chapter 11 trustee.

19.  New Stream's principal goal always was to maintain its asset base, and it

deployed every available means, honest or not, to do so.  In late 2007 and 2008 NSC received

hundreds of millions of dollars of redemption requests which could not be satisfied in the

ordinary course of business.  To induce investors to withdraw their redemption requests and to

maintain the façade of financial health, NSC insisted that overall redemption levels remained

normal, that sufficient liquidity existed to satisfy redemption requests in the normal course of

business, that much new money was being raised, and that New Stream's overall investment

performance was very good despite a very difficult investment climate.  Each of these

representations was false.

20.  The falsehoods not only caused investors to withdraw their redemption

requests (or not to redeem in the first place) but enabled the Fund Manager to receive an

12

outlandish management fee based both on the dollar amount of assets under management and inflated valuations. Had the redemption requests simply been honored, assets under NSC's management would have dropped precipitously, causing a corresponding drop in NSC's management fee. But NSC ensured that its management fee remained robust at the expense of the truth and its fiduciary obligations to the US/Cayman Investors.

21. Some of New Stream's activities set forth at length herein could have been the result of mere incompetence or gross mismanagement. Not everything need be grounded in fraud or dishonesty to provide the requisite "cause" for the appointment of a Chapter 11 trustee. The over-market terms New Stream paid on the Bermuda Fund debt since October 2005 demonstrate, at a minimum, gross mismanagement. The Bermuda Investors received a fixed rate of return of 10.0% to 10.5% on their secured notes, rates comparable to the historical return reported to the junior and unsecured investors of New Stream. NSC had allowed these senior secured investments, which had not been fully disclosed to existing US Investors and which new investors knew nothing about, to grow dramatically between 2005 and 2008; in 2005, the Bermuda Fund investments made up less than 10% of the investments in the New Stream enterprise; by 2008, that proportion had grown to 75%. Thus, unbeknownst to the US/Cayman Investors, who were not informed that the Bermuda Fund's security interest had survived the 2007 Restructuring, NSC's practice of paying over-market returns to swelling senior secured debt guaranteed that any "profits" from New Stream's operations would be consumed by the Bermuda Investors in the form of interest payments of approximately $54 million every year.

22. Other manifestations of gross mismanagement were prompted by New Stream's constant attempts to shore up its finances. NSC substantively consolidated the

finances of the various New Stream entities, using NSSC to pay more than $300 million of NSI's debts and expenses without requiring consideration or even documentation. NSC also provided internal information to Gottex, the largest secured investor among the segregated classes of the Bermuda Fund, which enabled Gottex to improve its position while maintaining its priority over the US/Cayman Investors.

### 4. The 2009 Restructuring and The Gottex Judgment Voiding It

23. In response to the avalanche of redemptions placed by its investors beginning in 2007 (which precipitated the 2007 Restructuring) and continuing throughout 2008, in mid-December 2008, New Stream gave notice that it was retroactively suspending redemptions that were not effective on or before September 30, 2008.

24. According to New Stream itself, by April 2009, hundreds of millions of dollars in redemption demands were outstanding and could not be paid.[8] To remedy the financial and structural chaos that had resulted from the US/Cayman Investors' reliance on New Stream's misrepresentations about the new fund structure, New Stream proposed a new restructuring (the "2009 Restructuring") intended primarily to enable the Fund Manager to pay the premiums for the Life Settlement Assets – then more than $60 million a year – until they could be sold in a better market. But New Stream failed to communicate that the Life Settlement Assets, which were the source of 70% of the proceeds to be liquidated, were NSI's assets, not NSSC's, and were claimed by Gottex as its collateral. Without Gottex's consent, the 2009 Restructuring was a waste of time and money.

---

[8] *See* Webinar (defined herein) (Ex. 15), p. 6, which provides that pre-October 1, 2008 pending redemptions were $192 million and post-October 1, 2008 pending redemptions were $695 million. It is unclear whether the $695 million total refers to redemptions that were actually submitted by investors or to all investors who did not have effective redemptions pre-October 1, 2008.

25.   Under the 2009 Restructuring, in consideration for investors agreeing to forbear from exercising rights and remedies in connection with their redemption requests, New Stream agreed to implement a liquidation plan that provided for, among other things, (i) intermittent payments to both Bermuda and US/Cayman Investors from so called "unrestricted cash" according to a certain ratio, and (ii) payment by the Bermuda Fund of an allocable portion of the Fund Manager's operating expenses and management fee.

26.   Gottex, the largest investor in the Bermuda Funds and sole owner of shares relating to Classes C and I, did not consent to the 2009 Restructuring.  In response to New Stream's expressed intent to impose the 2009 Restructuring on Gottex despite its lack of consent, Gottex brought litigation in the Supreme Court of Bermuda seeking (i) a determination that the 2009 Restructuring was void as to the Class C, F and I Classes of the Bermuda Fund, and (ii) the appointment of a receiver for the Class C, F and I Classes (the "Gottex Proceeding").

27.   Gottex prevailed.  Rejecting outright NSC's suggestion that it could retain management control over its investors' assets in furtherance of a restructuring where real conflicts of interests had been brought into play and objections interposed, the Bermudan Court voided the 2009 Restructuring as to the Class C, F, and I Classes of the Bermuda Fund and wrested control of those Classes from NSC, appointing joint receivers (the "Receivers") on the spot, *See* Judgment entered in *BNY AIS Nominees Ltd., et al. v. New Stream Fund Ltd.,* Supreme Court of Bermuda (2009: No. 178), entered May 27, 2010 (the "Gottex Judgment") (Ex. 50).

28.   Thereafter, receivers were appointed for the non-C, F, and I Classes of the Bermuda Fund from the Bermuda Supreme Court.  And in September 2010, in response to the Receivers' joint motion, they were appointed joint liquidators (the "Liquidators").  The Fund Manager thereafter volunteered to pay the counsel fees for the Liquidators, whose fiduciary

responsibility includes the obligation to maximize returns exclusively for the Bermuda Investors.

29.  As a result of the Gottex Judgment, no consideration ever passed under the 2009 Restructuring.  New Stream never made the redemption payments it agreed to make – although in 2009 it did pay almost twice the projected fees and expenses ($27 million vs. $15 million), largely to the Fund Manager – and the Bermuda Fund never paid its allocable portion of the Fund Manager's operating expenses and management fee.  In numerous communications in 2010 and 2011, New Stream consistently referred to the 2009 Restructuring as "fatally flawed" and incapable of performance.

## C.  THE URGENT NEED TO APPOINT A CHAPTER 11 TRUSTEE

### 1.  Conflicts Preclude Pursuit of Claims

30.  New Stream's malfeasance gives rise to many causes of action that can be brought for these and affiliated estates' benefit.  Described in detail below are actions sounding in substantive consolidation among these debtors and other non-debtor (so far) affiliates, including NSSC and NSI; constructive fraudulent conveyance against NSI, the initial transferee of NSSC's largesse, or against Gottex, the largest beneficiary thereof; avoidance of Gottex's lien and equitable subordination of Gottex's claim; and constructive trust in favor of the US/Cayman Feeders imposed against the purported collateral of the Bermuda Fund owned by NSI or NSSC, collateral that was augmented and preserved primarily with cash transferred from the US/Cayman Feeders to NSSC.  Moreover, the circumstances surrounding the security allegedly held by the Bermuda Fund and its Classes in NSI's and NSSC's Life Settlement Assets must be investigated, as any such security interest does not appear to be perfected.

31.  But the conflicting relationships between and among the Debtors, NSC, NSSC, NSI and Gottex, and these parties' deep and often undisclosed involvement in the

16

transactions underlying these claims, disables any of *these* parties from protecting the estates' interests by prosecuting these claims. That New Stream hired a Chief Restructuring Officer prepetition in anticipation of filing voluntary Chapter 11 petitions does not supply the requisite new blood, since the CRO takes his instructions from New Stream's board of directors and thus is neither disinterested nor uninvolved.

32. Probative of these disabling conflicts are the observations of the Bermuda Supreme Court that New Stream's actions were contrary to Bermuda law and the Bermuda Fund's bye-laws. The Court granted the relief sought by Gottex, appointing the Receivers based on its observations that NSC, the investment manager for all New Stream entities, had proven itself incapable of representing the different and conflicting creditor interests which had arisen as a result of the then-acknowledged insolvency of the New Stream enterprise. And those Receivers, appointed liquidators in September 2010, having become all too familiar with New Stream's operations, immediately terminated the Bermuda Fund's management agreement with NSC and notified New Stream that they would retain their own choice of management to manage the property they deemed to be the Bermuda Fund's collateral.

33. In addition, there are ongoing investigations by the SEC and the FBI into actions of either NSC or the entire New Stream enterprise. Pursuant to the Plan a $2 million "GP Administrative Reserve" will be established from proceeds of the sale of the Life Settlement Assets to fund NSC's defense of these investigations. These facts on their own constitute a crippling conflict of interest for NSC.

**2. New Stream's Prepackaged Plan and Disclosure Statement**

34. The appointment of a Chapter 11 trustee is made all the more urgent because New Stream's management and the Liquidators have distributed a prepackaged joint plan of liquidation (the "Plan") along with a disclosure statement (the "Disclosure Statement") for

17

which they are currently soliciting support, which they propose to confirm immediately

following the filing of voluntary Chapter 11 petitions by NSSC, NSI, NSCI and NSC no later

than March 11, 2011.[9]

36. The Plan continues the disenfranchisement of the US/Cayman Investors,

recognizing only the US/Cayman Feeders, all controlled by New Stream, as creditors of the four

proposed debtors, while ignoring the US/Cayman Investors themselves, those with the ultimate

economic interests.[10]

36. The Movants filed these involuntary petitions and this Motion to put a stop to

the fraud being perpetrated by New Stream. Yet by soliciting votes on the Plan, the New

Stream debtors are committing another fraud on the US/Cayman Investors in an effort to secure

releases for insiders and other malefactors and give a windfall to the Bermuda Investors at the

expense of US/Cayman Investors. And New Stream intends to file its prepackaged bankruptcy

in this district and ask this Court to bless the latest fraud.

37. There are three blatant problems with the Plan. First, the Bermuda investors

are getting far too much value on account of their allegedly senior secured position, because

(a) the US/Cayman Investors relied on New Stream representations that all investors would be

treated *pari passu*, (b) money invested by the US/Cayman Investors was used to purchase and

maintain the collateral subject to the lien of the Bermuda Fund, (c) causes of action to rectify

---

[9]   *See* Disclosure Statement in Connection With the Prepetition Solicitation of Votes in Respect of the Joint Plan of
    Reorganization Under Chapter 11 of the Bankruptcy Code, dated January 24, 2011 (the "Disclosure Statement"),
    attached as Exhibit 13 to the Green Decl.; Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy
    Code, dated January 24, 2011 (the "Plan"), attached as Exhibit 14 to the Green Decl.

[10]  Because the New Stream group was structured to be bankruptcy-remote – *i.e.*, the principal operating and asset-
    holding entities owe direct debt only to entities under the group's control – involuntary petitions have been filed
    only against the US/Cayman Feeders out of an abundance of caution. The US/Cayman Investors, several of
    whom are the involuntary petitioners herein, indirectly invested in the New Stream group through the US/Cayman
    Feeders, all of which are creditors of the Master Fund through which investments flowed to the other New Stream
    entities, including NSI, NSSC's wholly-owned subsidiary.

these injustices are being released under the Plan without adequate consideration, and (d) the Bermuda Fund does not appear to have a perfected security interest in the Life Settlement Assets that are being sold for approximately $127.5 million, and thus should not receive all of the net proceeds of such sale.  Second, the assets being distributed to the US/Cayman Investors are grossly overstated in value.  Third, insiders are receiving an unwarranted bonanza:  (a) they are being released without any consideration, (b) $2 million is being set aside for management to respond to an ongoing SEC investigation, as well as any future administrative, regulatory or criminal investigation against the Debtors or their former or current managers, officers, directors and employees, and to pay defense costs if not paid by insurance carriers, (c) the Debtors will assume their obligations to indemnify their managers, officers, directors and employees, thus elevating an otherwise unsecured claim that is out of the money, and (d) the attorney-client privilege is being preserved, which will likely benefit insiders and hinder investigations into insider malfeasance.

       38.   Significantly, the Disclosure Statement utterly fails to disclose that assets were regularly commingled and that since 2007 more than $300 million has been transferred from NSSC to NSI to buy and maintain life insurance assets that serve as the Bermuda Funds' collateral.  The Disclosure Statement is equally silent concerning NSSC's payment of over $25 million of NSI's expenses and New Stream's concession that NSI had no ability to pay its own expenses or function as an independent entity.  In 2010, NSC's President, J. Perry Gillies, submitted an affidavit in the Gottex Proceeding in Bermuda defending against Gottex's claims by asserting that in a Chapter 11 case, creditors would be able to successfully assert substantive consolidation and equitable subordination claims to equalize the distribution of assets.  Yet the

Disclosure Statement is silent on these critical issues that were so strenuously advocated by New Stream just months ago.

39.     The transactions described by Gillies bolstered the position of the Bermuda Investors with money supplied to NSSC by the US/Cayman Investors, at a time when New Stream was representing that all investors would be treated *pari passu*.  These and other facts the Movants have developed militate in favor of substantive consolidation, equitable subordination and other equitable remedies such as the imposition of a constructive trust.  In the absence of substantive consolidation, Movants would insist that the funds transferred from NSSC to NSI be recovered as fraudulent conveyances or that intercompany claims (which receive no distribution under the Plan) be honored for the benefit of the US/Cayman Investors. The Disclosure Statement fails even to *disclose* the existence of these causes of action and how prosecution thereof would significantly enhance the recovery of US/Cayman Investors.

40.     The Disclosure Statement also misleads the US/Cayman Investors about their distribution in two principal ways.  First, the Plan offers US/Cayman Investors up to $15 million in "gifts" from the Bermuda Investors and the nominee of MIO Partners, Inc. ("MIO"), a proposed purchaser of assets under the Plan, to cajole their acquiescence, but fails to disclose that these "gifts" are being paid from assets funded by the US/Cayman Investors which can be reached under the aforementioned legal theories.  What appears to be New Stream's carrot is really its stick, as the Debtors solicit the US/Cayman Investors support by withholding most of the "gifts" to those who do not vote for the Plan.  Second, the allegedly most significant asset being distributed to US/Cayman Investors is the equity in a company called Northstar Financial Services Ltd. ("Northstar"), a Bermuda-based life and annuity insurance company.  The Disclosure Statement values Northstar at $40 million, but fails to disclose that in March 2010,

Gillies submitted an affidavit in the Gottex Proceeding in which he tried to convince the Bermuda Court that the Bermuda Investors should not be permitted to foreclose on Northstar because it had little or no value. Gillies testified: "Far from generating cash by disposing of the company, effecting a forced sale of Northstar in April 2009 would probably have required NSI to pay the purchaser roughly between US$40 and US$75 million."[11]

41. Besides obtaining recoveries from assets, US/Cayman Investors will benefit from asserting litigation claims against third parties, including insiders and auditors. The Plan, however, provides a broad release for the Debtors, insiders, the Liquidators and Receivers appointed on behalf of the Bermuda Fund, MIO, and each of their respective officers, directors, members, employees, agents, advisors and professionals. This release will be given on behalf of both the Debtors and any creditor entitled to vote, provided such creditor did not vote to reject the Plan. Yet, astonishingly, there is absolutely no disclosure of any facts to enable creditors to make an informed decision, no mention of the claims that would be released under the Plan.

42. Movants are concerned that the only reason that MIO, an affiliate of McKinsey & Co., holder of an approximately $75 million unsecured claim against the US/Cayman Feeders, is supporting the Plan is because MIO is getting a "sweetheart deal" on the sale of the life insurance settlement and premium finance loan portfolio.

43. In short, the Plan presents a woefully inadequate division of available assets, and the Disclosure Statement attempts to mislead US/Cayman Investors into accepting an inequitable result so that the Bermuda Fund can procure a windfall for the Bermuda Investors and New Stream management and other malefactors can obtain releases.

---

[11] *See* Second Affidavit of Perry Gillies, submitted in *BNY AIS Nominees Ltd., et al. v. New Stream Capital Fund Limited*, Supreme Court of Bermuda (2009: No. 178) (the "Gottex Proceeding"), sworn to March 17, 2010 ("2nd Gillies Aff."), ¶ 38 (Ex. 16).

SL1 1042350v16/106114.00001

44.  Simply put, the Bermuda Investors, the Liquidators and New Stream management are working together to benefit themselves improperly at the expense of the US/Cayman Investors.

45.  NSC has indicated that should a prepackaged plan of liquidation not be agreed upon during this solicitation period, it intends to file a Chapter 11 petition and immediately seek approval to sell the NSI insurance assets pursuant to Section 363 under the same terms to MIO. The arm's-length nature of that proposed purchase must be investigated before that sale, whether under the Plan or pursuant to § 363, can be allowed to proceed.

46.  In summary, neither the Debtors nor their principals should be left in charge of these estates.  Fraud, gross incompetence, and rampant conflicts of interest disqualify these Debtors from controlling their own destiny before this Court.  A Chapter 11 trustee or an examiner must be appointed immediately so that the improprieties detailed in this Motion are not covered up, so that the claims against the Debtors, their principals, Gottex and the Bermuda Fund are investigated and pursued, so that all creditors are treated fairly, and so that the integrity of this judicial process is maintained.

## III. FACTUAL BACKGROUND

47.  For the supporting factual background of this Motion, US/Cayman Investors respectfully refer the Court to the Declarations of David M. Green, Irvin D. Yalom (Ex. 1), Robert Shostak (Ex. 2), Jean Y. Rose (Ex. 3), Laurence Latta (Ex. 4), Christopher John Meredith (Ex. 5), Robert Jan van Hoorn (Ex. 6), Matthew Thorley (Ex. 7), Glen Cremer (Ex. 8),

Matthew Ridley (Ex. 9), Joseph Umbach (Ex. 10), Tricia Ward (Ex. 11) and Roy Callahan (Ex. 12) filed contemporaneously with this Motion, which are incorporated herein.[12]

## IV. BASIS FOR RELIEF REQUESTED

### A. Appointment Of A Trustee Before Entry Of Order For Relief Is Appropriate

48. A trustee may be appointed for cause at any time after the filing of the involuntary petition – including during the "gap period" between the filing of the involuntary and the entry of an order for relief. The filing of the involuntary petition commences the case and therefore triggers the application of Section 1104 of the Code. *See In re Professional Accountants Referral Servs., Inc.*, 142 B.R. 424, 429 (Bankr. D. Colo. 1992); COLLIER ON BANKRUPTCY ¶ 303.29 (15th ed. 2010) (same). Section 105 of the Code provides additional support for appointing a Chapter 11 trustee during the gap period. *Professional Accountants Referral Servs.*, 142 B.R. at 430 (asserting that "if necessary, the exercise of [the Court's] equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period.").

49. To appoint a trustee in an involuntary Chapter 11 case prior to entry of an order for relief, the Court must find a reasonable likelihood that the Debtor will be found to be a proper involuntary debtor under 11 U.S.C. § 303 and that an order for relief will be entered. *Professional Accountants Referral Servs., Inc.*, 142 B.R. at 429.

50. Section 303(h) provides that an order for relief shall be entered in an involuntary case if the debtor is generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute. 11 U.S.C. § 303; s*ee also Shinko v. Miele*, 29 Fed.

---

[12] Exhibits to all accompanying declarations and this Motion are annexed to the Declaration of David M. Green (the "Green Decl.") submitted with this Motion. All exhibits are generally numbered in the order cited in this Motion. For ease of reading, citation protocol is that exhibits are identified with (Ex. #), the number referenced in the Green Decl., following the first citation in each paragraph in which it is cited in this Motion. Subsequent citations in the same paragraph will contain only the name of the exhibit, not its identifying number.

Appx. 890 (3d Cir. 2002); *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65 (3d Cir. 1989).

51.  Section 303(b) provides the following additional requirements:

An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $10,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724 (a) of this title, by one or more of such holders that hold in the aggregate at least $10,000 of such claims.

11 U.S.C. § 303(b).

52.  Bankruptcy Code Section 101(5) provides that the term "claim" means "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured…." 11 U.S.C. § 101(5)(A).

53.  Thus, for each involuntary debtor, the requisite number of holders of claims that are not contingent as to liability or the subject of a bona fide dispute as to liability or amount must be petitioning creditors.  Here, the US Feeder may have more than twelve creditors, thus potentially requiring three petitioning creditors; each of the Cayman Feeders has fewer than twelve creditors, thus requiring only one petitioning creditor for these entities.[13]

---

[13] *See* Declarations of Irvin D. Yalom (Ex. 1), Robert Shostak (Ex. 2), Jean Y. Rose (Ex. 3), Laurence Latta (Ex. 4), Glen Cremer (Ex. 8) and Matthew Ridley (Ex. 9) for circumstances underlying the debt owed by each involuntary Debtor to each petitioning creditor.

54. The application of these standards to these three involuntary debtors is straightforward. Upon information and belief, the debtors' sole debts are owed to the US/Cayman Investors, who previously held redeemable shares in the debtors, equity which has been converted into debt, and the investors into creditors, by redemption demands which have "crystallized." In industry parlance, a "crystallized" redemption demand is one for which proper demand was made and the demand became effective under the terms of the respective debtor's operating agreement. Each of the involuntary petitioners in these involuntary cases holds a crystallized redemption demand (under the terms of the applicable debtor's operating agreement) that is unpaid. Thus, each such petitioner is a creditor, and each debtor is generally not paying its debts as they become due. *See* 6 Del. C. § 16-606 (governing rights to distributions in Delaware partnerships); 6 Del. C. § 18-215 (governing rights to distributions in Delaware limited liability companies); *see also In re Global Ship Systems, LLC*, 391 B.R. 193 (Bankr. S.D. Ga. 2007) (applying Georgia law while looking to the LLC operating agreement to determine entitlement to file an involuntary petition); *In re Andersen*, 166 B.R. 516, 524 (Bankr. D. Conn. 1994) (same, applying Connecticut law); *Culross Global SPC Ltd. V. Strategic Turnaround Master Partnership Ltd* [2010] UKPC 33 (same, applying Cayman Islands law to investor's right to issue a winding-up petition against an investment fund based on the fund's inability to pay a debt due under its redemption notice) (Ex. 17).[14]

---

[14] Any suggestion that the involuntary petitioners relinquished their status and rights as creditors by consenting in 2009 to an agreement to forbear from asserting those rights can be summarily dismissed by reference to New Stream's own press release in which it acknowledged that the 2009 Restructuring, of which the forbearance was an integral component, had been "fatally impacted" by the decision of the Bermuda Court (*see* discussion at ¶¶ 26-29 below), necessitating New Stream's orderly wind-down and the upcoming filing of its reorganization proceedings which are inconsistent with the terms of that 2009 Restructuring. *See* "New Stream Capital Announces Agreement with Bermuda Investor Classes Providing for Orderly Wind-Down of Funds," published in Business Wire, December 2, 1010 (Ex. 18). The Liquidators for the non-C, F, and I Classes testified to the same effect before the Bermuda Supreme Court in support of their application for a determination that the 2009 Restructuring was void, contending that it could not be implemented and therefore did not bind them; that in view of the Gottex Judgment, the 2009 Restructuring as implemented would be different from the plan to which

55. Once the Court finds that there is a reasonable likelihood that an order for relief will be entered, the analysis for the appointment of a Chapter 11 trustee is the same prepetition as post petition.

> In this case there has been the commencement of an involuntary case by the filing of the Involuntary Petition. Section 1104(a), by its terms, does not require the entry of an order for relief prior to appointment of a trustee. Indeed, the plain language of subsection 1104(a) specifically allows for appointment of a trustee in the gap period. The section provides for a trustee's appointment " [a]t any time after commencement of the case ..." (emphasis added).
>
> If Congress had intended to preclude the ability of a court to appoint a Chapter 11 trustee under 11 U.S.C. 1104 during the gap period, between the filing of an involuntary petition and the entry of the order for relief, then Congress easily could have provided for it. Congress did not. Consequently, this Court finds that it has the statutory authority to appoint a trustee during the gap period.
>
> This Court further believes that, if necessary, the exercise of its equitable powers under 11 U.S.C. § 105 allows for the appointment of a trustee during the gap period. Extraordinary circumstances allow for such special authority. *See In re Unioil*, 948 F.2d 678, 682 (10th Cir. 1991).

*Professional Accountants Referral Servs.,* 142 B.R. at 429 (emphasis in original); *see also In re C.W. Mining Co.*, 2008 WL 3539795 (Bankr. D. Utah); *In re PRS Insurance Group, Inc*, 274 B.R. 381 (Bankr. D. Del. 2001).

56. Because the petitioning creditors hold undisputed debts sufficient in number and amount against each involuntary Debtor, there is a reasonable likelihood that an order for relief will be entered in each of these cases. Therefore, the appointment of a Chapter 11 trustee during the involuntary "gap period" is appropriate.

---

investors consented; and that there was a complete failure of consideration. *See* Fourth Affidavit of Michael W. Morrison, sworn to November 12, 2010, submitted in *BNY AIS Nominees Ltd., et al. v. New Stream Capital Fund Limited*, Supreme Court of Bermuda (2010: No. 190 and 2009: No. 178 and No. 374), ¶¶ 4-15 (Ex. 19).

## B.  **THE FACTS SUPPORT APPOINTMENT OF A CHAPTER 11 TRUSTEE**

### 1.  **The Statute, Its Purposes, and the Applicable Standards**

57.  The protection of creditors from management's fraud, dishonesty, gross mismanagement or incompetence represents one of the most basic tenets of the Code. The provisions of the Code and plain common sense dictate that New Stream management cannot be left in possession of its assets and in control of this reorganization process.

58.  Section 1104 of the Code governs the appointment of a trustee in a Chapter 11 proceeding.  It provides, in pertinent part:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –
>
>> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or for similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; [or]
>>
>> (2) if such appointment is in the interest of creditors, any equity security holders and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor …

11 U.S.C. § 1104(a).

59.  "[T]he twin goals of the standard for appointment of a trustee should be protection of … the interests of creditors … and facilitation of a reorganization that will benefit both the creditors and the debtors …."  H.R. Rep. No. 595, 95th Cong., 1st Sess. 232 33 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6192.

60.  The Court determines whether the moving party has proven the need for a trustee by "clear and convincing evidence."  *Official Comm. of Asbestos Claimants v. G-I Holdings, Inc. (In re G-I Holdings, Inc.)*, 385 F.3d 313, 317 18 (3rd Cir. 2004) (*quoting*

*In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3rd Cir. 1998)). Once the "clear and convincing" standard is satisfied, however, the Court's discretion is subject to the statute's mandate: The court *must* appoint a trustee. *Id.* at 319 20; *Oklahoma Refining Co. v. Black (In re Oklahoma Refining Co.)*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re Deena Packaging Indus. Inc.*, 29 B.R. 705, 706 (S.D.N.Y. 1983).

61. Where there is doubt about management's ability to carry out its fiduciary duties, appointment of a trustee is the appropriate remedy. *See, e.g., Professional Accountants Referral Servs.*, 142 B.R. at 429; *Variable-Parameter Future Dev. Corp. v. Comerica Bank Cal. (In re Morpheus Lights, Inc.)*, 228 B.R. 449, 454 (Bankr. N.D. Cal. 1998); *Hirsch v. Penn. Textile Corp., Inc. (In re Centennial Textiles, Inc.)*, 227 B.R. 606, 612 (S.D.N.Y. 1998).

62. "In the appropriate case, the appointment of a trustee is a power which is crucial for the Court to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interest of creditors are served." *In re Intercat, Inc.*, 247 B.R. 911, 920 (Bankr. S.D. Ga. 2000); *see also In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 525 (Bankr. E.D.N.Y. 1989) ("[s]ection 1104(a) represents a potentially important protection that courts should not lightly disregard or encumber with overly protective attitudes towards debtors-in-possession").

## 2. Appointment Of Chapter 11 Trustee Is Compelled For Cause

63. The Debtors' management's fraudulent behavior, dishonesty, lack of credibility, acknowledged gross mismanagement, and acknowledged conflicts of interest are "cause" mandating the appointment of a Chapter 11 trustee in these cases. These Debtors cannot be trusted to administer these cases honestly, competently, and without bias. They have not done so since the Bermuda Fund was established in 2005, and there is no reason to believe

that would change under the watchful eye of this Court, where mere laws, morality, SEC supervision, and FBI investigation have proven an unsuccessful constraint in the past.

64. Without an operational history that engenders confidence that management can carry out its fiduciary duties, management cannot remain in possession. *See In re V. Savino Oil*, 99 B.R. at 526 ("The willingness of Congress to leave a debtor in possession is premised on an expectation that current management can be depended upon to carry out the fiduciary responsibilities of a trustee. And if the debtor-in-possession defaults in this respect, § 1104(a)(1) commands that stewardship of the reorganization effort must be turned over to an independent trustee").

65. The standard for appointment of a trustee for "cause" under § 1104(a)(1) is adaptable to the limitless factual circumstances which could come before the Court, so § 1104(a)(1)'s examples of "cause" are not exhaustive. *See id*. at 525. Rather, a determination of cause "is within the discretion of the court [based on] various interests involved in the bankruptcy proceeding." *In re Bellevue Place Assocs.*, 171 B.R. 615, 623 (Bankr. N.D. Ill. 1994); *see also Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239, 242 (4th Cir. 1987). Prepetition activity may be considered. *See In re Oklahoma Refining Co.*, 838 F.2d at 1136; *see also In re Rivermeadows Assocs., Ltd.*, 185 B.R. 615, 619 (Bankr. D. Wyo. 1995) (observing that "the Code is clear that the prepetition conduct of the debtor's management may be the sole deciding factor").

66. Most often, "cause" is found in the form of "gross mismanagement and incompetence." *In re Sharon Steel*, 86 B.R. 455, 458 (Bankr. W.D. Pa. 1988). But other factors are part of the equation, including (a) conflicts of interest, including inappropriate relations between corporate parents and subsidiaries; (b) misuse of assets and funds; (c) inaccurate and

inadequate record keeping and reporting; (d) non-filing of required documents, including lack of adequate disclosure; (e) fraudulent or dishonest conduct; (f) failure to make required payments; (g) lack of credibility and creditor confidence; and (h) acrimony and deep-seated animosity between the debtors and their creditors. *In re Clinton Centrifuge, Inc.*, 85 B.R. 980 (E.D. Pa 1988).

67. Of particular interest here, an unwillingness or inability of management to pursue estate causes of action has been deemed "cause." *See Intercat*, 247 B.R. at 920 21; *Morpheus Lights*, 228 B.R. at 454; *see also In re Ridgemour Meyer Props., LLC*, 413 B.R. 101, 113 (Bankr. S.D.N.Y. 2008) (finding that debtor's principal was not a trustworthy fiduciary and could not be counted on to "conduct independent investigations [on behalf of the estate] of questionable transactions in which [he was] involved"); *PRS Insurance Group*, 274 B.R. at 381 (finding it "unrealistic" to assume that the debtor would pursue causes of action against its principal). And conflicts of interest arising from the mere corporate structure of the debtor entities can supply "cause." *In re Cajun Electric Power Cooperative, Inc.*, 74 F.3d 599 (5th Cir. 1996) (*adopting on rehearing the opinion of dissent in* 69 F.3d 746, 751). *See generally In re Fiesta Homes of Georgia, Inc.*, 125 B.R. 321, 325 (Bankr. S.D. Ga. 1990); *In re Microwave Products America, Inc.*, 102 B.R. 666, 672 (Bankr. W.D. Tenn. 1989).

68. Finally, as is self-evidently present in this case, "cause" can result from exceptional antagonism and mistrust between the debtor's management and creditors. Where the district court below had found "conflict and animosity" between the debtor and its creditors and a resulting lack of confidence in the debtor's ability to serve as a fiduciary, the Third Circuit in *Marvel* observed that a "court may find cause to appoint a trustee for acrimony … when the inherent conflicts extend beyond the healthy conflicts that always exist between debtor and

creditor, or … when the parties begin working at cross-purposes." 140 F.3d at 472-73 (citations omitted); *Cajun Elec. Power Coop. v. Cent. La. Elec. Coop. (In re Cajun Power Coop.)*, 74 F.3d 599 (5th Cir. 1996); *In re Nat'l Farm Fin. Corp.*, 07-31580-TEC, 2008 Bankr. LEXIS 398, at *5 (Bankr. N.D. Cal. Feb. 12, 2008) (citing *Marvel*).

69. *Every factor cited above as illustrative of "cause" is present here.* This extensive menu of factors, spanning the spectrum from the most benevolent incompetence to the most malevolent fraud, encompassing both structural conflicts and behavioral ones and stretching from a mild distrust among the parties to extreme and disabling acrimony, each of which is sufficient cause and cumulatively all of which are compelling cause, mandates the appointment of a Chapter 11 trustee to oversee and manage these Debtors' affairs.

### (a) Prepetition Fraud, Dishonesty, Incompetence and Gross Mismanagement are "Cause" to Appoint a Trustee

#### (1) The Debtors' Fraudulent Failure to Disclose the Bermuda Fund's Continuing Existence and Security Interest, and Misrepresentations About *Pari Passu* Treatment Among All Investors Constitute "Cause"

70. In November 2007, NSC announced the 2007 Restructuring of the New Stream Group. The new master/feeder structure was to be comprised of several investment entities, including two onshore entities: NSSC, the so-called "Master Fund," and its wholly-

owned subsidiary NSI.[15]  Prior to the 2007 Restructuring, the Bermuda Investors, through the

Bermuda Fund, had lent funds to NSSC and its wholly-owned subsidiary[16], NSI, on a secured

basis, mostly unknown to existing US Investors.  Bermuda Fund segregated Classes C, F and I

(the "C, F, and I Classes"),[17] of which Gottex was the majority owner, asserted blanket senior

liens against NSI's assets, and the remaining Bermuda Fund segregated Classes (the "Non-

Insurance Classes" or the "Non-C, F and I Classes") asserted blanket senior liens against

NSSC's assets.  Other investors from the U.S. and overseas had invested in and lent directly to

NSSC.  For the purported reason of reducing NSSC's leverage,[18] the 2007 Restructuring

provided that all investments and loans (except for small bank loans), both existing and new,

would become indirect investments in newly-established U.S. and Cayman Feeders

---

[15] According to Perry Gillies, the President of New Stream Capital, LLC ("NSC"), the Fund Manager of both NSSC and NSI, NSSC is a Delaware limited partnership which primarily made loans to private corporate borrowers in North America.  It predominantly invested in asset-based loans backed by inherently illiquid assets such as real estate, life insurance policies, oil and gas interests, and general corporate assets.  NSSC began marketing direct limited partnership interests to US investors in March 2003.  *See* First Affidavit of Perry Gillies, submitted in *BNY AIS Nominees Ltd., et al. v. New Stream Capital Fund Limited*, Supreme Court of Bermuda (2009: No. 178) (the "Gottex Proceeding"), sworn to February 24, 2010 ("1st Gillies Aff."), ¶¶ 1, 15-18 (Ex. 20).  NSC is beneficially owned by its managing members, David Bryson ("Bryson"), Donald Porter ("Porter"), and Bart Gutekunst ("Gutekunst"), who jointly constitute NSSC's senior management team.  NSSC's limited partners are the US Feeder and NSCI, and its general partner is NSC.  *See* Disclosure Statement, § V.B.3, p. 56 (Ex. 13)

Also according to Gillies, NSI, a Delaware limited liability company, was focused on investing in life insurance products, particularly life settlements and premium finance loans.  A life settlement is a life insurance policy that the policy holder has sold to a third party.  The third party makes premium payments and receives the death benefit upon maturity.  These assets require periodic payments of premiums by NSI to keep those policies in effect.  The other part of NSI's business model involves making loans to finance the premiums on life insurance policies.  In the event of non-payment, NSI would foreclose on the insurance policy, converting that premium finance loan into a life settlement.  1st Gillies Aff., ¶ 19 (Ex. 20).

[16] NSI did not become a wholly-owned subsidiary of NSSC until June 1, 2007.  *See* n.96 below.

[17] The Bermuda Fund is incorporated in Bermuda and registered under section 6 of the Segregated Companies Act of 2000.  1st Gillies Aff., ¶ 24 (Ex. 20).

[18] *See* 1st Gillies Aff., ¶ 41 (Ex. 20).  NSC has presented several conflicting reasons for this restructuring.  For example, NSC represented to US Investors that the primary reason was to offer tax benefits to foreign investors.  *See* discussion at ¶ 89 below.

32

(collectively, the "US/Cayman Feeders").[19]  Under the new fund structure, the US/Cayman Feeders would automatically funnel their assets to NSSC.  The advances from the US/Cayman Feeders to NSSC would take the form of 80% debt and 20% equity.[20]

71.  In formal documentation implementing the 2007 Restructuring, including private placement memoranda for the US/Cayman Feeders and NSSC,[21] and in all written and oral communications with NSC and New Stream Capital (Cayman) Ltd. ("NSC (Cayman)"),[22] the principals and managers of various New Stream entities including the US Feeder, the Cayman Feeders, NSSC and NSI, either omitted any mention of the Bermuda Fund and its senior secured debt or stated unequivocally that the Bermuda Fund and its senior secured debt would be eliminated in the 2007 Restructuring, that the investors in the Bermuda Fund (the "Bermuda Investors") would either convert to the Cayman Feeder or redeem their interests, that all remaining investments by all creditors of all entities in the New Stream group would be treated *pari passu* with identical risk/reward profiles, and that the debt owing to the US/Cayman Feeders would not be subordinated.

---

[19] Under the new master/feeder structure, all US Investors invested in New Stream Secured Capital (U.S.), LLC (the "US Feeder").  Each Cayman Investor invested in a separate Cayman Island company named New Stream Secured Capital Fund (Cayman), Ltd., one company for each investor, numbered consecutively (collectively, the "Cayman Feeders"; collectively, the US and Cayman Feeders, the "US/Cayman Feeders").  1st Gillies Aff., ¶¶ 40-41 (Ex. 20).

[20] This 80/20 ratio allegedly was fixed to comply with tax counsel's advice concerning foreign portfolio interest exclusion (PIE) regulations.  *See* 1st Gillies Aff., ¶¶ 23-27 (Ex. 20).

[21] Individually, the "2007 US Feeder PPM" (Ex. 21); the "2007 Cayman Feeder PPM" (Ex. 22) and the "2007 Amended NSSC PPM" (Ex. 23); collectively, the "2007 PPM(s)."  The referenced 2007 Cayman Feeder PPM is that of New Stream Secured Capital Fund M1 (Cayman), Ltd., one of the series of consecutively-titled Cayman Feeders differentiated only by one letter (A1, B1, C1, etc.) and investor.  Upon information and belief, the organizational documents for all Cayman Feeders are substantively identical.  Documents relating to Cayman Feeders referred to herein are those relating to Cayman Feeders M1 and T1.

[22] New Stream Capital (Cayman), Ltd. is the "Investment Manager" of the Cayman Feeders, responsible for operations of the Cayman Feeders.  Although technically administered by an independent board of directors, its owners are the owners of NSC (Bryson Holdings, Lowerline Corp. and BCG Capital LLC), which is indirectly owned respectively by Bryson, Porter and Gutekunst.  Thus, NSC and NSC (Cayman) are functionally identical.  Depending on the context, the shorthand NSC may refer to NSC, NSC (Cayman), or both.  *See* Disclosure Statement, § V.A.2, pp. 40-41 (Ex. 13).

72.    Indeed, none of the documents distributed to investors as part of the 2007 Restructuring contained any mention whatsoever of the Bermuda Fund, altogether ignoring its $543 million senior debt (and the related approximately $54 million in interest due yearly) in a discussion of risk factors.  Most notably, none of the 2007 PPMs (for the US/Cayman Feeders or NSSC) contained any mention of the Bermuda Fund, and the New Stream organizational chart attached to the 2007 Cayman Feeder PPM and the 2007 US Feeder PPM (upon information and belief, no organizational chart accompanied the final 2007 Amended NSSC PPM) did not recognize the existence of the Bermuda Fund.  A comparison of the October 2007 organizational chart (containing an entry for New Stream Capital Fund, Ltd. (Bermuda)) with the organizational chart attached to the 2007 Cayman Feeder PPM and the 2007 US Feeder PPM (containing no entry for New Stream Capital Fund LTD (Bermuda)) is telling. *See* Composite Exhibit of Organizational Charts (Ex. 24); van Hoorn Decl., ¶ 7 (Ex. 6).

73.    The November 28, 2007 letter from Tara A. Bryson, Director of Marketing & Client Relations of NSC ("November 28, 2007 Letter"), accompanying the 2007 PPMs for the US/Cayman Feeders and the solicitation materials made the same points loudly and clearly.  It was distributed to existing and potential U.S. and non-U.S. investors as part of the solicitation materials related to the 2007 Restructuring.  *See, e.g.,* Thorley Decl., ¶¶ 7-8 (Ex. 7); van Hoorn Decl., ¶¶ 10-11, 15 (Ex. 6); Meredith Decl., ¶¶ 7-8, 14 (Ex. 5).  The November 28, 2007 Letter stated that it was "intended to outline the procedures that U.S. and non-US investors need to follow to remain invested in New Stream Secured Capital, LP ..."  The letter assured all investors that "[t]his new fund structure … ensures that all investors (U.S. and non-U.S.) will have the same risk-reward profile, the same portfolio exposures and the same pre-tax return."  Further, "[a]s of December 1, 2007, New Stream Capital Fund, Ltd. (NSC's existing Bermuda

fund) and NSSC (NSC's existing onshore fund …) will be closed to new direct investments. We request that, going forward, you make all new allocations either to [the US Feeder or the Cayman Feeder]. Further, we ask all investors to transfer their existing positions to the Feeder Funds. Transfers may begin on December 1, 2007 and they should be completed by January 1, 2008."[23]

74. Further evidence of New Stream's representations that all investors including the Bermuda Investors would have the same risk-reward profile and would be treated *pari passu* is provided by a telling change in Collateral Agency Agreements (singly or collectively, the "CAA(s)") which implemented the 2007 Restructuring. These CAAs, so-called "inter-creditor agreements,"[24] purported to fix priorities among potential competing security interests in NSSC's and NSI's property,[25] while designating Wilmington Trust Company as the collateral agent.[26] Upon information and belief, a November 16, 2007 amendment to the NSSC CAA (the "November 2007 NSSC CAA") combined the Bermuda Fund (denominated the "Lenders")

---

[23] Most of the documents soliciting support for the 2007 Restructuring were transmitted by email to all investors. *See* email dated November 28, 2007, from Tara Bryson to Cayman Investors, entitled "New Stream Capital Announcement#2 [sic]" (Ex. 25). Attached to that email were five documents: (i) the 2007 Cayman Feeder PPM (Ex. 22); (ii) the November 2007 organizational chart omitting the Bermuda Fund (Ex. 26); (iii) the November 28, 2007 Letter (Ex. 27); (iv) a tax opinion (Ex. 28); and (v) a subscription agreement. Upon information and belief, the same email was forwarded to all existing and prospective investors. All contained attachments (ii) and (iii); variations of documents (i), (iv), and (v) were forwarded to US Investors.

[24] *So called* because NSC signed on behalf of all parties except for the collateral agent itself.

[25] The Disclosure Statement incorrectly characterizes the CAAs as fixing "the priority of Claims among the various lenders …." *See* Disclosure Statement, § V.A.1, p. 39. In fact, the CAAs say nothing about the priority of *claims*. By their own terms they are limited to priority among competing security interests and are of no force or effect to the extent the security interests are unperfected or avoided. Similarly, the Disclosure Statement is incorrect when it says that lenders hold security interests in NSSC's investment portfolio pursuant to the CAA. *See id.*, § V.C.2, p. 58. The CAAs do not create security interests; they merely clarify the priority of existing liens. Again, they are of no force or effect to the extent that the security interests are unperfected or avoided.

[26] On October 5, 2006, Collateral Agency Agreements (for NSSC, the "NSSC CAA"; for NSI, the "NSI CAA") were entered into between NSC, as manager for NSI and NSSC, and Wilmington Trust, as collateral agent. Each segregated account of the Bermuda Fund was a signatory to both of these agreements, with NSC signing, upon information and belief, as agent for all lenders and borrowers. *See* First Affidavit of Perry Gillies, submitted in *UBS Funds Service (Cayman) Limited, et al. v. New Stream Capital Fund Limited*, Supreme Court of Bermuda (2009: No. 165) (the "Tensor Proceeding"), sworn to August 28, 2009 ("Gillies Tensor Aff."), ¶ 23 (Ex. 30).

and the US/Cayman Feeders (denominated the "Note Holders") into one class denominated the "Secured Parties," granting them a *combined* security interest *pari passu* in NSSC's assets, thereby eliminating the Bermuda Fund's senior security interest in NSSC's property.[27]

75. Assured that the senior secured position of the Bermuda Fund would be eliminated by the 2007 Restructuring, that all investments made pursuant to the 2007 Restructuring would be *pari passu*, and that new investments would be used by New Stream only as capital to acquire new investments assets, all US Investors complied with New Stream's request. The investors converted $152 million in existing direct investments in NSSC into new investments in the US/Cayman Feeders and advanced approximately $200 million in new money.[28]

---

[27] *See* Gillies Tensor Aff., ¶ 29 ("When the US and Cayman Feeder Funds were introduced in late 2007, in anticipation of the [Bermuda Fund]'s investors' transferring to the Cayman Feeders, the Collateral Agency Agreement for NSSC … was revised to include the US and Cayman Feeders as lenders.") (Ex. 30); 1st Gillies Aff., ¶ 47 (Ex. 20); UCC Financing Statement Amendment and attached Schedule "A" (Restated Collateral Description), filed November 20, 2007 (the "2007 UCC Amendment") (Ex. 31). Movants have no copy of the November 2007 NSSC CAA, and thus draw the strong inference from the Gilles Tensor Aff. and the 2007 UCC Amendment that the Bermuda Fund's lien was therein made *pari passu* with the US/Cayman Feeders' lien, reflecting the revisions intended by the 2007 Restructuring and stated in the organizational documents that all investments would be treated *pari passu*. Upon information and belief, in March of 2008, another amendment to the NSSC CAA eliminated the *pari passu* treatment, granting the Non-Insurance Classes of the Bermuda Fund a lien in NSSC's assets senior to the US/Cayman Feeders' lien, consistent with, among other explanations (*see* ¶¶ 82-87 below), New Stream's recognition that most of the segregated accounts comprising the Bermuda Fund had not agreed to convert their interests to the Cayman Feeder (the "March 2008 NSSC CAA"). *See* Gillies Tensor Aff., ¶ 29. The Disclosure Statement mentions only the March 2008 NSSC CAA, which granted the senior lien to the Bermuda Fund, while failing to disclose the November 2007 NSSC CAA, which had made it *pari passu* with the liens granted the US/Cayman Feeders. *See* Disclosure Statement, § V.A.2, p. 44 (Ex. 13). Nor does it disclose the avoidance action which arises against the Bermuda Fund as a result. *See* discussion at ¶ 230 below.

[28] Approximately $152 million, roughly 95% of NSSC's debt to the US Investors as of December 31, 2007, was converted by US Investors to either the US or Cayman Feeders. *See* NSSC and Subsidiaries Consolidated Audited Financial Statement for the year ended December 31, 2008, dated June 16, 2009 (the "2008 NSSC Financials") (Ex. 32), Cash Flow Statement, p. 8 and Note 1, p. 9 (the "2008 NSSC Cash Flow Statement"). All investors, existing and new, advanced new funds estimated at $194 million to the US or Cayman Feeders. *See* 2008 NSSC Cash Flow Statement, p. 8, Note 1, p. 9, Note 6, p. 20. The calculation for the $194 million in new funds is as follows: Under the heading "Financing Activities": "Partners' Contributions" ($42,823,999) plus "Proceeds from senior subordinated, mezzanine and subordinated notes" ($185,935,036) less "Mezzanine notes" ($35,000,000) equal new funds ($193,759,035) invested in NSSC.

76.  Yet despite having been written out of the New Stream organization by the 2007 Restructuring, most of the Bermuda Investors, including Gottex, the largest single Bermuda Investor and the owner of the C and I Classes, refused to transfer their investments from the Bermuda Fund to the Cayman Feeder as New Stream had represented.[29]  1st Gillies Aff., ¶¶ 42, 44 (Ex. 20).

77.  The misrepresentations in the published solicitation materials regarding all investments sharing the same risk/reward profile proved to be costly for the US/Cayman Investors.  The Bermuda Fund retained its purported senior secured direct debt in NSI and NSSC despite the 2007 Restructuring, immediately priming all existing debt and equity in the new Cayman Feeder (including some Bermuda Investors that transferred as requested), retaining its senior position over all investments transferred to the US Feeder, and immediately priming all new debt and equity in both the US/Cayman Feeders.

78.  NSC's misrepresentations were not limited to the foregoing solicitation materials.  NSC restated these misrepresentations, in emails and telephone calls with individual investors, both before *and after* January 1, 2008, the date the new fund structure was to be fully effective.  For example:

- In an email dated November 19, 2007 to Robert Jan van Hoorn of Finles Capital Management, investment manager for Kas Trust Bewaarder Finles Alternative Bond Fund and Kas Trust Bewaarder Finles European Selector Fund, Joseph Tremblay of NSC represented that NSC "will be transferring all investors from the Bermuda Fund to the New Cayman fund over the course of a few months."  (Ex. 33)

- In an email dated December 12, 2007 on which Matthew Thorley of Thomas Funds Limited (Cayman), investment manager to ZAM AF, was copied, Tara Bryson informed ZAM AF of the need for Bermuda investors to switch to the

---

[29] US Investors switched from NSSC to the US Feeder.  All Bermuda Investors were asked by NSC to switch from the Bermuda Fund to a Cayman Feeder, but most did not.

Cayman Feeders, and encouraged ZAM AF as a Bermuda Fund investor to make an early switch to the Cayman Feeder (Ex. 34).

- In a conference call on January 23, 2008 between Joseph Tremblay of NSC, Richard Pereira, Chief Financial and Operating Officer of NSC, Michiel Prins, then the Chief Operating Officer of Thomas Funds Limited (Cayman) and Matthew Thorley, NSC again explained that ZAM AF must switch its investments out of the Bermuda Fund into a Cayman Feeder by redeeming all investments in the Bermuda Fund and subscribing to a Cayman Feeder. *See* Thorley Decl., ¶ 12 (Ex. 7).

- In a meeting on January 30, 2008 at the offices of Thomas Funds Limited (Cayman) with Michiel Prins and Matt Thorley (the "January 30, 2008 ZAM AF Meeting"), Bryson of NSC made no mention that almost all of the Bermuda Investors had rejected the 2007 Restructuring. *See* Thorley Decl., ¶ 14 (Ex. 7).

- In an email dated January 17, 2008 from Joseph Tremblay at NSC to US investors, the first communication to all US investors in 2008, NSC reported that NSSC "has just completed 56 months of positive performance. The fund is currently open to new investments through the feeder structure launched on 1 December 2007." No mention was made that almost all of the Bermuda Investors had rejected the 2007 Restructuring (*See* NSC Monthly Performance Emails (as defined below) Ex. 35).

- In similar emails dated February, March and April 2008 reporting NSSC's monthly returns, no mention was made that almost all of the Bermuda Investors had rejected the 2007 Restructuring (*See* NSC Monthly Performance Emails Ex. 35). More particularly, in an email dated February 8, 2008, Tara Bryson reported that "our return for January is in line with our previous expectations, and we have no negative surprises."

- Gordon Miller, then the director of risk for Toledo Fund, LLC, spoke to Tara Bryson on or about December 20, 2007, and she represented that the only investors in NSSC after the 2007 Restructuring would be the US/Cayman Feeders. Umbach Decl., ¶ 15 (Ex. 10).

79. In fact, most of the Bermuda Investors retained their senior secured position against NSSC's and NSI's assets because they refused to participate in the 2007 Restructuring, thereby rendering New Stream's representations about *pari passu* treatment false, and rendering New Stream's failures to disclose the ongoing existence of the Bermuda Fund after the 2007 Restructuring materially misleading and fraudulent. Relying on New Stream's

38

misrepresentations and non-disclosure, all US/Cayman Investors converted existing investments to the US/Cayman Feeders, a few Bermuda Fund investors converted existing interests to the US/Cayman Feeders, and vast quantities of new funds were invested from various sources. The sums are all the more staggering because every penny invested in the new fund structure was fraudulently induced.[30]

80.   That the Bermuda Fund retained its senior security interest under the 2007 Restructuring was first disclosed to creditors in a footnote in the 2007 NSSC Financials dated April 7, 2008, which was released long after the 2007 Restructuring became effective and $194 million[31] in new funds had been invested.   Moreover, for those investors who did not scrutinize the footnotes in the 2007 NSSC Financials for their hidden messages, choosing instead to rely on the 2007 PPMs and the affirmative statements of NSC's principals, the first hint of the Bermuda Fund's ongoing claim to a senior secured position came almost one year later, in January 2009, buried in an email concerning losses incurred by NSSC in November 2008, in which NSC disclosed:  "This increase resulted in a loss of approximately <6.22%> on a capital base of approximately $309.2 million, *after paying the preferred return of the Bermuda fund* and other debt obligations."  (*emphasis* added.) (Ex. 36).  Full disclosure was first made in April 2009, when New Stream sought approval of its 2009 Restructuring Plan.[32]

81.   Whether the Debtors intended to defraud their creditors from the inception of the 2007 Restructuring is unknown.   What is certain is that the Debtors recklessly failed to disclose the Bermuda Fund's existence in their 2007 Restructuring solicitation materials and

---

[30] *See* n.28 above.  In addition, at least $24.7 million, approximately 5% of the December 31, 2007 balance, was transferred by Bermuda Fund investors to the Cayman Feeder.

[31] *See* n.28 above.

[32] *See* NSSC Situation Overview, dated April 2009, presentation to investors (the "Webinar"), p. 3 (Ex. 15); 1st Gillies Aff., ¶ 76 (explaining that the Webinar was prepared by NSC to explain the challenges still facing the New Stream Group and to induce investors to approve New Stream's 2009 Restructuring Plan) (Ex. 20).

then committed actual fraud by failing to disclose immediately that Gottex and the majority of the Bermuda Investors had refused to participate in the 2007 Restructuring.

82. NSC has presented a host of conflicting excuses for its concealment of the Bermuda Fund in the 2007 Restructuring solicitation documents. First, NSC has argued that it sufficiently disclosed the Bermuda Fund because the 2007 PPMs for the US/Cayman Feeders stated that NSSC can be leveraged and NSSC's PPM allows for "leverage." 2nd Gillies Aff., ¶ 77 (Ex. 16). NSC's contention is frivolous.[33] This discussion, in conditional future terms, could not be construed to encompass $543 million of *existing* debt. Moreover, the term "leverage" does not encompass the Bermuda Fund debt, as the Bermuda Fund is neither a bank nor a financial institution to which the 2007 PPMs limit their reference.[34] Again, not one of the 2007 PPMs makes a single reference to the Bermuda Fund. Not one of them includes the mention of $543 million in senior secured debt, or the $54 million in interest due yearly, among "risk factors" worthy of mention. And not one of them includes the Bermuda Fund in its comprehensive organization chart.

83. Moreover, NSC's own communications to the US/Cayman Investors disprove its contention that the term "leverage" encompasses its debt to the Bermuda Fund. For example, on March 13, 2008, shortly after the new fund structure was launched, in an email distributed to all US/Cayman Investors, Tara Bryson stated that the use of "leverage" was not an integral part of their investment strategy, making no reference to the Bermuda Fund. The email stated:

---

[33] The reference to "leverage" in the 2007 US Feeder PPM and the 2007 Cayman Feeder PPM is as follows: "The use of margin and other leverage may be a component of the [U.S. Feeder/Cayman Feeder]'s and/or [NSSC]'s investment strategy. The [U.S. Feeder/Cayman Feeder] and [NSSC] are authorized to borrow funds from banks and other financial institutions in order to employ investment leverage." These 2007 PPMs also state that "the Fund currently does not intend to use margin or any other leverage technique." 2007 US Feeder PPM, VI.C.9, p.22 (Ex. 21); 2007 Cayman Feeder PPM, VI.C.9, p.23 (Ex. 22)

[34] Indeed, if the Bermuda Fund were the bank and NSSC the borrower, the lender and the borrower would be under the same management and control – NSC.

The Wall Street Journal's U.S. edition ran an article last week (Hedge Fund Squeezed, As Lenders Get Tougher, Page 1A, 3/07/08) that focused on the risks some hedge funds face having built up significant leverage against their book of assets. We'd like to make sure that our investors understand that New Stream Capital has not used any bank-leverage facilities historically. As a result, we have not been negatively affected by the dislocations in the broader credit markets. In fact, as an alternative source of capital, NSC has seen an increase in transactional opportunities.

(Ex. 37).

84. NSC has also made the equally implausible argument that, rather than make material disclosures concerning leverage in the 2007 Restructuring solicitation materials, it intentionally chose to make these important disclosures in the footnotes of various audited financial statements. Gillies testified as follows in the Gottex Proceeding:

[T]hese details were disclosed in the 2007 and 2008 [Audited Financial Statements] of NSSC. While it is true that there is no disclosure about security priorities in the PPMs for [the] Feeder Funds, one would not expect to find that kind of information in these documents. The proper place for such disclosures is the financials of NSSC. The financials of NSSC clearly show the leverage and priority (see page 3 of the financials for 2007) … which distinguishes "senior subordinated" debt (the Bermuda [Fund] and Northstar) from "subordinated" debt (US and Cayman Feeders).

2nd Gillies Aff., ¶ 77 (Ex. 16).[35] Again, NSC's contention is frivolous. Investors of new moneys would not even have received the 2007 or 2008 audited financials before making their investment decisions in late 2007. NSSC's 2007 Financial Statements were not dated until April 7, 2008, more than three months after the January 1, 2008 effective date of the 2007 Restructuring and more than five months after NSC started its formal solicitation for the 2007 Restructuring. The 2008 Financial Statements were issued more than fifteen months after that. Given the indisputable premise that $543 million in senior debt was material information to those

---

[35] Notably, while numbers buried in the footnotes may have disclosed "senior subordinated" debt to those scouring the footnotes, the 2007 NSSC Financials contained no express mention that almost all of the Bermuda Investors had rejected the 2007 Restructuring.

contemplating participating in the 2007 Restructuring, NSC's contention that NSSC adequately disclosed the continued existence of the Bermuda Fund in its financial statements is patently without merit.

85. Moreover, even if *all* Bermuda Investors had transferred to the new Cayman Feeders, the 2007 NSSC Financials would *still* show them as senior secured debt because the financials are reported as of December 31, 2007 and the 2007 Restructuring was not effective until January 1, 2008.

86. Plainly, essential material disclosures regarding the 2007 Restructuring should have been made in the offering materials, including the annexed organizational chart containing a detailed description of the new fund structure. The ongoing existence of the Bermuda Fund, the most serious risk factor to US/Cayman Investors, belonged in the PPMs' discussion of risk factors.

87. An excuse not yet clearly voiced by Gillies is that NSC actually *believed* that the Bermuda Fund would consent to the 2007 Restructuring and drafted the documents as if it were a *fait accompli*.[36] That excuse, far more credible than the two above to which Gillies has actually testified, would transform fraudulent misrepresentations into mere incompetence or gross management; still "cause" for the appointment of a Trustee, but at least not corrupt.

88. But even assuming that fraud did not permeate NSC's misrepresentations in the original 2007 Restructuring offering materials, no credible excuse can explain NSC's failure to disclose Gottex's rejection of the 2007 Restructuring after the fact, other than the corrupt excuse of continuing to solicit funds under false pretenses. By May 1, 2008, NSC indisputably

---

[36] "[U]ntil late 2008 when market forces outside of the control of the Debtors required a freeze on all redemptions, the intention was that the Bermuda fund would be terminated, either by the redemption of the remaining investments over time, or by those remaining Bermuda investors changing their decision and deciding to move to the Cayman Feeder, an option that remained available to them." *See* Disclosure Statement, § V.B., p. 44 (Ex. 13).

knew that the Bermuda Investors in general, and Gottex in particular, had overwhelmingly rejected the 2007 Restructuring. Yet, the May 1, 2008 Cayman Feeder PPM still contains no mention of the Bermuda Fund, its existence, its senior secured debt of hundreds of millions of dollars, or the newly-subordinated position of the Cayman Investors.[37] It fails to disclose that substantially all of the Bermuda Investors rejected the 2007 Restructuring. No relevant disclosure appeared in the July 1, 2008 Cayman Feeder PPM, either.[38]

89. NSC's dissembling touches not only the elimination of the Bermuda Fund but the rationale underlying the 2007 Restructuring, as NSC has, in different contexts, supplied different reasons for the restructuring. Initially, NSC explained that the restructuring served foreign investors' tax purposes. *See, e.g.*, November 28, 2007 Letter ("The new funds structure substantially limits the tax consequences usually associated with direct investments of non-U.S. entities in U.S. lending companies") (Ex. 27). Later, in the Gottex Proceeding that resulted in the displacement of NSC as manager of the Bermuda Fund, NSC contended that its primary purpose was to eliminate the excessive leverage in NSSC and NSI caused by the Bermuda Fund notes. 1st Gillies Aff., ¶ 41 (Ex. 20); Gillies Tensor Aff., ¶ 25 (Ex. 30). Contrary to NSC's contention, however, the debt-to-equity ratio increased dramatically under the 2007 Restructuring. In fact, on the day the 2007 Restructuring went fully effective, the debt-to-equity ratio was almost <u>three times</u> the 600% debt-to-equity ratio allowed under the 2007 NSSC

---

[37] *See* New Stream Secured Capital Fund T1 (Cayman), Ltd. Private Placement Memorandum, dated May 1, 2008 ("<u>May 1, 2008 Cayman Feeder PPM</u>") (Ex. 38).

[38] *See* New Stream Secured Capital Fund AC1 (Cayman), Ltd. Private Placement Memorandum, dated July 1, 2008 ("<u>July 1, 2008 Cayman Feeder PPM</u>") (Ex. 39); *see also* Affidavit of Amy Lai, Managing Director of Gottex Fund Management Limited, sworn to February 24, 2010, and submitted in the Gottex Proceeding ("<u>4th Lai Aff.</u>"), ¶ 83 ("I note that the US and Cayman Feeder Fund Private Place Memoranda dated 1 July 2008 and issued to feeder fund investors some time after the late 2007/early 2008 restructuring … makes no mention of the Bermuda Fund or the fact that the feeder funds are in a subordinated position to the Bermuda Fund Loan Notes") (Ex. 40).

Amended PPM.[39]  This occurred primarily because the Bermuda Fund debt had not been

eliminated, and most of the limited partnership interests of the US Investors were converted to

debt.  1ˢᵗ Gillies Aff., ¶ 45 (Ex. 20).[40]

        90.  New Stream's failure to disclose the Bermuda Fund's continuing senior

security interest, its failure to disclose the ongoing existence of the Bermuda Fund in the 2007

Restructuring solicitation materials, and its misrepresentations concerning the *pari passu*

treatment of all investors under the 2007 Restructuring, are "cause" for the appointment of a

trustee under Section 1104(a)(1).

> **(2)  The Debtors' Other Misrepresentations, Including Those
> Made to Induce Investors Not to Redeem, Constitute
> "Cause"**

        91.  NSC received many redemption requests from investors, including some

US/Cayman Investors, in late 2007 and 2008.

---

[39] The 2007 NSSC Amended PPM provides as follows in the "Investment Objective and Strategy Section" under the heading "Leverage":

> *The Fund intends to borrow In order to leverage its portfolio with the goal of increasing its returns.  Leverage generally will be employed by the Fund in amounts varying from 25%  to 400% of the Funds Net Asset Value.  In no event will the Fund borrow to the extent that, after giving effect to such borrowing, the Fund's total outstanding debt would exceed 600% of its Net Asset Value.*

2007 NSSC Amended PPM, p. 12 (Ex. 23).

[40] The 2008 NSSC Financials disclose that on January 1, 2008 US/Cayman Investors' equity investments were transferred to US/Cayman Feeders as 80% debt and 20% equity.  2008 NSSC Financials, Note 1, p. 9 (Ex. 32). Implementing that 80%/20% ratio, on January 1, 2008, the effective date of the 2007 Restructuring, NSSC and subsidiaries consolidated debt-to-equity ratio was **$708,979,423/$39,736,668** or 1784%, almost three times the 600% allowed under the NSSC Amended PPM.  More particularly, using the amounts reported in the Audited NSSC and Subsidiaries Consolidated Financial Statements for year ending December 31, 2007, dated April 7, 2008 ("2007 NSSC Financials") (Ex. 41), Balance Sheet, p. 4, for the amount of "Borrowings under line of credit" ($13,129,000) plus "Senior Subordinated Notes" ($542,625,900) plus "Subordinated Notes" ($31,531,268) plus 80% of the "Partners Capital Redeemed" (.8 x $152,116,569 equals $121,693,255; *see* 2008 NSSC Financials, Cash Flow Statement, p. and Note 1, p. 9).  Thus, total debt as of January 1, 2008 was **$708,979,423**.  Total Equity is derived from "Partners' Capital" ($161,429,944; *see* 2007 NSSC Financials, Balance Sheet, p. 4) less "Partners' Capital Redeemed" ($152,116,569; s*ee* 2008 NSSC Financials, Cash Flow Statement, p. 8 and Note 1, p. 9) plus 20% of "Partners' Capital Redeemed" (.2 x 152,116,569 equals $30,423,313; s*ee id.*, Note 1, p. 9). Thus, total equity as of January 1, 2008 was **$39,736,668.**

92. Apparently, the "end" of inducing these investors to withdraw their redemption requests justified the "means," so NSC tried to talk investors out of it by any means possible. Truth was irrelevant. Among the misrepresentations NSC made to the US/Cayman Investors were these: (i) the valuation of the Life Settlement Assets was not inflated; (ii) independent appraisals were obtained monthly to assure life settlement valuations were modeled accurately; (iii) redemption levels remained normal; (iv) sufficient liquidity existed to satisfy redemptions in the normal course of business; (v) large amounts of new money were being raised; and (vi) New Stream's overall investment performance was very good because its businesses were not affected by the difficult investment climate.

### a. Misrepresentations About Redemptions and Liquidity

93. The experiences of Stratos Non-Directional Fund, L.P. ("Stratos") – its concerns about the valuation of the Life Settlement Assets, its communications with NSC, its redemption requests, and NSC's misrepresentations in response – serve as a template encapsulating many aspects of NSC's dishonesty and fraudulent conduct.

94. In early 2008, Stratos became aware that three key NSC employees had resigned, including Richard Kearns ("Kearns"), NSI's president and insurance portfolio manager, and Robert Hebert ("Hebert"), the real estate portfolio manager.[41] Kearns confided to Roy Callahan ("Callahan"), Stratos' principal, that NSI's insurance portfolio was overvalued and the US Feeder would likely experience a substantial loss. Callahan Decl., ¶ 19 (Ex. 12).

95. Kearns' and Hebert's departure should have set off alarms at NSC, but NSC continued to represent that all was well. No public disclosure of Kearns' or Hebert's resignation

---

[41] Kearns and Hebert left effective December 31, 2007. New Stream's insurance portfolio was then valued at $342,504,500 ($169,830,913 plus $172,673,587; see 2007 NSSC Financials, Balance Sheet, p. 4 and Note 4, p. 13 (Ex. 41)), or 43% of New Stream's assets, and the real estate portfolio was valued at $250,907,809 (see 2007 NSSC Financials, Note 4, p. 13), or 31.9% of its assets. Thus, the managers responsible for more than 75% of New Stream's assets had resigned.

was made, and no write-down of the Life Settlement Assets was taken. As a result of the concerns expressed by Kearns, on or about April 15, 2008, Stratos requested a redemption of $5 million (the "Stratos First Redemption Notice"), which request had an effective date of July 31, 2008 (the "Stratos First Redemption Date"). Callahan Decl., ¶ 19 (Ex. 12).

96. On or about April 28, 2008, Callahan spoke by telephone to Bart Gutekunst, a principal of NSC (the "April 28, 2008 Stratos Call"). Gutekunst asked Callahan to rescind the Stratos First Redemption Notice, urging that Stratos' source (Kearns) was a disgruntled former employee and that the information Kearns had conveyed was false. Gutekunst further assured Callahan that NSC routinely obtained multiple third party valuation input to assure the accurate valuation of their life insurance portfolio and that such valuations supported New Stream's monthly loan reserve accounting. Gutekunst assured Callahan that the US Feeder was not experiencing any liquidity problems, that it had experienced normal levels of redemptions (approximately $125 million) and that it had sufficient "roll off," *i.e.*, available cash, revolving bank facility, and new investments, with which to pay all redemptions in the normal course. Callahan Decl., ¶¶ 20-21 (Ex. 12).

97. On or about June 5, 2008, Callahan traveled from California to Connecticut to visit New Stream to further evaluate its operations and performance (the "Stratos June 5, 2008 Visit"). During this visit, Gutekunst repeated the representations that he had made on the April 28, 2008 Stratos Call. Furthermore, this time he also represented that investor confidence in NSC was greater than ever given the continued steady positive performance of the portfolio investments which he said had no correlation to the investment climate that then existed. He also represented that NSC was continuing to raise significant new money through new subscriptions despite the existing difficult economic environment, there was nothing remarkable

about the level of redemptions that had been received, and there were no liquidity concerns. Callahan Decl., ¶ 22 (Ex. 12).

98.  In reliance on Gutekunst's representations during the April 28, 2008 Call and the Stratos June 5, 2008 Visit, Stratos caused the Stratos First Redemption Notice to be rescinded.  Callahan Decl., ¶ 23 (Ex. 12).

99.  Similar communications and assurances from NSC were prompted by a $3.4 million redemption request on or about December 24, 2007 from ZAM AF (the "ZAM AF December 24, 2007 Redemption Notice").  On January 30, 2008, Bryson visited the offices of Thomas Funds Limited (Cayman) and met with Michiel Prins and Matt Thorley.  At that meeting, Bryson represented that there had been only one significant redemption to date, by Eden Rock, for $35 million.  Thorley Decl., ¶ 14 (Ex. 7).

100.  On February 21, 2008, Joseph Tremblay of NSC sent responses to a questionnaire sent to NSC by Consulta Limited, the investment advisor to Consulta Collateral Fund PCC, Ltd. and Consulta Alternative Strategy Fund PCC, Ltd. (collectively, "Consulta"), which specifically asked the amount of "Leverage/Overdraft/Borrowing Facility in Offshore Fund."  Tremblay responded that the Cayman Feeder had $0 "Leverage/Overdraft/Borrowing Facility in Offshore Fund".  Ridley Decl., ¶¶ 19-21 (Ex. 9).

101.  NSC's assurances to Stratos and Thomas Fund Limited (Cayman) on behalf of ZAM AF and response to Consulta's questionnaire were provably false, a desperate attempt to delay or even counteract the flood of redemptions against NSSC which ultimately triggered its collapse.  NSSC was experiencing severe liquidity problems due to the avalanche of redemptions in the end of 2007 and 2008, those redemptions could not be satisfied in the

ordinary course of business, and Gutekunst and Bryson knew it.[42] During the first quarter

of 2008, NSC paid most of the more than $170 million in redemptions it paid in all of 2008,[43]

more than twice the redemptions paid in 2007.[44] For redemptions paid in the 1st quarter of 2008,

the redemption requests must have been received by November of 2007.[45] Thus, NSC was

experiencing a heightened level of redemptions and a liquidity crisis prior to the launch of the

2007 Restructuring in January of 2008, and well prior to the false assurances given to Stratos

and ZAM AF.

      102. NSC ultimately acknowledged the truth, and thus the falseness of its earlier

denials, only after the fact in connection with the 2009 Restructuring, admitting then that New

Stream had "received heightened levels of redemption requests … in the Spring of 2008."

Webinar, p. 4 (Ex. 15). Providing further detail, in 2010 NSC admitted that it had received a

substantial increase in redemption requests by the spring of 2008, including about $200 million

that became effective by September 2008. 1st Gillies Aff., ¶¶ 77, 79 (Ex. 20). Indeed, by

September 30, 2008, NSC had received a total of $545 million in redemption requests, including

the $200 million which had become effective. *Id.*, ¶ 79. New Stream ultimately makes the

same concessions now in its Disclosure Statement, though the dissembling which suffused New

---

[42] By the Stratos June 5, 2008 Visit, NSC had already defaulted on at least two redemption requests. On January 22, 2008, Tensor, a Bermuda Fund investor, submitted a redemption request for $8,820,838 effective or crystallized on May 31, 2008. *See* Judgment entered December 18, 2009 in the Tensor Proceeding at ¶ 4, p.3, ¶ 53, p.24. (Ex. 42). In or around late February 2008**,** Toledo LLC caused redemption requests to be submitted on its behalf for $4 million which became effective May 31, 2008. Umbach Decl., ¶ 18 (Ex. 10). Neither redemption request was paid timely, or ever. Moreover, New Stream now acknowledges that by early 2008, they could not redeem the Bermuda Investors who refused to transfer to the Cayman Feeder. *See* Disclosure Statement, § V.B., p. 44 (Ex. 13).

[43] *See* n.47 below.

[44] 2007 NSSC Financials, Cash Flow Statement, p. 6 (Ex. 41) provides that "Partners Redemptions" were $39,975,780 and "Repayments of senior subordinated notes" were $31,345,532, for a total of approximately $71 million redemptions in 2007.

[45] The applicable redemption provisions provided that redemptions were payable 120 days following the end of the month in which demand is made. Accordingly, for redemptions paid in the 1st quarter of 2008, NSC must have received the request by November 30, 2007.

Stream's existence still permeates its grudging disclosure in liquidation mode.[46]  These belated

admissions and the disclosures in the 2007 NSSC Financials demonstrate conclusively that

NSC's representations about the "normal" level of redemptions in 2007 and 2008 were false.

103.  New Stream misrepresented not just the amount of redemptions, but their

causes as well.  The Fund Manager repeatedly blamed the Petters fraud for the avalanche of

redemptions that caused them to suspend redemptions in September 2008, and still does.

*See, e.g.*, Disclosure Statement, § IV.B, p. 30.  Yet the FBI raid of Petters' offices took place on

September 24, 2008.  By then over $170 million of the Bermuda Fund's investors held

crystallized redemptions and Gottex had requested a redemption for its entire $270 million

interest, withdrawing it only after receiving the gratuitous benefit of an amended security

agreement.  Thus, essentially 100% of the Bermuda Investors had at least requested redemptions

months before the Petters raid.

104.  Equally false were NSC's representations that New Stream had sufficient

liquidity in 2008 to satisfy redemptions in the normal course of business.  NSC could not

liquidate funds timely to satisfy the avalanche of redemption requests in late 2007 and 2008.

As a result, of the funds New Stream raised from new investor subscriptions in the 2007

Restructuring, almost 90% was used to pay redemptions.  As discussed above, according to the

---

[46] New Stream's first mention of the "flood" of redemptions in its Disclosure Statement attributes it to activities in September 2008.  Under the heading "Changes in Financial Markets Prompt Flood of Redemptions," the Debtors observe that "[i]n late September 2008, the first of a series of fund failures … had an adverse effect on many of the Investors.  A substantial number of redemption requests were made as a result of the Petters fraud and similar events during the last week of September 2008, comprising approximately 40% of the value of the Debtors' 'Feeder Funds'."  *See* Disclosure Statement, § IV.B, p. 30 (Ex. 13).  Fourteen pages later, though, the Debtors suggest that the "flood" began in March 2008.  *See id.*, § V.B, p.44 ("Beginning in March 2008, the Debtors began to receive substantially increased levels of redemption requests ….  This flood of redemption requests ….").  One page later, the Debtors quantify the flood, acknowledging that redemption requests of $545 million had been received by September 2008, including approximately $200 million of redemptions *already effective by that date*.  *See id.*, § V.B at p. 45.  So by March 2008, the Debtor's belatedly-acknowledged trigger point – evidence will demonstrate that late 2007 is more like it – a veritable tsunami of redemptions had been received while New Stream was denying anything out of the ordinary in response to pointed questions from its investors.

2008 NSSC Financials, approximately $194 million of new money was raised in 2008, with most raised during the first quarter, of which over $170 million was used to satisfy redemptions in violation of the 2007 PPMs.[47]

105.  These Ponzi-like funding practices, whereby new investments were used to satisfy almost 90% of pending redemptions, were presumably not the ordinary course of business for New Stream.  If they were, New Stream's business was a criminal enterprise.  Thus, NSC's representations in 2007 and 2008 that it could pay redemption requests in the ordinary course of its business were false.

106.  Not only was NSC unable to satisfy redemption requests in the ordinary course of business, but many redemption requests that became effective under the terms of their respective Feeders were never paid.[48]

**b.  Misrepresentations About Revised Life Expectancy Tables**

107.  NSC knew that its representations regarding its valuation of insurance assets were false.  Insurance asset valuations involve two key components:  life expectancies and discount rates.  On March 13, 2008, the Society of Actuaries ("SOA") and the American

---

[47] 2007 NSSC Financials, Note 15, p. 19 (Ex. 41) ; 2008 NSSC Financials, Consolidated Statement of Cash Flows, p. 8, "Partners' capital and subordinated notes' redemptions" of (40,231,781) plus "Repayments of senior subordinated, mezzanine and subordinated notes" of (162,623,009) = (202,854,790) less ($24.7 million) for amount Movants converted from Bermuda Fund to Cayman Feeders =(178,154,790); *see also* 1st Gillies Aff., ¶¶ 77-78 (acknowledging using new subscriptions to pay redemptions as early as spring 2008) (Ex. 20).

[48] In addition to the Tensor and Toledo Fund redemption requests set forth at n.42 above, ZAM AF submitted one redemption request for $3.4 million while it was still invested in the Bermuda Fund on December 24, 2007 which became effective on April 30, 2008 and two other redemption requests after ZAM AF transferred to a Cayman Feeder, one for $3 million on February 26, 2008 which became effective on June 30, 2008, and one for $3.3 million on April 28, 2008, which became effective on July 31, 2008.  Thorley Decl., ¶¶ 15, 17-18, 22-23, 25-26 (Ex. 7).  Consulta submitted a redemption request on or around February 28, 2008 for $3.3 million which became effective on May 31, 2008.  Ridley Decl., ¶¶ 23-24 (Ex. 9).  Latta Family Trust submitted a redemption request in April 2008 for $166,000 which became effective on July 31, 2008.  Latta Decl., ¶¶ 5, 7 (Ex. 4).  Jean Y. Rose Revocable Trust submitted a redemption request in April 2008 for $157,865 which became effective on July 31, 2008.  Rose Decl., ¶¶ 5, 7 (Ex. 3).  Irwin and Marilyn Yalom submitted a redemption request in April 2008 for $168,000 which became effective on July 31, 2008.  Yalom Decl., ¶¶ 4, 6 (Ex. 1).  Robert and Nancy Shostak submitted a redemption request in April 2008 for $166,000 which became effective on July 31, 2008.  Shostak Decl., ¶¶ 4, 6 (Ex. 2).  All of these redemption requests were acknowledged by NSC as effective or crystallized prior to October 1, 2008.  None of them was ever paid.

Academy of Actuaries ("AAA"), the professional bodies relied upon to calculate life

expectancies for life settlements, released long-anticipated revised life expectancy tables

(the "Revised LE Tables") which reflected a material increase in key life expectancies and a

resulting decrease in the value of life settlement assets.  Fully aware that the release of these

Revised LE Tables would significantly impact their financial statements, NSC failed to timely

disclose this significant development to the US/Cayman Investors.  The 2007 audited financial

statements issued in April of 2008 made no mention of this potentially significant asset

impairment despite the dictates of Generally Accepted Accounting Principles (GAAP).[49]

108.  Moreover, it had been common knowledge in the life settlement industry since

the appointment of the SOA/AAA task force in 2005 that the upcoming revisions to life

expectancy tables would cause a material decrease in the value of life settlement assets to those,

including New Stream, which had used very aggressive (*i.e.*, shorter than industry standard) life

expectancies and had not already devalued such assets in anticipation of the long-anticipated

and publicized revisions.[50]  March 2008 was the *latest* possible date, not the *earliest*, for

appropriate disclosure of the Revised LE Tables and the revaluation of life settlement assets.

109.  When NSC first disclosed this new valuation information, it falsely

represented that the SOA/AAA revaluation did not occur until November 2008.  *See* 1st Gillies

---

[49] *See* Statement of Financial Accounting Standards (SFAS) No. 5 – "Accounting for Contingencies," which provides essentially that even if the amount of the loss is not yet reasonably estimable, disclosure of a material loss that is reasonably possible is required.

[50] Indeed, SOA and AAA had been charged in 2005 with developing revised mortality tables because, as was then widely known, the pre-existing tables from 2001 failed to take into account multiple classes for underwriting life insurance – for example, non-smoker and low blood pressure – which would extend life expectancies and therefore reduce values of life settlement assets.

Aff., ¶ 85 (Ex. 20).[51]  Later, NSC shifted the timeframe again, asserting that the valuation

drivers of life insurance policies shifted dramatically in late June 2009.  *See* Webinar, p. 21

(Ex. 15).

110.  Only in 2009, when New Stream issued its 2008 NSSC Financials, did New

Stream disclose that the value of its Life Settlement Assets had decreased $106 million in 2008,

of which 84%, or $90 million, was taken in December 2008, nine months following the formal

issuance of the Revised LE Tables.  *See* n.53 below.

111.  Given that the insurance assets were 43.5% of the total assets of the New

Stream enterprise as of December 31, 2007,[52] timely disclosure of the Revised LE Tables and

the resulting devaluation of the life settlement portfolio would certainly have led most investors

to redeem their interests.  Consistent with New Stream's uniform practice of saying whatever

was necessary to avoid redemptions – and failing to disclose that which would elicit

redemptions – NSC made no timely mention of the Revised LE Tables.

### c.  Misrepresentations About Investment Performance

112.  NSC's lies were not limited to redemptions and liquidity.  Another integral

part of New Stream's efforts to avert, delay, or counteract redemption requests was NSC's

misrepresentations concerning New Stream's investment performance.  For example, on a

January 23, 2008 telephone call with Michiel Prins and Matt Thorley of Thomas Funds Limited

(Cayman), investment manager for ZAM AF (the "ZAM AF 1/23/08 Call"), Joseph Tremblay

---

[51] Gillies's suggestion that the November 2008 action by a life settlement rating agency was the driving force behind
the devaluation, *see* 1st Gillies Aff., ¶85 (Ex. 20); Disclosure Statement, § V.C, pp. 31-32 (Ex. 13), is a transparent
pretext for delaying the write-down.  Competing funds did not await the issuance by secondary life expectancy
providers of tables specifically customized for the life settlement industry.  Most did not even await the formal
issuance by the SOA/AAA task force of its long-anticipated Revised LE Tables.  *See* discussion at ¶¶ 107-08, 126
and n.50 below.

[52] Life settlement assets of $169,830,913 (2007 NSSC Financials, Balance Sheet, p. 3 (Ex. 41)) plus life insurance
loans of $172,673,587 (*id.*, Note 4, p. 13) total $342,504,500.  The ratio of life insurance assets over total assets of
$786,718,338 (*id.*, Balance Sheet, p. 3) is .435%, or 43.5%.

52

(investor relations of NSC) and Richard Pereira (CFO of NSC) represented that (i) New Stream was well positioned for 2008, (ii) the interest rate cut did not affect New Stream, (iii) there had been no major changes to the portfolio, (iv) New Stream was within its investment guidelines, and (v) the accounts receivable financing and insurance sectors were expected to improve in 2008.  Thorley Decl., ¶¶ 12-13 (Ex. 7).  Also, during the January 30, 2008 ZAM AF Meeting, Bryson stated that he expected 2008 to be a very good year and that fund returns should be increasing to 1% per month with an annual return estimated at 12 to 12.5%.  Thorley Decl., ¶ 14 (Ex. 7).  These statements flew in the face of the then-pending flood of redemption requests; the impending revisions to the life expectancy tables in March 2008 which would materially reduce the value of life settlement assets for those few, like New Stream, which had not already taken them into account; and the acknowledged overleveraging of NSSC's portfolio.

113.  Monthly performance emails from NSC to investors reported positive performance for each month from December 2007 through September 2008 (collectively, "NSC Monthly Performance Emails") (Ex. 35).  These reports failed to disclose then-pending redemption requests constituting 39% of the Bermuda Fund, *see* 1st Gillies Aff., ¶ 77 (Ex. 20); NSC's inability by late 2007 to pay redemptions in the ordinary course; the material overvaluation of the life settlement assets; and the departure as of December 31, 2007 of Kearns and Hebert, who had been primarily responsible for managing more than 75% of the New Stream business.

114.  Indeed, as late as August 5, 2008, NSC represented that the turbulent economic environment was having no impact on its investments and that the New Stream funds were performing well.  Tara Bryson informed all investors of the US/Cayman Feeders by email on August 5, 2008 that "our return for July is in line with our previous expectations," that NSC

had had "no negative surprises," that "the recent volatility has not had any material impact on our returns," that "[l]oan defaults have not increased in our portfolio, and we remain confident for the foreseeable future," and that "we expect the return [in our accounting based estimate] to be at least +.80%." *See* NSC Monthly Performance Emails (Ex. 35); van Hoorn Decl., ¶ 22 (Ex. 6); Ridley Decl., ¶ 32 (Ex. 9).

115.  On August 7, 2008, NSC issued a press release (the "NSC 8/7/08 Press Release") quoting Bryson as saying, "Based on the confidence of our investors and the steady performance of our portfolios, New Stream Capital has joined the few hundred hedge funds worldwide with assets under management of more than $1 billion …  More importantly, we continue to deliver steady returns against the backdrop of the most challenging investment climate in recent memory." *See* NSC 8/7/08 Press Release (Ex. 43); Thorley Decl., ¶ 35 (Ex. 7). By this time, New Stream was already in default of redemption requests submitted by Tensor, ZAM AF, Consulta and Toledo Fund, LLC, at a minimum.

116.  Consistent with these rosy images, two months later NSC boasted that it had achieved 65 consecutive months of positive returns and had a year-to-date return of nearly 8%. *See* October 16, 2008 2:38 p.m. email from Tara Bryson to investors.  *See* NSC Monthly Performance Emails (Ex. 35).

117.  In mid-November 2008, however, NSC suddenly announced losses in October 2008 for the US and Cayman Feeders of <2.50%> and <2.25%>, respectively – allegedly its first losses ever – contending that they were due to "an impairment of a position secured by a pool of insurance annuities." *See* November 14, 2008 email from Tara Bryson to investors (Ex. 44).

54

118. In fact, substantially in response to the Revised LE Tables issued in March, and having ignored their effect for the following seven months, NSC took small write-offs in October (2.5% for US Feeder and 2.25% for the Cayman Feeder) and November 2008 (6.22% for both Feeders) followed by a write-down of over 80% of the annual charge on just one day, December 31, 2008.[53] The total write-down in 2008 was $160 million, of which more than 40% was attributable to Life Settlement Assets alone.[54]

119. In fact, NSC neither acknowledged nor published the full extent of the 2008 write-downs until it had no choice, when it announced its 2009 Restructuring in April 2009.

120. New Stream inflated profits in other ways. *See* discussion at ¶¶ 154-65 below. At December 31, 2006, loans that were on a non-accrual/troubled status totaled $12,636,349, while the loan loss reserve, approximately 108% of troubled loans, totaled $13,677,210. *See* NSSC and Subsidiaries Consolidated Audited Financial Statement for Year Ended December 31, 2006 (the "2006 NSSC Financials"), Note 1 (Ex. 45). At December 31, 2007, non-accrual/troubled loans had increased to $104,976,364, but the loss reserve, approximately 14% of troubled loans, totaled but $15,288,173. *See* 2007 NSSC Financials, Note 1 (Ex. 41). Increasing the loss reserve by just 11% in the face of a 725% increase in troubled loans was another means by which New Stream artificially maintained profits.

### d. Other Misrepresentations

121. New Stream's misrepresentations extended to its disclosures concerning amounts of new investments. For example, the NSC 8/7/08 Press Release disclosed that "firm

---

[53] The calculation of the 80%+ write-down on one day is as follows: In December 2008, write-downs of $71 million on Life Settlement Assets and $19 million on premium finance loans were taken, totaling $90 million. *See* NSSC Restructuring Plan Overview (Draft), dated March 2009 (Ex. 46). 2008 NSSC Financials reflect annual loss of $86 million on Life Settlement Assets and $20 million on premium finance loans, totaling $106 million (Ex. 32).

[54] The calculation of $160 million is as follows: 2008 NSSC Financials, Consolidated Statement of Operations, p. 6, "Net unrealized loss on loans" of (73,087,756) plus "Net unrealized loss on life settlement contracts" of (85,597239) = (158,684,995). (85,597239) is 53.9% of (158,684,995) (Ex. 32).

wide assets exceeded $1.2 billion, including $400 million recently raised for a new institutional

debt strategy designed to take advantage of opportunities in the credit markets." *See* NSC

8/7/08 Press Release (Ex. 43); Thorley Decl., ¶ 35 (Ex. 7).  Upon information and belief, no

such funds had been raised, and there has been no further mention of the new debt strategy fund

nor the $400 million allegedly raised.

122.    Another misstatement concerning new investments was published in New

Stream's financials.  The "Subsequent Events" section of the 2007 NSSC Financials recited that

$264,547,172 was raised by NSSC in the first quarter of 2008.  The 2008 NSSC Financials

reduced that amount to $193,759,035 *for all of 2008*,[55] without explanation.

123.    Another unexplained material misrepresentation is evident from a comparison

of the 2008 and 2009 NSSC Financials.  The 2008 NSSC Financials recited that the pre-

October 1, 2008 pending redemptions totaled $165,761,506.[56]  The 2009 NSSC Financials

recited that they totaled $211,255,619.  After adding $17,905,509 of redemptions paid in the

interim to that total, the pre-October 1, 2008 pending redemptions were reported at

$229,161,128,[57] almost $65,000,000 more than set forth in the 2008 NSSC Financials, even

though the September 30, 2008 redemption suspension date was fixed.

124.    NSC continues to make false statements when that serves its purposes.

As recently as March 17, 2010, Gillies testified that Northstar, a subsidiary of NSSC, had a

negative value of between $40 to $75 million.  2nd Gillies Aff., ¶ 38 ("Far from generating cash

---

[55] 2008 NSSC Financials, Cash Flow Statement, p. 8 and Note 6, pp. 19-20 (Ex. 32).

[56] 2008 NSSC Financials, Note 10, p. 21 (Pending redemptions are reported as of December 31, 2008.  Because
NSC purportedly froze all redemptions with respect to the US/Cayman Feeders  in mid-December 2008 as of
September 30, 2008, this amount is the same as the pre-October 1, 2008 pending redemptions) (Ex. 32).

[57] Audited New Stream Secured Capital, LP and subsidiaries consolidated financials for the year ended
December 31, 2009 (the "2009 NSSC Financials"), Cash Flow Statement, p. 8 (reflecting repayments of senior
subordinated notes totaling $17,905,509) (Ex. 47).

by disposing of the company, effecting a forced sale of Northstar in April 2009 would probably have required NSI to pay the purchaser between US$40 and US$75 million") (Ex. 16). New Stream also disclosed that Northstar had lost $60 million over the last three years. Yet in a presentation to European investors in meetings in November 2010 (the "November 2010 PowerPoint") (Ex. 48), NSC represented that in a 2009 year-end appraisal, Northstar's common equity was valued at $40 million and the company itself was appraised at $62.5 million.[58]  The $80 million to $137.5 million increase in Northstar's value in only eight months was unexplained, except by the context. By his first statement, given in affidavit testimony in the Gottex Proceeding, Gillies strategically sought to devalue Northstar. By his second statement, Gillies intended to elicit investors' consent to New Stream's Plan under which the US/Cayman Investors would receive equity in Northstar. From Gillies' perspective, his strategic goal, not the truth, determined Northstar's value. Indeed, in a November 17, 2010 meeting among Bryson, Michael Buenzow (consultant from FTI Consulting and Chief Restructuring Officer for NSSC) and Gillies, all representing New Stream, and Cremer and Thorley from Thomas Funds Limited (Cayman), investment manager for ZAM AF, Bryson admitted that Northstar may not have been worth even the minimum $40 million value attributed to it in the November 2010 PowerPoint. Thorley Decl., ¶ 40 (Ex. 7).

125.  In conclusion, the Debtors have used all available means to fraudulently induce investors to withdraw or delay their redemption requests, to make additional investments, and to support the Debtors' Plan. In these contexts, the Debtors' sworn testimony, oral representations to concerned investors, and asset valuations have been dictated by their

---

[58] The inconsistent valuations have not abated. In Exhibit 8 of the Disclosure Statement (Ex. 13), New Stream states that NorthStar had a fair market value of $40 million in 2009 and a fair market value $40 million today. In NSI's liquidation analysis, New Stream states that NorthStar has a value of $40 million but a liquidation value of only $2 million. The liquidation analysis refers to the value of the preferred shares, while Exhibit 8 refers to the common shares.

strategic goals, not the truth. This constitutes "cause" for the appointment of a trustee under Section 1104(a)(1).

### (3) The Debtors' Delay in Writing Down Deteriorating Assets Constitutes "Cause"

126. NSC knew full well that its valuations of its Life Settlement Assets were false. *See* discussion at ¶¶ 107-11 above. What's more, because the issuance by the SOA/AAA of the Revised LE Tables had been highly anticipated by the industry since the creation of the SOA/AAA task force in 2005, when it was well known that the then-existing 2001 life expectancy tables were too short for life settlement insureds, March 2008 was the *latest* possible date, not the *earliest*, for revaluation of New Stream's Life Settlement Assets.[59] Yet NSC failed to write down the value of New Stream's insurance assets until nine months after the Revised LE Tables were released.

127. It was unreasonable to delay the write-down of insurance assets until December 2008. Indeed, it was unreasonable to await even the formal publication of the Revised LE Tables in March of that year to reduce valuations in anticipation of their issuance. Most funds holding significant life settlement assets had factored the Revised LE Tables into their valuations long before the formal publication of the tables.[60] As a result, most competing funds did not suffer material charges in 2008, and certainly nothing on a scale of the 40% write-down suffered by NSSC attributable to its insurance assets. Indeed, funds in the Alternative

---

[59] The report issued by the SOA/AAA recounted the origin of the task force in pertinent part, as follows: "In 2005, the National Association of Insurance Commissioners (NAIC) Life and Health Actuarial Task Force (LHATF) requested that the actuarial professional bodies develop mortality tables that could be used to better reflect the actual mortality of companies for reserving. That LHATF stated that "Available life insurance mortality valuation tables are generally considered higher than the mortality of many preferred risks underwritten in the marketplace today." *See* "Joint Preferred Mortality Project Interim 2007 Report," dated March 13, 2008 (Ex. 49).

[60] For the same reason, most competing funds did not await the issuance by secondary life expectancy providers (American Viatrical Services, EMSI, Fassano and 21st Services) of tables specifically customized for the life settlement industry. These secondary providers, who supply underwriting for the industry, increased life expectancies by between 5% and 25% in the fall of 2008 based on the Revised LE Tables.

Asset-Partners (AAP) Life Settlement Index, a recognized industry benchmark for investments in traded US life insurance policies, returned a positive 3.99% in 2008.[61]

128.  The possible motives for NSC's delay in writing down its insurance assets include (i) *greed*, since NSC's compensation was a direct function of assets under management; (ii) *fraud*, since delaying the write-down also delayed the redemptions which would have inexorably followed, *see* discussion at ¶¶ 93-106 above; and (iii) *incompetence and gross mismanagement*.

129.  Fraud as a motive is self-evident.  Delaying the write-down of Life Settlement Assets delayed the onslaught of redemptions which would inevitably have followed and the resulting collapse of the New Stream enterprise.  Greed as a motive is less self-evident, requiring a basic understanding of NSC's rights to compensation.  Pursuant to the US Feeder and Cayman Feeder operating agreements and the 2007 PPMs, NSC was entitled to receive management fees of (i) .05% of the capital account of each investor, which fee was calculated and paid monthly in advance at a rate of one-twelfth of .05% per month, and (ii) .45% per annum of the total assets of NSSC, which was also paid monthly (collectively, the "Management Fees"), and (iii) a performance allocation (the "Profit Share") of 25% of net profits attributable to the US and Cayman Feeders' capital accounts (based on their equity interest in NSSC) in the calendar month for which the accrual calculation was made.[62]  Notably, by delaying these charges until the 4th quarter, the Fund Manager received a Profit Share of $5.6 million in 2008 on "income" of approximately $21 million during the first three quarters,

---

[61] The inadequacy of the belated write-down in December 2008 is now undeniable, as the proposed sale of Life Settlement Assets under New Stream's current proposed plan of reorganization for $127.5 million reflects an ongoing overvaluation, even after the December 2008 write-down, of another $222.5 million over book value of $350 million.

[62] 2007 US Feeder PPM, pp. 15-16 (Ex. 21); 2007 Cayman Feeder PPM, pp. 16-17 (Ex. 22).

while concluding the year with a loss of nearly <u>eight times</u> that amount, $162 million.  The Fund Manager refused to return the Profit Share.

130.  Thus, despite the failure of the 2007 Restructuring and the huge losses incurred by the New Stream enterprise in 2008,[63] NSC's total compensation in 2008 increased by a staggering 146%.[64]  NSC's monthly draw of Management Fees and Profit Share combined with its strategically delayed write-down assured NSC of a stupendously successful 2008 in the face of the investors' disaster.

131.  Predictably, no objection was heard from any of the suffering entities, as each was managed by NSC.[65]  Management unashamedly advanced its own interests without regard for the constituencies it represented and has failed to disgorge the fees.

132.  The evidence that NSC's delayed write-down of valuations in 2008 was motivated by fraud and greed is undeniable and substantial.  But should these motives ultimately be unprovable, the only other plausible explanation – incompetence and gross mismanagement[66] – is, while less corrupt, no less "cause" for the appointment of a trustee under Section 1104(a)(1).

---

[63] The 2008 NSSC Financials reflect a loss of $162,717,060 (2008 NSSC Financials, Statement of Operations, p. 6) (Ex. 32).

[64] Per the 2008 NSSC Financials, NSC was paid Management Fees and a Profit Share of approximately $9,295,000. The 2007 NSSC Financials show that NSC was paid Management Fees and a Profit Share of approximately $3,773,000.  $9,295,000/$3,773,000 equals 2.46, an increase of 146% (Ex. 32).

[65] NSC and NSC (Cayman), both of which have been under identical effective control at all relevant times, have managed all New Stream operating entities, including NSSC, NSI, the US/Cayman Feeders and the Bermuda Fund, creating conflicts between and among these entities to the detriment of the entities and their investors. *See* discussion at ¶¶ 178-87 below.  NSC's failure to timely write-down the Life Settlement Assets and the exorbitant fees taken as a result is but one of the many manifestations of this disabling conflict.

[66] *See* discussion at ¶¶ 133-74 below.

### (4) The Debtors' Incompetence and Gross Mismanagement Constitute "Cause"

133. Circumstantial evidence of the Debtors' corrupt motives for the acts which triggered the collapse of the New Stream enterprise is abundant. But even attributing the most benign motives to the Debtors, the Debtors grossly mismanaged their businesses. With a panoply of examples to choose from, the Movants limit discussion (for purposes of this pleading only) to these five: (i) the Debtors' acknowledged commingling of all assets and liabilities of NSSC, NSI, their subsidiaries and affiliates, and the US/Cayman Feeders, and the resulting substantive consolidation of those entities; (ii) the Debtors' payment of above-market rates of interest to the Bermuda Fund, thereby ensuring that NSSC and the US/Cayman Feeders would be rendered insolvent by normal operations; (iii) the Debtors' borrowing of so much at such above-market rates from Gottex, and giving Gottex access to inside information, thereby enabling Gottex to wield undue influence on the Debtors' operations, influence which inevitably contributed to the collapse of the New Stream enterprise; (iv) the Debtors' overvaluation of their insurance assets, *see* discussion at ¶¶ 107-11 above and ¶¶ 154-65 below; and (v) the Debtors' delayed write-down of their insurance assets, enabling them to maximize NSC's compensation and minimize redemptions, thereby maximizing the losses to innocent investors, *see* discussion at ¶¶ 126-32 above.

134. Before considering the circumstances underlying those specific examples of incompetence and gross mismanagement, however, consideration of some of the Bermuda Court's findings in the judgment issued in the Gottex Proceeding makes a compelling case.

a. **Implementing the 2009 Restructuring Without Gottex's Consent, Statutory Authority, or the Advice of Counsel, Was Found in the Gottex Proceeding to be Gross Mismanagement Warranting the Appointment of Joint Receivers for the Bermuda Fund**

135. There could be no more self-evident proof of the Debtors' incompetence and gross mismanagement than the Gottex Judgment, which was issued in the litigation brought by Gottex against the Bermuda Fund in June 2009 seeking a determination that New Stream's 2009 Restructuring was contrary to Bermuda law and the Bermuda Fund's bye-laws, and seeking the appointment of receivers for the Bermuda Fund Classes (C and I) owned by Gottex. In the Gottex Judgment, the Bermuda Court characterized NSC's attempt to implement the 2009 Restructuring without Gottex's consent as "[NSC]'s brinkmanship," observing further that "at no point did [NSC] formally seek or obtain Bermuda law advice …, with [the Bermuda Fund's] directors and their local attorneys seemingly adopting a 'don't ask, don't tell' stance to the implications of the knotty issues …." Gottex Judgment, ¶ 199 (Ex. 50). Rejecting outright NSC's suggestion that it could retain management control over its investors' assets in furtherance of an insolvent restructuring where real conflicts of interests had been brought into play and objections interposed, the Court wrested control of the subject classes of the Bermuda Fund from NSC, appointing joint receivers on the spot. *See id.*, ¶¶ 201, 207.

136. Had "incompetence" or "gross mismanagement" been necessary findings for the relief granted by the Bermuda Court, it would have had no problem issuing its ruling, for the decision is replete with inferences of ineptitude combined with aggressive, improper and unprofessional conduct. Acting without legal authority or the parties' consent, NSC's aggressive behavior was "brinksmanship." Acting without legal advice while adopting a "don't ask, don't tell" attitude connotes NSC's lawless imposition of force motivated by greed that has continued to this day by its solicitation of votes for the Plan. *See* Gottex Judgment, ¶ 183

62

("[I]f I were required to find want of probity as an element of the just and equitable ground for appointing a receiver, I would find that this element has also been made out. Firstly it is implicit in a finding that the [Bermuda Fund] has entered transactions which are unlawful that some impropriety has occurred. However, this implied misconduct was accompanied by a 'don't ask, don't tell' approach to Bermuda law advice …") (Ex. 50).

### b. De Facto Substantively Consolidating NSSC, NSI, The US/Cayman Feeders, and Subsidiaries and Affiliates

137. Since at least 2007 and, according to Gillies, possibly as early as 2004, all assets and liabilities of NSSC, NSI, the US/Cayman Feeders, and their subsidiaries and affiliates, have been commingled. All entities in the New Stream enterprise shared common bank accounts. With NSC managing all entities and all accounts, NSSC paid more than $300 million of NSI's obligations mostly with funds advanced to NSSC by the US/Cayman Feeders, without any offset, with elimination of inter-company balances, and without the US/Cayman Investors' knowledge. This commingling of assets and liabilities without appropriate record-keeping rises to the level of gross mismanagement and breach of fiduciary duty.

138. Gillies testified under oath at length in the Gottex Proceeding that NSSC and NSI *ought* to be consolidated based on their disregard of corporate distinctions between them. *See, e.g.*, 1st Gillies Aff., ¶ 26 (testifying that with regard to NSSC and NSI, "[t]he assets of the accounts, the loans themselves, were quite clearly always going to be very closely related and exposed to the same credit risks and collateral risks, etc.") (Ex. 20); *id.*, ¶ 65 ("no distinction has been drawn between the loans of NSI and the loans of NSSC."); *id.*, ¶ 67 ("Upon the change in ownership, NSSC and NSI began to operate group accounts. NSI expenses (for example funding insurance premiums) were treated as expenses of NSSC"); *id.*, ¶ 71 ("no distinction is

drawn between NSSC and NSI when funding redemptions of investments in the Bermuda

Fund"). *See generally* 2nd Gillies Aff., ¶ 61 ("I have also explained how the corporate history of

NSSC and NSI means it is an error to treat them as separate asset bases anyway") (Ex. 16);

Gottex Judgment, ¶¶ 30, 38 (Ex. 50).

139. Gillies explained that in 2007, when NSI became a wholly-owned subsidiary

of NSSC, the direct equity investment by investors in NSI was eliminated and equity investors

in NSI were given a choice of swapping their NSI shares for NSSC Shares, or being redeemed.

1st Gillies Aff., ¶ 73 (Ex. 20). Gillies further explained:

> [i]t was decided to retain the C, F and I Bermuda Loans with NSI and not
> to assign them to NSSC. They were left in place because to do so
> benefited shareholders of the Bermuda Fund, in particular the Gottex AB
> Funds. If the loans were moved to NSSC then Gottex AB Funds would
> have to combine their reported investment in NSI with NSSC. This would
> have resulted in an excessive concentration in NSSC and [Gottex] would
> have had to place a redemption to lower this concentration. Gottex
> management requested we leave the loans at the NSI level, as then they
> could continue to report the positions separately. So the direct lending and
> security arrangements between the Bermuda Fund and NSI were left in
> place, and NSSC capital has continued to be applied to support the
> collateral securing advances by these accounts, both for the benefit of the
> Bermuda shareholders. *As far as we were concerned, it really did not
> matter which entity was the obligor on the loans, as the assets of all NSSC
> subsidiaries were still treated as a mutual pot available for all redeemers
> regardless of the Feeder Fund. In spite of the precise letter of the security
> arrangements and the Collateral Agency Agreements, the two borrowers
> were In fact one.*

*Id.*, ¶ 74 (*emphasis* added). What Gillies was saying was that Gottex AB and NSC agreed that

NSI and NSSC would be consolidated. To allow Gottex AB not to reduce its investment in the

New Stream enterprise, the loans of Gottex AB would stay with NSI (thus secured by NSI's

assets) while the payments of those loans would come from NSSC. Essentially, Gillies admitted

that even though the Gottex AB loans stayed with NSI and despite what is provided in the

Collateral Agency Agreements, NSI and NSSC were really consolidated.

64

140. Also, when NSI became a wholly-owned subsidiary of NSSC in 2007, the companies began to operate group accounts, and NSI expenses were treated as NSSC expenses, and vice versa. 1st Gillies Aff., ¶ 67 (Ex. 20). Under this framework, NSSC contributed all funding necessary to enable NSI to make its premium payments and invest in new premium finance loans, with the assets freely moving between the entities. *Id.*, ¶¶ 29, 69 ("[s]ince 2007 NSSC has contributed over US $300 million to NSI to make premium payments and invest in new premium finance loans"); 2nd Gillies Aff., ¶ 51 (Ex. 16).[67]

141. In addition, the cash management systems were consolidated in NSSC's name, so that "no cash was held in NSI's separate bank account, any cash [was] swept to NSSC." 1st Gillies Aff., ¶ 73 (Ex. 20); 2nd Gillies Aff., ¶ 52 ("the accounts of the two entities have been centralized. Since 2007, no individual entity accounts have been prepared for NSI. NSSC [and] NSI … have been treated as a single consolidated unit") (Ex. 16). Neither NSSC nor NSI held intercompany ledgers to "book" which cash was NSI's and which was NSSC's; the funds were commingled and used by either entity as if its own. *Id.*, ¶ 53 ("The mutualization is evident from the financials for NSSC for 2007 …. See for example, the 'Basis of presentation' statement on page 7 of the 2007 financials for NSSC … confirming the consolidated treatment and elimination of inter-company balances").

142. Gillies' testimony did not stop with mere recitations of the transfers and bookkeeping. Rephrasing his testimony to emphasize the huge volume of cash transfers implicated, he acknowledged that NSSC and NSI:

---

[67] Because NSI was hopelessly insolvent at all times, neither NSSC nor the US/Cayman Feeders who indirectly invested in NSSC and whose return on investments would be based on NSSC's performance, received any value in exchange for NSSC's transfers of more than $300 million to NSI or on NSI's behalf. These transfers for no consideration, fraudulent conveyances at a minimum and compelling additional grounds for substantive consolidation, are further evidence of the Debtors' gross mismanagement. *See* discussion at ¶¶ 223-30 below.

> have for some years formed a single pool of assets, mutually self-funding, and available for the repayment of any and all loans advanced to either NSI or NSSC …. The assets are made available for the benefit of all investors. As such, there is no special connection between the assets of either vehicle and the loans advanced by its lenders. Hundreds of millions of dollars of loan repayments and premiums have been paid out of this mutual pool, without regard to actual legal ownership of assets …. This has been the position since 2007, and in many ways, since 2004.

1st Gillies Aff., ¶ 75 (emphasis added) (Ex. 20).

143. Moreover, NSSC apparently had no choice in the matter, since NSI never had liquidity with which to pay its own obligations. 2nd Gillies Aff., ¶ 51 ("NSI is, and has since incorporation in 2004 been, chronically cash flow negative …. As a result, NSI has been consistently cash flow negative and completely dependent upon NSSC for the maintenance of its expensive asset base") (Ex. 16); *Id.*, ¶ 31 (annual premium payments for life insurance policies held by NSI exceeded $60 million).

144. The commingling of accounts, assets and liabilities was not limited to NSSC and NSI. Upon information and belief, other subsidiaries were treated no differently from NSI. *See* 2nd Gillies Aff., ¶ 52 ("the assets of *all entities* under NSSC have been treated as an undifferentiated pool from which all Feeder Loans may be repaid regardless of the identity of the borrower") (*emphasis* added) (Ex. 16); *id.*,¶ 69 ("For ordinary course of business repayments, *the assets of all subsidiaries of NSSC* were treated as one economic unit, and were always available to repay any Feeder Loan regardless of borrower") (*emphasis* added).

145. Apparently, NSC made no distinction among feeders either. 1st Gillies Aff., ¶ 64 ("liquidity generated from NSSC and NSI assets has always been applied to repay Feeder Loans in the order determined by the effective date of the underlying redemption obligation that the loan repayment will ultimately be used (by the Feeder Fund) to discharge") (Ex. 20); 2nd Gillies Aff., ¶ 85 ("For years, NSSC, and NSI … have represented one single fund

66

under single management, with an undifferentiated pool of assets which was centrally paid for, and which was available to repay all Feeder Loans … regardless of the actual identity of the borrower") (Ex. 16).

146. The substantive consolidation of the Debtors and their subsidiaries or affiliates which Gillies has admitted to in urging the Bermuda Court to consolidate NSSC and NSI rises to the level of incompetence and gross mismanagement.

### c. Payment of Above-Market Terms to the Bermuda Fund At the Cost of the US/Cayman Investors

147. From the inception of NSSC through the creation of the Bermuda Fund in 2005, investments in NSSC were made directly by US Investors solely as limited partnership interests, *i.e.*, equity.[68]

148. Unbeknownst to many US Investors,[69] in 2005 NSSC and NSI began raising most of their investment funds through the Bermuda Fund, which invested directly in NSSC and NSI through senior secured notes that had fixed interest rates between 10% and 10.5% secured by substantially all of NSSC's and NSI's assets.[70] By the end of fiscal 2005 NSSC had raised a net $19 million through the Bermuda Fund[71] and a net $154 million through other investors;[72] by the end of 2007, however, NSSC had raised $543 million through the Bermuda Fund,[73] while the funding from US Investors was relatively unchanged from 2005 at $148 million. Thus, by

---

[68] *See* Porter Capital Private Placement Memorandum, dated March 2003 ("2003 PPM"), p. ii ("This fund is offering its limited partnership interests … by way of this Confidential Private Placement Memorandum") (Ex. 51).

[69] Prior to January 1, 2008, all of the direct investors in NSSC were US Investors.

[70] *See* 2007 NSSC Financials, Note 8, p. 16 (Ex. 41).

[71] *See* Audited Porter Capital Consolidated Financial Statements for Years Ending December 31, 2004 and December 31, 2005, dated April 13, 2006 ("2004 and 2005 NSSC Financials"), Balance Sheet, p. ii, for amount of "Senior Subordinated Notes" and Note 11, p. xii) (Ex. 52).

[72] "Net" refers to the amount on the Fund's balance sheet as of the referenced date, *i.e.*, all investments made and interest and/or income, net of any redemptions.

[73] *See* 2007 NSSC Financials, Balance Sheet, p. 3 for amount of "Senior Subordinated Notes" and Note 8, p. 16 (Ex. 41).

the end of 2007, the Bermuda Fund investments made up approximately 75%[74] of the invested capital in the New Stream enterprise.

149.  The fixed rate of return on the notes paid by New Stream to the Bermuda Investors – 10.0% to 10.5% – was almost equal to NSSC's reported historical rate of return.[75] Thus, even assuming reported profits had been real, the return on senior secured Bermuda notes consumed most of NSSC's gross profit.  This preference given to the Bermuda Investors left almost nothing for NSSC's US Investors, despite New Stream's representations in the US and Cayman PPMs that leverage would be used only to enhance profits.[76]

150.  The return for the US Investors was based on residual profit only after (i) paying the Bermuda Investors their guaranteed rate, (ii) deducting all of the Fund's expenses, including all the costs of the Fund Manager, (iii) deducting other interest costs, and (iv) deducting for loan loss reserves and other expenses of NSSC.  This meant that the US Investors were subsidizing the expenses of the Bermuda Fund, and unknowingly were placed in a much riskier, unsecured position with very little upside on their investment.

151.  Again, New Stream paid a guaranteed return of 10.0-10.5% to the Bermuda Investors, whose debt comprised approximately 75% of the capital at the time of the 2007

---

[74] *See* 2007 NSSC Financials, p. 3 (Ex. 41): Partners Capital ($161,429,944) plus Subordinated Notes ($31,531,268) plus Senior Subordinated Notes ($542,625,900) equals total assets (est.) of New Stream enterprise ($735,586,612).  Senior Subordinated Notes ($542,625,900) divided by total assets (est.) of New Stream enterprise ($735,586,612) equals 74%.

[75] *See* Report on Monthly Performance Through Month End September of 2008 transmitted by NSC to US Investors (the "US Feeder Tear Sheet through Sept. 2008") (Ex. 53).  The US Feeder Tear Sheet through Sept. 2008 reported results for the consolidated New Stream enterprise at least through 2007.

[76] A similar representation in the 2003 PPM underlies the impropriety of borrowing from the Bermuda Fund virtually from the inception.  While such debt was arguably a technically proper means of avoiding the 2003 PPM's prohibition against foreign investors, the borrowing grossly violated the 2003 PPM's limitation that leverage would be used *only* to enhance profits.  *See* 2003 PPM, p. 9 ("Other Potential Fund Investments" – "Leverage") (Ex. 51).  With such debt earning interest of 10.0% to 10.5%, profits were wholly consumed by the swollen borrowing from the Bermuda Fund by late 2007, when debt comprised 75% of the invested capital in New Stream.

Restructuring.  New Stream's Portfolio Report through October 2007, the latest such report issued prior to the solicitation for the 2007 Restructuring, showed a gross return on all investments of 13.51%.  Reducing this gross return by expenses and management's profit share – 4.6% and 0.8%, respectively, of assets under management (using a rolling 2-year average for 2006 and 2007) – only left New Stream a net 8.11% return.  *See* 2005 – 2007 NSSC Financials (Ex. 52, 45 and 41).  That return was well short of the amount necessary to pay the 10.0 -10.5% interest to the Bermuda Investors, let alone provide any return to the US/Cayman Investors.

152.  As principal and manager of NSSC, manager of the Bermuda Fund and managing member of NSI, NSC controlled all three entities.  Thus, NSC served as both lender and borrower with regard to the Bermuda Fund's secured notes.  Not surprisingly, no objection was interposed to the above-market interest rate.

153.  NSC knew or should have known that the structure of the investments in New Stream's funds, the rate of return on the Bermuda Fund's secured notes, and the rapid growth in the Bermuda Fund's investments assured that the US/Cayman Investors' interests, both debt and equity, would become worthless.  NSC's failure to disclose this to the US/Cayman Investors and its failure to stanch the growth of the Bermuda Fund's investments while still soliciting investments from the US/Cayman Investors was at least grossly negligent, and thus constitutes "cause" to appoint a trustee under section 1104(a)(1) of the Code.

### d.  Overvaluing Life Insurance Assets In Order To Appear Profitable

154.  As discussed above, New Stream's Portfolio Report through October 2007, the last such report before New Stream's solicitation of the 2007 Restructuring, valued assets to generate a return of 13.51%.  New Stream also told the US Investors at the time of the 2007

Restructuring that NSSC had produced "an annualized rate of return, since inception, of 11.2+%." *See* NSC Monthly Performance Emails (Ex. 35).

155. To generate this claimed level of return, NSSC's "cost of capital" – the overall percentage cost of the funds NSSC required to finance their assets – was 15.9%, calculated as follows: the weighted average return to Bermuda Fund and US Investors of 10.5%;[77] plus expenses and management's profit share – 4.6% and 0.8%, respectively.

156. Per the October 2007 Portfolio Report, approximately 40% of those assets was related to life insurance. Those assets were valued using a discount rate ranging from 10% to 12%, rates even further below New Stream's cost of capital than its other assets.

157. Life insurance-related assets include Life Settlement Assets, which are life insurance policies owned by NSI and NSSC.[78] The average death benefit on these policies was almost $5 million, while the average insured was over 65 years old. The second component of life insurance assets are premium finance loans, loans made to finance (at least partly) the inception costs of a policy including the first two years of premiums, loans which are collateralized by the policy itself. Rarely are these loans actually repaid; typically the loans default, and NSSC takes over the policy as a Life Settlement Asset.

158. Life settlements are a unique asset class. Because of the large death benefits and the insured's advanced age, the policies require high annual premium payments. The investment makes sense only if, on average, the insured dies before the premiums paid (discounted to present value) exceed the death benefit. Therefore, although NSSC always acknowledged that its Life Settlement Assets had always been and would continue to be cash

---

[77] Calculated using the weighted average of the Bermuda Fund's 75% of capital at 10-10.5% and the equity's 25% of capital at 11.25% return.

[78] Life insurance assets were on both NSSC's and NSI's balance sheets. In this discussion, "NSSC" will refer to the consolidation of both funds.

flow negative for years[79] – *i.e.*, outgoing premiums far exceeded the expected incoming death benefits for any time period – New Stream carried Life Settlement Assets on its balance sheet and reported income each year for the alleged increase in "fair value" of the policy according to accounting principles, as described in New Stream's 2007 financial statement:

> [T]he fair value method requires that the initial investment in a life settlement contract be recognized at its transaction price.[80] The investment is re-measured at fair value in its entirety based upon life expectancy and other variables at each subsequent reporting period, with changes in fair value recognized in earnings in the period in which the changes occur. The significant assumptions used in the valuations as of December 31, 2007 were (a) life expectancy of each person insured which is determined by a third party life expectancy provider who bases the life expectancy on mortality tables and (b) a discount rate of 12%.[81] Proceeds received are recognized in earnings on the same financial reporting line as changes in fair value. The fair value of the policy increases to the face amount of the policy at a level rate of return over the estimated life expectancy of the insured. Premiums are capitalized as additional investment into the fair value of the policy. *Each month an unrealized gain or loss is recorded for the change In fair value.*

2007 NSSC Financials, Note 1, p. 10 (Ex. 41) (*emphasis* added).

159. Unlike a loan asset where a higher interest rate produces higher income, a Life Settlement Asset, whose value is based not on current cash flows but on *future expectations of death benefit collections*, will be *devalued* by using a higher discount rate assumption. Conversely, using too low of a rate will inflate the value of the Life Settlement Asset and its related income. Also, a loan's rate is fixed at its inception, while the rate on a Life Settlement Asset can be adjusted at will.

---

[79] *See* 1st Gillies Aff., ¶ 20-21 (Ex. 20)

[80] The other method of valuation is the Investment Method, which capitalizes costs and premiums incurred, and only recognizes income when an insured dies. The investment method is the more conservative of the two methods.

[81] The discount rate of 12% is determined solely by New Stream.

160. Many factors determine an investment's discount rate, but the discount rate for any investment should never fall below the cost of capital; if it does, the expected future income from the investment cannot provide a gross return adequate to pay the investor's cost of capital.

161. New Stream valued its Life Settlement Assets at the end of 2007 using a 12% discount rate, and it valued the return on its premium finance loans, which almost always became future Life Settlements Assets, at 10%. At October 31, 2007, these assets were carried at approximately $142 million and $149 million, respectively. Without non-public policy detail, it is difficult to calculate the potential loss caused by New Stream's overstatement. Using a discount rate of 17% to cover New Stream's cost of capital of 15.9% and other contingencies, however, the difference in discount rates suggests that these assets were at least 40% overvalued based on an understated discount rate alone.

162. A further indication that New Stream's life insurance assets were routinely and materially overvalued is that New Stream now proposes to sell its Life Settlement Assets which it had valued at approximately $350 million in August 2010, for only $127.5 million after a sale process which New Stream claims enabled it to get the maximum price. And this write-down of over $200 million now follows a $106 million write-down already taken in 2008.

163. For the year ended December 31, 2007, net income to New Stream's equity investors, after paying interest to the Bermuda Fund and NSC's expenses, was $21,470,416. Included in net income was "life settlement income" of $20,110,456, an amount material to the New Stream's income. Indeed, without "life settlement income," there would have been no income.

164.   As principal and manager of NSSC and managing member of NSI, NSC controlled these entities.  Thus, NSC fixed the discount rate used to value these Life Settlement Assets, and it could adjust this rate to dictate the Fund's reported income.

165.   NSC knew or should have known that New Stream's life insurance assets were overvalued and its reported income was overstated.  Further, NSC valued them so that the returns from the underlying life insurance policies, net of the premium costs necessary to maintain these assets, would never provide the return necessary to pay New Stream's cost of capital.  NSC's failure to disclose to its investors that these investments were significantly overvalued, and quite possibly never should have been made in the first place, while still soliciting investments from the US/Cayman Investors, was at least grossly negligent.  This overvaluing of assets and NSC's failure to disclose the material contingencies on these assets while soliciting investments virtually worthless from the inception constitutes "cause" to appoint a trustee under section 1104(a)(1) of the Code.

### e.   Enabling Gottex to Wield Undue Influence

166.   New Stream's incompetence and gross mismanagement is further evidenced by its over-borrowing from Gottex and granting Gottex unrestricted access to otherwise confidential information.  Aided by such access and economic leverage, Gottex wielded undue influence to the detriment of other creditors, the US/Cayman Feeders, and NSSC itself.

167.   To maintain its security interest in NSSC's and NSI's assets and its priority over other creditors, Gottex refused to participate in the 2007 Restructuring despite New Stream's representations to all other parties that the Bermuda Fund would be eliminated in the 2007 Restructuring and all investor interests would be treated *pari passu*.  Moreover, although Gottex knew that NSI was hopelessly insolvent and illiquid, with no assets to pay its own debts (comprised almost exclusively of NSI's premium obligations on its Life Settlement Assets

73

which served as Gottex's collateral), Gottex knew that NSSC would fund NSI's obligations for no consideration. Gottex's investment would remain secure although NSI, its debtor, was hopelessly insolvent and illiquid. Gottex also knew that NSI's premium obligations would be funded by NSSC with advances from the US/Cayman Feeders, even though Gottex's right to repayment was senior to the rights of the US/Cayman Feeders.

168. Gottex also wielded undue influence by extracting from NSC an amendment to the November 2007 NSSC CAA. In November 2007, upon information and belief, the Bermuda Fund and New Stream amended the NSSC CAA to treat the US/Cayman Feeders' security interest *pari passu* with the Bermuda Fund's lien as part of the anticipated 2007 Restructuring. *See* discussion at ¶ 74, n.27 above. In March 2008, Gottex requested full redemption of approximately $270 million, or 35% of assets under management. To induce Gottex to withdraw its redemption request, which request could not have been satisfied timely and would have resulted in a 35% reduction in NSC's Management Fees and a quick forced liquidation, NSC amended the November 2007 NSSC CAA to grant to Gottex and other Non-Insurance Classes *senior* liens against NSSC's assets, thereby priming the US/Cayman Feeders' interests. *See* 1st Gillies Aff., ¶ 25 (Ex. 20); Gillies Tensor Aff., ¶ 29 (Ex. 30); discussion at ¶ 74, n.27 above; *see also* 1st Gillies Aff., ¶ 57. Indeed, among the Movants who were Bermuda Investors who converted to the Cayman Feeder as NSC had requested, $24.7 million worth (*see* discussion at n.30 above), were immediately subordinated to Gottex by the March 2008 NSSC CAA.

169. No injured party objected since no injured party was aware of the March 2008 NSSC CAA. After all, upon information and belief, NSC served as signatory for all parties to that NSSC CAA except for the collateral agent.

74

170. NSC's response was unnecessary and highly prejudicial to the US/Cayman Investors, motivated only by NSC's greed in preserving its own Management Fees and the undue influence wielded by Gottex. NSC could and should have responded by suspending redemptions from NSSC, as it ultimately did later that year as to the US/Cayman Feeders. But even without suspending redemptions, neither NSSC nor NSI had to make any payments until one year after Gottex's demand, for the Bermuda Fund could only satisfy Gottex's demand with the proceeds of NSSC's and NSI's notes, all of which were payable between six and twelve months after demand at the payor's discretion. Indeed, had the US/Cayman Investors known of Gottex's redemption demand, they could have made their own demands from the US/Cayman Feeders and received payment of their debt before Gottex, before any obligation to the Bermuda Fund had ripened, since, upon information and belief, NSSC's notes to the US/Cayman Feeders were payable on shorter notice than the notes payable to the Bermuda Feeder. *That* would have been the only appropriate result under the then-pending November 2007 NSSC CAA, and was the likely scenario had NSC respected its fiduciary duties to its equity holders, the US/Cayman Investors.

171. At a minimum, NSC could and should have immediately ceased commingling assets and liabilities of NSI and NSSC, entering into a loan and security agreement pursuant to which NSI assets would have been pledged to NSSC to secure NSSC's routine payments of insurance premiums. Upon Gottex's redemption demand, NSC's fiduciary responsibility to the US/Cayman Investors would have proscribed the continuing use of the US/Cayman Investors' funds to artificially prop up the insurance assets of NSI exclusively for Gottex's benefit.

172. But NSC could not preserve its Management Fees without appeasing Gottex and satisfying its concerns. No new institutional investor – what NSC would have needed in

view of the amount of Gottex's debt – would permit the proceeds of its investment to be used to cash out the largest current investor. Thus NSC capitulated to Gottex's demands.[82]

173. The ultimate result of NSC's actions was to deny even return of investment principal to the US/Cayman Investors while enabling Gottex to expand its collateral and thereafter improve and augment such collateral with funds supplied by the US/Cayman Investors. That funding will not be repaid in these cases in the absence of some combination of disgorgement, substantive consolidation and equitable subordination. NSC's capitulation to Gottex was gross mismanagement.

174. In summary, the incompetence and gross mismanagement manifested by the Debtors' de facto substantive consolidation of NSSC, NSI, their subsidiaries and affiliates, and the US/Cayman Feeders, the Debtors' payment of above-market terms to the Bermuda Fund, the Debtors' enabling Gottex to wield undue influence, the Debtors' overvaluation of their insurance assets, and the Debtors' delayed write-down of their insurance assets, is "cause" for the appointment of a trustee under Section 1104(a)(1).

### (5) The Debtors' Misuse of Funds Raised During the 2007 Restructuring in Violation of the Offering Documents Constitutes "Cause"

175. As ultimately acknowledged by New Stream itself, NSC could not liquidate funds timely to satisfy the avalanche of redemption requests which were due in 2008. As a

---

[82] Other examples abound of Gottex's wielding undue influence, taking advantage of leverage resulting from NSC's over-borrowing, NSC's overriding interest in preserving its Management Fees at the expense of its fiduciary responsibilities, and the US/Cayman Investors' ignorance of the Bermuda Fund's existence and senior lien. For example, in or about August 2008, Gottex negotiated modifications to the Bermuda Fund Loan and Security Agreement which required New Stream to maintain a certain loan-to-value ratio to "ensure that sufficient cash would be available to secure [Gottex's investment] at all times. 1st Gillies Aff., ¶ 52 (Ex. 20). Thus, Bermuda Loans could no longer represent more than 50% of the assets of NSSC or NSI. *Id.* at ¶¶ 50, 105. In another example, Gottex dictated the distribution formula for payments of redemptions made after October 1, 2008, under which, according to Gillies, all other investors "are expected to make a loss, the question being how significant." *Id.* at ¶ 62. Gillies estimated that under the best scenario, Gottex would recover all its principal and interest, while all other investors would incur a $60 million loss. *Id.* NSC received nothing for these concessions.

result, 92% of the funds New Stream raised from new investor subscriptions were used to pay pending redemptions. More particularly, $200 million of new money was raised during the first quarter of 2008, of which approximately $152 million was used to satisfy redemptions. *See* discussion at ¶ 75, n.28 above.[83]

176.  This use of newly raised funds to pay redemptions violated the express terms of the 2007 PPMs, all of which stated that the proceeds from the offering would be used only for "investment and trading activities and to pay certain expenses, liabilities and indemnification obligations."[84] NSC knowingly failed to comply with the permitted uses of proceeds when it used funds raised from new investors to pay the theretofore undisclosed avalanche of redemption requests.

177.  This violation of the provisions of the 2007 PPMs concerning permitted uses of the proceeds raised from investors in the US/Cayman Feeders is "cause" for the appointment of a trustee under Section 1104(a)(1). Indeed, even were the 2007 PPMs silent on this issue, this Ponzi scheme-like practice of paying redemptions with funds from new investors would qualify as gross mismanagement at a minimum, and thus "cause."

**(b) Conflicts and Inappropriate Relationships Constitute "Cause" to Appoint a Trustee as No Impartial Fiduciary Exists to Investigate and Pursue Claims Against Affiliates, the Bermuda Fund, and Gottex**

178.  A chapter 11 trustee must be appointed to investigate and pursue the New Stream entities' claims and causes of action between and among themselves, and against the Bermuda Fund, the Liquidators, Gottex and others who may have played a role in the New

---

[83] *But see* discussion at ¶ 122, n.55 above, in which Movants observe that the 2008 NSSC Financials reduced the amount of new funds raised to $193,759,035 *for all of 2008,* without explanation.

[84] *See* 2007 Cayman Feeder PPM at p. xvi (Ex. 22); 2007 US Feeder PPM at p. xii (Ex. 21); 2007 Amended NSSC PPM at p. 2 (Ex. 23). Clearly redemption obligations were not within the scope of the permitted "certain expenses, liabilities and indemnification obligations." Otherwise, there would have been nothing left for the principal use for which new funds were raised: "capital for … investment and trading activities."

Stream entities' demise, and to pursue substantive consolidation of NSSC, NSI, and other affiliates, including the Debtors. *See Intercat*, 247 B.R. at 923; *In re William Vaughan & Co.*, 40 B.R. 524, 526 (Bankr. E.D. Pa. 1984) (appointing trustee because of debtor's post-petition failure to scrutinize prepetition transfer to debtor's president); *In re L.S. Good & Co.*, 8 B.R. 312 (Bankr. N.D. W.Va. 1980) (appointing trustee because of strong probability of conflict of interest that will hinder management's ability to investigate and pursue claims on estate's behalf); *Fiesta Homes of Georgia*, 125 B.R. at 321 (finding that appointment of a trustee would be appropriate due to conflict of interest inherent in corporate structure); *cf. In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 473 (3rd Cir. 1998) (appointing trustee based on acrimony driven by inherent conflicts of interest among management).

179.  While managing all of the New Stream entities at once, NSC advanced its own interests at the expense of the constituencies underlying the New Stream enterprise. *See, e.g.,* ¶¶ 129-31, above.

180.  Indeed, since no later than January 1, 2008, when NSC purported to implement the 2007 Restructuring without the consent of all necessary parties, NSC has been unable to fairly represent the divergent interests of its investors asserting conflicting liens against New Stream's property.  And in its ruling focused on the same conflicts one year later, the Bermuda Court in the Gottex Proceeding appointed receivers of the C, F and I classes of the Bermuda Fund based on its determination that NSC, by purporting to implement the 2009 Restructuring without the consent of all necessary parties, had proven itself incapable of representing the different interests.  *See* Gottex Judgment, ¶ 206 and n.22 (Ex. 50).  Moreover, the obvious conflict between the Bermuda Investors and the US/Cayman Investors, which the Debtors only now acknowledge, *see* Disclosure Statement, § IV.D, p. 33 (Ex. 13), has always

78

existed and has biased NSC's actions from the inception, most notably manifested by NSC's failure to disclose that the Bermuda Fund had not participated in the 2007 Restructuring.

181.  The same reasoning disqualifies NSC from its ongoing representation of the US Feeder and the Cayman Feeders.  The Movants believe that it is in their interests to pursue causes of action sounding in substantive consolidation, equitable subordination, constructive trust and fraudulent conveyance, as set out at length at ¶¶ 188-235 below.  NSC apparently believes that the Movants' interests are served by accepting the crumbs which the Plan offers them while granting releases to all malefactors.  The disabling conflict could not be more apparent.

182.  Upon information and belief, different entities have never represented the divergent interests of the various New Stream entities or the different investor groups until recently, when the Liquidators, having become all too familiar with New Stream's operations during their preceding term as Receivers, terminated the Bermuda Fund's management agreement with NSC pursuant to specific authorization of the order appointing them.  *See* Letter from Mike Morrison, Joint Receiver and Joint Provisional Liquidator, to Kings Mountain Capital, dated September 22, 2010 (Ex. 54); Disclosure Statement, § V.A.1, p. 37 (Ex. 13).

183.  As the Liquidators' action has demonstrated, NSC is *legally* conflicted from serving as a fiduciary for all New Stream entities, since in liquidation mode, the interests of the New Stream entities conflict among themselves.  That investors may have acquiesced in NSC's wearing many hats when they believed that the New Stream enterprise was healthy and creditors would be treated *pari passu* is of no significance now that conflicts have ripened among the several constituencies vying for large slices from one too-small liquidation pie.

184. New Stream hired FTI Consulting (by Michael Buenzow) as its Chief

Restructuring Officer prepetition in anticipation of filing voluntary Chapter 11 petitions, but that

does not supply the requisite new blood – though no doubt he was retained for appearance's

sake – since Mr. Buenzow necessarily has taken his instructions from New Stream and thus is

neither disinterested nor uninvolved. Moreover, he has been intimately involved in New

Stream's attempt to propose a consensual plan of reorganization, a process from which the

US/Cayman Investors have been wholly excluded (except as the recipients of sales pitches

which characterize the crumbs they are being offered, funded by their own money, as "gifts").[85]

*See* discussion at ¶¶ 236-43 below. By participating in this process which proposes a plan

which essentially ratifies the injustices of the New Stream scheme and supplies releases to all

third-party wrongdoers, Mr. Buenzow effectively has disqualified himself from serving as

Trustee.[86]

185. Moreover, NSC is *functionally* disabled by its lack of impartiality, since it has

a severe disincentive to bring actions for damages caused by its own decisions and acts.

186. A Chapter 11 trustee must be appointed to investigate and pursue claims and

causes of action which NSC cannot bring. First, because of the admitted commingling of assets

and liabilities, the lack of adequate record-keeping, and the elimination of inter-company

balances, NSI and NSSC must be made debtors, and their estates, along with the involuntary

Debtors' estates and others, must be substantively consolidated. Second, because of the use of

the US/Cayman Feeders' funds to preserve and augment the Bermuda Fund's collateral,

---

[85] *See* Disclosure Statement, § X.G, pp. 102-03 (Ex. 13).

[86] And NSC's attempt to skirt the conflict by appointing New Stream Capital Services, LLC, a wholly-owned subsidiary of NSC, as an Additional Managing Member to supplant it by acting as, and exercising all of the duties of, the Managing Member of the US Feeder is equally futile, although NSC's recognition that because of its own conflict and the hostility of the US Investors, the US Feeder requires new management to represent its interests in these cases, is essentially a consent to this Motion. *See* NSC letter to US Investors, dated February 17, 2011 (Ex. 96); Disclosure Statement, § V.C.7.e.i, p. 73 (Ex. 13).

Gottex's strategic silence in the face of the US/Cayman Investors' reliance on the Bermuda Fund's elimination in the 2007 Restructuring, and Gottex's access to New Stream's confidential information, the liens securing Gottex's claims must be avoided and their unsecured claims subordinated to those of the US/Cayman Investors. Third, and alternatively, unjust enrichment claims must be pursued against the Bermuda Investors, and actions to impose constructive trusts against their collateral in favor of the US/Cayman Investors must be brought. Fourth, in the absence of substantive consolidation, fraudulent conveyance claims must be pursued against NSI, the Bermuda Fund, and Gottex, as the recipients or beneficiaries of more than $300 million of NSSC's payments to or on behalf of NSI; or inter-company claims must be respected and paid. And fifth, the circumstances of the allegedly senior security interests held by the Bermuda Fund and its segregated classes must be investigated, as it appears that the security interests in NSI's and NSSC's assets may not have been perfected and the Bermuda Fund's reliance on the CAAs is misplaced.[87]

187. These causes of action arise from the combination of three critical facts, each of which has been admitted by NSC under penalty of perjury. First, NSSC paid more than $300 million of NSI's debts and expenses for no consideration. Second, NSSC, NSI and their other subsidiaries and affiliates were operated as one entity, commingling assets and liabilities since 2007, and possibly as early as 2004, without appropriate record-keeping or offset. Inter-company balances were eliminated. And third, the Bermuda Fund, which failed to disclose its

---

[87] Although all of these claims would be released under New Stream's proposed Plan, the Disclosure Statement contains no mention of them. *See* Disclosure Statement, §§ IV.F, p. 36 ("The Plan, if confirmed, would settle and resolve issues related to the rights of Creditors, the relative priorities and potential claims and causes of action that each of them may have against the other"); XV.A, p. 117; XV.C, p. 118-19 (Ex. 13). It does not disclose them cursorily, disclose them without explanation, or disclose them and explain why they have no merit. Rather, the Disclosure Statement discloses only that all such claims would be released by the Plan, without any discussion whatsoever. This blatant lack of disclosure is additional compelling evidence of the need for the appointment of a Trustee to investigate these claims.

continuing interest despite the 2007 Restructuring which allegedly did away with it, purports to hold liens on the Life Settlement Assets, harming all investors in the US/Cayman Feeders, whose investments funded NSSC and indirectly satisfied NSI's debts and expenses, both preserving and augmenting the Bermuda Fund's collateral.

### (1) Claims for Substantive Consolidation of NSSC and NSI Estates Must be Pursued

188.  The finances of NSSC, NSI and the US/Cayman Feeders have been inextricably intertwined for years.  Since at least 2007, and possibly as early as 2004, NSSC's and NSI's finances have been wholly commingled.  As Gillies has acknowledged, the entities shared common bank accounts, and NSSC paid nearly all of NSI's obligations from NSSC's own coffers without appropriate record-keeping or offset.  And to complicate the finances further, the US/Cayman Feeders were one of the primary sources of NSSC's liquidity, providing most of the funds which NSSC used to pay NSI's debts and expenses.  Certainly, hundreds of millions were funneled from the US/Cayman Feeders through NSSC to or for NSI's benefit, all to satisfy NSI's obligations for which neither NSSC nor the feeders had any liability.

189.  Because NSC managed all of the commingled entities and did not *itself* differentiate among them, upon information and belief, *creditors* of NSI and NSSC viewed NSI, NSSC, and the feeders as one as well.  After all, how could New Stream have assured *pari passu* treatment and the same risk profile to creditors of all feeders *unless* New Stream was commingling assets and liabilities among the funds?

190.  Also, given NSC's failure to account for or document the obligations between NSSC and NSI, it would be extremely difficult and prohibitively costly to unscramble these eggs to sort out which assets and liabilities belong to which entity.

SL1 1042350v16/106114.00001

191. Thus, the filing of involuntary petitions against NSI and NSSC should be pursued by a Chapter 11 trustee, and substantive consolidation of those estates considered. Likewise, investigation into the US/Cayman Feeders' relationship with NSSC and NSI is warranted, and substantive consolidation must be considered.

192. Binding Third Circuit law dictates that substantive consolidation is appropriate where (i) pre-bankruptcy, the entities to be consolidated "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity" or (ii) after filing for bankruptcy, the entities' assets and liabilities "are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005), as amended by 2005 US App. LEXIS 18043 (3d Cir. Aug. 23, 2005), *cert. denied*, 126 S. Ct. 1910 (2006). Substantive consolidation is typically justified "when separately accounting for the assets and liabilities of the distinct entities would reduce the recovery of every creditor – that is, when every creditor will benefit from the consolidation." *Id.* at 214.

193. Substantive consolidation is "meant to protect in bankruptcy the prepetition expectations of those creditors." *Id.* at 212. Consequently, a *prima facie* case for substantive consolidation "typically exists when, based on the parties' prepetition dealings,… corporate disregard creat[ed] contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id.*

194. Many factors militate in favor of substantive consolidation of NSSC and NSI and all the US/Cayman Feeders' estates. Gillies testified under oath at length in the Gottex Proceeding that NSSC and NSI *ought* to be consolidated based on their disregard of corporate distinctions between them. *See* discussion at ¶¶ 137-46 above.

195.  The *Owens Corning* standards have been satisfied.  NSC has admitted under oath that the NSSC and NSI estates "disregarded separateness so significantly that their creditors relied on the breakdown of entity borders and treated them as one legal entity." Although the Feeders' contributions were ostensibly to NSI *or* NSSC, the moneys were used for all purposes related to the management of NSSC and NSI, with no differentiation between the two and no offset.  This combined identity has been forged for at least three years, and possibly six years, involving more than $300 million in transfers.

196.  Upon information and belief, the creditors of NSSC and NSI thought they were transacting with a single entity and treated NSSC and NSI as one legal entity.  Among the Bermuda Investors, Gottex is estopped from arguing that it relied on the corporate separateness of NSI and NSSC, when in fact it relied on the substantial *identity* of NSSC and NSI.  To maintain its security interest, Gottex kept silent in the face of New Stream's blaring headlines that the Bermuda Fund and its security interest would be eliminated in the 2007 Restructuring, and despite Gottex's knowledge that NSI's illiquidity and insolvency jeopardized NSI's ability to preserve Gottex's collateral.  Simply put, Gottex maintained its liens on the Life Settlement Assets, which could be preserved only with the monthly payment of multi-million dollar premiums, in reliance on NSSC's ongoing practice of paying NSI's debts for no consideration and without offset.

197.  Gottex took full advantage of NSC's disregard of corporate formalities.  In late 2007, Gottex sought to redeem approximately $30 million from the Bermuda Fund.  When the redemptions became effective in March 2008, NSI had no liquidity, so NSSC paid the redemption, as usual.  Gottex knew that NSSC, not NSI, made the payment.  After all, Gottex, with full visibility into how proceeds flowed from NSSC to NSI (*see* 1st Gillies Aff., ¶ 72),

reviewed the consolidated group's portfolio monthly and studied the cash flow. Gottex knew that NSI had insufficient funds to pay, that NSI *never* had sufficient liquidity to pay its own debts, and that the payment it received in March 2008 was from NSSC to the detriment of the US/Cayman Investors.

198.  Gottex's reliance on *the identity* of NSSC and NSI, all under NSC's management but with the US/Cayman Investors' ignorance of Gottex's purported senior position, estops Gottex, the willing beneficiary of New Stream's disregard of corporate distinctions, from asserting that it relied on corporate and financial separateness.

199.  New Stream's impassioned advocacy in the Gottex Proceeding in favor of substantive consolidation did not stop with the first-hand testimony of its president. New Stream also presented the expert legal testimony of Professor Frederick Tung, who applied the facts to which Gillies testified to the applicable law, concluding that substantive consolidation of NSSC and NSI is a "very real possibility."[88]

200.  Professor Tung found a "substantial identity between" NSSC and NSI: they are part of the New Stream group, they share common management, and they share centralized accounting functions. Tung Report, ¶ 39 (Ex. 55). Moreover, reasonable creditor reliance on New Stream's single identity was the natural result of New Stream's own treatment of the enterprise as a single consolidated group: the "US and Cayman Feeders, as well as the various classes of segregated accounts within the Bermuda Fund that lent to NSSC, could all make strong claims that they reasonably relied on the apparent unity of NSSC and NSI." *Id.*, ¶ 42.

---

[88] *See* Expert's Report of Frederick Tung (Robert T. Thompson Professor of Law and Business, Emory University School of Law) submitted in the Gottex Proceeding (the "Tung Report"), ¶¶ 38, 40 (observing that assets of both NSSC and NSI have been treated as "one undifferentiated pool") (Ex. 55).

201.  Further, according to Professor Tung, New Stream likely satisfies the

alternative test for substantive consolidation concerning the inability to unscramble the eggs.

As a result of the admitted commingling of assets and liabilities within the New Stream group, it

would prove "very difficult and costly at this point to unwind these transfers and separately

value the assets of NSSC and NSI." Tung Report, ¶ 42 (Ex. 55).  Because NSSC paid NSI's

obligations routinely without appropriate record-keeping, it cannot be determined retroactively

whether NSSC's intention, on a transfer-by-transfer basis, was to advance debt or an equity

contribution to its subsidiary NSI.  *Id.*, ¶¶ 42, 45; *see also* Gottex Judgment, ¶ 41.  While tracing

the cash transfers between the two debtors might be possible, "it is conceptually very

difficult … to try to divide the value of the combined entities into separate pools for NSSC and

NSI …  The cost of this exercise could be quite high, and its conceptual basis would be murky

at best."  Tung Report, ¶ 45.

202.  The final required element of proof is whether substantive consolidation will

benefit every creditor of the US/Cayman Feeders, NSSC and NSI estates.  It will.  For years, the

US/Cayman Investors have been funding NSI's operations through the US/Cayman Feeders, to

their detriment and for the benefit of the Bermuda Fund.  As discussed at ¶¶ 204-35 below, the

Bermuda Investors and Gottex in particular should be the subject of actions seeking

(i) avoidance of security interests to the extent valid, enforceable and perfected, (ii) equitable

subordination of claims, (iii) claims for unjust enrichment, (iv) claims to impose a constructive

trust on collateral to the extent improved or preserved with funds of the US/Cayman Investors,

and (v) avoidance and recovery of assets constructively fraudulently transferred by NSSC to or

for Gottex's benefit.  Should the liens be avoided, should resulting unsecured claims be

subordinated, should the US/Cayman Feeders impose a constructive trust against NSI's or

NSSC's assets in which others assert a security interest, or should NSSC succeed in obtaining disgorgement of its transfers to or in NSI's behalf as constructive fraudulent conveyances – one or several of which are likely given the facts present here, the damning admissions by Gillies, and the state of law in the Third Circuit – all Bermuda Investors, like all US/Cayman Investors, will benefit from the substantive consolidation of NSI, NSSC, and the US/Cayman Feeders.

203.  Given NSC's admitted disregard of the New Stream entities' corporate and financial separateness, and its conflicts of interest which would hinder its ability to pursue substantive consolidation, the Debtors cannot be relied on to pursue substantive consolidation. Thus, a Chapter 11 trustee must be appointed to examine and pursue substantive consolidation of some or all the New Stream entities.[89]

### (2)  Claims for Equitable Subordination of Gottex's Claims And/or Avoidance of its Liens Must be Pursued

204.  A "court may (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate."  11 U.S.C. § 510(c).  The Third Circuit has described equitable subordination as a "remedial rather than penal" doctrine designed "to undo or to offset any inequality in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results."  *In re Winstar Communications Inc.*, 554 F.3d 382, 411 (3d Cir. 2009) (*quoting Citicorp Venture Capital,*

---

[89] That in the context of an action seeking declaratory relief nullifying a portion of the 2009 Restructuring and appointing a receiver, the Bermuda Court in the Gottex Proceeding granted the relief Gottex sought despite NSC's defense that NSI and NSSC had been substantively consolidated, has no bearing in these proceedings on the ability of a trustee of any of the New Stream entities to seek substantive consolidation with any other, a point recognized implicitly by the Bermuda Court. *See* Gottex Judgment, ¶ 168 (observing, while referring to the commercial reasonableness of NSC's unilateral modification of the loan arrangements with Gottex, that "these arguments have greater potential relevance to … any application which may be made in the US Bankruptcy Court for substantive consolidation of any NSI and NSSC proceedings …."), ¶ 206 (granting Gottex relief "subject to … cross-claims which may arise out of US Bankruptcy Court proceedings, which may be filed") (Ex. 50).

*Ltd. v. Committee of Creds. Holding Unsec. Claims*, 323 F.3d 228, 233-34 (3d Cir. 2003)).

Equitable subordination is appropriate when equity demands that the payment priority of claims

of an otherwise legitimate creditor be changed to fall behind those of other claimants.

*In re SubMicron Systems Corp.*, 432 F.3d 448, 455 (3d Cir. 2006); *see Citicorp Venture Capital,*

*Ltd. v. Committee of Creds. Holding Unsec. Claims*, 160 F.3d 982, 986 87 (3d Cir. 1998).

205.  Three conditions must be satisfied for equitable subordination: (1) "[t]he

claimant must have engaged in some type of inequitable conduct;" (2) "[t]he misconduct must

have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the

claimant"; and (3) "[e]quitable subordination of the claim must not be inconsistent with the

provisions of the Bankruptcy [Code]."  *In re Winstar Communications Inc.*, 554 F.3d at 411.

206.  A review of testimony in the Gottex Proceeding in Bermuda, both from

Gillies, NSC's president, and John-Paul Bailey, Gottex's Senior Managing Director,[90] provides

a treasure trove of information warranting the equitable subordination of Gottex's claims against

the estates to those of other creditors.[91]

207.  As a starting point, Gottex's self-serving characterization that it was just one

of several Bermuda Investors standing on the sidelines is gutted by the facts.  In fact, Gottex

often interjected itself into decisions made by the Bermuda Fund to benefit Gottex, such as

participating in monthly portfolio reviews with NSC.  1st Gillies Aff., ¶ 27 (Ex. 20).[92]  Because

Gottex was the Bermuda Fund's largest investor, NSC "always strived to co operate with Gottex

---

[90] *See* First Reply Affidavit of John-Paul Bailey submitted in the Gottex Proceeding (the "Bailey Aff.") (Ex. 56).

[91] Discovery may demonstrate that equitable subordination of the interests of the Bermuda Feeder, not just Gottex, would be warranted.

[92] This access was far more than required, or offered other investors:  "As with NSSC, the Bermuda Fund documents afforded investors only the right to a monthly valuation report and an annual audit …."  *See* Disclosure Statement, § V.A.1, p. 38 (Ex. 13).

Management.  In fact, it is impossible to relate the history of the Bermuda Fund without documenting Gottex Management's considerable involvement along the way."  *Id.*

208.  Gottex wielded its leverage as the largest Bermuda Investor to insist upon favorable treatment in New Stream's financing documents.  First, while all of the non-Bermuda Investors switched to the US or Cayman Feeders as part of the 2007 Restructuring, Gottex refused to move from the Bermuda Fund, despite NSC's repeated representations that the Bermuda Fund would be eliminated.  1st Gillies Aff., ¶ 44.  And Gottex wielded undue leverage against NSC by demanding a complete redemption in March 2008, to which New Stream cowered in response by amending the NSSC CAA to grant to Gottex and the other classes of the Bermuda Fund priming liens above the existing liens of the US/Cayman Investors.  This was all done out of view as NSC executed the NSSC CAA on everyone's behalf.  *See* n.27 above.

209.  Gottex's gravest impropriety, however, and the source of the maximum harm to the US/Cayman Investors, derives from Gottex's utter silence in the face of the 2007 Restructuring and the panoply of accompanying documents and public representations that the Bermuda Fund and its secured interests would thereby be eliminated.  According to Bailey, Gottex's Senior Managing Director, even before the 2007 Restructuring was offered, New Stream had proposed that Gottex's loans to NSI be transferred to NSSC.  Bailey had immediately responded that such a move would force Gottex to withdraw its funds from New Stream because it would violate Gottex's internal investment concentration limits.  And according to Bailey, Gillies knew that Gottex took its concentration limits seriously.[93]

---

[93] *See* Bailey Aff., ¶ 22-23 (Ex. 56).  Gottex's "concentration limits" are its specific numerical boundaries that restrict the level of investment in any one investment opportunity so that a fund's investments are diversified.  *Id.*, ¶ 20.  Combining all of Gottex's investments in New Stream – combining the C, F, and I Classes' loans to NSI with Gottex's portion of the Non-Insurance Classes loans to NSSC, as Gillies was proposing, allegedly would have violated Gottex's concentration limits and forced immediate redemption.

210.  Bailey's warning could reasonably be construed to mean that Gottex would *never* agree to the not-yet-proposed 2007 Restructuring.  Ignoring that, however, NSC went forward with its planned restructuring, which by eliminating the Bermuda Fund and its first-priority security interest and transferring its investment to the Cayman Feeders, proposed exactly that which Bailey had warned Gillies just months before would result in the withdrawal of Gottex's funds.

211.  But Gottex did not immediately demand redemption of its investments.  Nor did Gottex immediately decline to participate.  What Gottex did, according to Bailey, was *listen*, listen to NSC try to persuade Gottex (and the other Bermuda Investors) to transfer their entire investment to the Cayman Feeder.  *See* Bailey Aff., ¶ 25 (Ex. 56).  Four months passed between when the 2007 Restructuring was proposed in November 2007 and Gottex's redemption request in March 2008.  In the interim, as the 2007 Restructuring became effective on January 1, 2008, as Gottex laid low, while its collateral improved from a 70% loan-to-asset exposure on its investment to a 50% exposure as new investments poured in.  As almost all existing investors in NSSC (including some Bermuda Investors) converted to the US/Cayman Feeders in reliance on the declared elimination of the Bermuda Fund and its senior security interest and in reliance on the representation that all investors would be *pari passu*, Gottex's security improved.  Then in March 2008, with maximum leverage and minimum risk, Gottex demanded redemption of its investments, in response to which NSC apparently felt it had no choice – not if it were to maximize its assets under management and therefore its Management Fees – but to grant Gottex a senior lien against NSSC's assets, a priority which had been eliminated by the November 2007 NSSC CAA.  *See* discussion at ¶76, n.27 above.

90

212.  The resulting damage to US/Cayman Investors is evident.  As Gillies put it: "the direct lending and security arrangements between the Bermuda Fund and NSI were left in place, and NSSC capital has continued to be applied to support the collateral securing advances by these accounts, both for the benefit of [Gottex]."  1st Gillies Aff., ¶ 74 (Ex. 20).

213.  Whether Gottex was rendered speechless for four months as part of a bilateral scheme with NSC, a unilateral scheme as NSC sought earnestly, albeit naively, to negotiate with a party not willing to cooperate, or a strategic silence upon advice of counsel that it had no duty to respond, is for now unknown.[94]  Whatever its motives, Gottex's silence in the face of the blaring pronouncements of the 2007 Restructuring that the Bermuda Fund and its security interest were being eliminated, all the while knowing that its collateral was being preserved and augmented by those acting in reliance on the Debtors' statements and Gottex's own silence, is inequitable conduct meriting equitable subordination.

214.  Professor Tung concurs that the facts support equitable subordination of Gottex's claim, focusing on Gottex's acceptance of the benefits of NSSC's constructively fraudulent funding of NSI.  Specifically, Professor Tung finds compelling that "[m]any if not all the transfers from NSSC to NSI could be qualified as constructive 'fraudulent transfers'" which benefited Gottex at the expense of all of NSSC's creditors.  Tung Report, ¶ 62 (Ex. 55).  While the innocent receipt of constructive fraudulent transfers would not necessarily support equitable subordination of the transferee's claims, Gottex was innocent neither in fact nor in law.  Both the Bermuda Fund and its segregated classes C, F and I are, for bankruptcy purposes, insiders of NSSC, since NSSC and the Bermuda Fund were under the common control of NSC.  NSC was

---

[94] Gottex has predictably contended that its intentions were sincere, that it did propose alternative investment restructuring options to New Stream, and that there were telephone calls in early 2008 in which alternative, legally compliant structures were considered.  None were implemented, however.  *See* 4th Lai Aff., ¶¶ 76-80 (Ex. 40).

the general partner of NSSC and the investment manager of the Bermuda Fund. Moreover,

before August 2008, the directors of the Bermuda Fund were principals of NSC. *See id.*, ¶ 63;

11 U.S.C. §§ 101(2) and (31).

215. Undeniably, whether as a statutory insider within the meaning of Code

section 101(31), a non-statutory insider at less than an arm's-length relationship with New

Stream, or a creditor wielding undue influence over those who had forsaken their fiduciary

duties in favor of personal gain, Gottex unjustly reaped financial reward at other creditors'

expense. As a result, Gottex's security interest should be avoided, and its remaining claim

should be equitably subordinated to the claims of unsecured creditors.[95]

216. Given the incestuous relationship between Gottex and the New Stream

entities, current management cannot be relied on to pursue equitable subordination of Gottex's

claims or avoidance of its liens. Thus, the appointment of a Chapter 11 trustee is necessary to

assure that these causes of action are impartially investigated and pursued.

### (3) Unjust Enrichment and Constructive Trust Causes of Action Must be Pursued Against the Bermuda Investors And Their Collateral

217. Unjust enrichment is "the unjust retention of a benefit to the loss of another,

or the retention of money or property of another against the fundamental principles of justice or

---

[95] A distinct claim, but one conceptually related to equitable subordination on the facts of this case, is a claim to recharacterize Gottex's claim as equity. *See generally Cohen v. KB Mezzanine Fund II, L.P. (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006); *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),* 405 B.R. 527, 554 (Bankr. D. Del. 2009). Preliminary evidence indicates that such a claim exists and must be investigated by Movants in discovery, and thereafter by a trustee. In October 2005, to circumvent the prohibition in the 2003 PPM against foreign investors, New Stream organized what is now the Bermuda Fund to enable foreign entities to invest in NSSC and later NSI. *See* 2003 PPM, p. 2 ("Investor Qualifications") (Ex. 51). Because of the above-market interest rate and terms extracted by Gottex, terms exceeding the actual return ever earned or ever *possibly* to be earned by interests formally denominated as equity, the borrowing grossly violated the 2003 PPM's limitation that leverage would be used *only* to enhance profits. *See* discussion at ¶ 149, n.76 above. New Stream routinely referred to Gottex as an investor, even noting that some of the so-called "debt" provisions of the 2007 Restructuring and the 2009 Restructuring Plan were added to accommodate the needs of foreign investors. *See* Disclosure Statement, § V.A.1, p. 37 ("The Bermuda Fund was formed to offer investment opportunities in NSSC (or NSI) to non-US investors ....").

equity and good conscience." *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062

(Del. 1988); *LaSalle Nat. Bank v. Perelman*, 82 F.Supp.2d 279 (D. Del. 2000). "The elements

of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the

enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a

remedy provided by law." *Id.* These elements have been described alternatively as:

(1) a benefit conferred upon the defendant by the plaintiff, (2) an appreciation or knowledge by

the defendant of the benefit and (3) the acceptance or retention by the defendant of the benefit

under such circumstances as to make it inequitable for the defendant to retain the benefit

without payment of its value. *CBS Surgical Group Inc. v. Holt*, 37 Conn. Sup. 555, 558, 426

A.2d 819, 821 (Conn. Super. 1981).

218. This is a classic example of unjust enrichment, with Gottex and other

Bermuda Investors being unjustly enriched at the US/Cayman Investors' expense. To the extent

that Gottex's behavior is found to be improper, Gottex's claim is subject to equitable

subordination. *See* discussion at ¶¶ 204-16 above. To the extent that Gottex is found not

culpable – that its silence in the face of the 2007 Restructuring and its insistence thereafter on

the secret modifications to the NSSC CAA and other loan documents and terms to improve its

position at the ever-burgeoning cost to the US/Cayman Investors, is found to be innocent or

benign – Gottex and the other Bermuda Investors are subject to a claim for unjust enrichment.

219. A trustee must also be appointed to investigate a claim to impose a

constructive trust against any portion of the Bermuda Fund's collateral which has been

preserved or improved with funds traceable to the US or Cayman Feeders. "A constructive trust

arises when a person holding title to property is subject to an equitable duty to convey it to

another on the ground he would be unjustly enriched if he were permitted to retain it." *Nagle v.*

93

*Nagle*, 799 A.2d 812, 819 (Pa. Super. 2002) (*citing Yohe v. Yohe*, 466 Pa. 405, 353 A.2d 417

(Pa. 1976)); *Gulack v. Gulack*, 30 Conn. App. 305, 310, 620 A.2d 181 (Conn. 1993) ("The

elements of a constructive trust are the intent by a grantor to benefit a third person, the transfer

of property to another who stands in a confidential relationship to the grantor with the intent that

the transferee will transfer the property to the third person and the unjust enrichment of the

transferee if the transferee is allowed to keep the property").

220.  As Justice Cardozo observed long ago:

> A constructive trust is the formula through which the conscience of equity
> finds expression.  When property has been acquired in such circumstances
> that the holder of the legal title may not in good conscience retain the
> beneficial interest, equity converts him into a trustee.

*Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (N.Y. 1919).

221.  A constructive trust may be applied even when the acquisition of property was

not wrongful.  *Gee v. Eberle*, 279 Pa. Super. 101, 112, 420 A.2d 1050, 1056 (Pa. 1980).  The

most significant consideration is whether the enrichment of the defendant is unjust.

*In re Perotti*, 2008 WL 5158275, at *2 (Bankr. M.D. Pa. Oct. 22, 2008); *Stoeckinger v.

Presidential Fin. Corp. of Delaware Valley*, 948 A.2d 828, 833 (Pa. Super. 2008).

222.  The Debtors' management cannot be expected to pursue a claim for unjust

enrichment against Gottex and the Bermuda Investors, nor for constructive trust against property

transferred to them or in which they retain an interest, given management's lack of impartiality

and its own involvement in these prepetition transfers.  Thus, a Chapter 11 trustee must be

appointed to investigate and then to pursue unjust enrichment and constructive trust causes of

action necessary to undo the manifest injustice to the US/Cayman Investors and others.

### (4)  Fraudulent Conveyance Causes of Actions Against
###      NSI and Gottex Must be Pursued

223.  If substantive consolidation is not pursued, both the US/Cayman Feeders and NSSC have powerful grounds to seek disgorgement from NSI of constructively fraudulent conveyances made to or for the benefit of NSI, either as the initial transferee of the transfers described above (collectively, the "<u>Fraudulent Transfers</u>") (to the extent that NSSC transferred funds to NSI to enable NSI to pay its obligations), or as the entity for whose benefit the transfers were made (to the extent that NSSC paid NSI's creditors directly).  The same claim exists as to Gottex, an entity only once removed from NSI.  Gottex would be liable as the entity for whose benefit the transfers were made or as an immediate or mediate transferee, to the extent its collateral was improved or preserved.  Gottex both knew of NSI's financial straits and that NSSC was the source of all funding, thus satisfying the proof required under Code section 550 to impose liability against immediate and mediate transferees.

224.  NSSC also has a constructive fraudulent conveyance claim directly against Gottex as the initial transferee of payments from NSSC to satisfy NSI's redemption and loan repayment obligations to Gottex.

225.  A trustee's impartial investigation will show that (a) NSSC was insolvent when the Fraudulent Transfers were made or became insolvent as a result of the Fraudulent Transfers;[96] or (b) NSSC was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining was an unreasonably small capital; or (c) NSSC intended to incur, or believed that it would incur, debts that would be beyond its

---

[96] This insolvency is, among other things, a function of the inflated values attributed to NSI's Life Settlement Assets at all relevant times.  *See* discussion at ¶¶ 154-65 above.

ability to pay as such debts matured.  Accordingly, NSSC is entitled to judgment avoiding the Fraudulent Transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a)(1).

226.  That value to a wholly-owned subsidiary (such as NSI) <u>may</u> constitute indirect value to the parent (such as NSSC) is undisputed, *see, e.g., Silverman v. Paul's Landmark, Inc. (In re Nirvana Restaurant, Inc.)*, 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006), but value to a wholly-owned subsidiary does not <u>necessarily</u> constitute value to the parent.  *RubIn v. Manufacturers Hanover Trust*, 661 F.2d 979 (2d Cir. 1981) (vacating judgment holding consideration to a wholly-owned subsidiary was *per se* fair consideration to its parent, and remanding to District Court for factual determination of the tangible economic benefit to the parent); *see Mellon Bank, N.A. v. Metropolitan Communications, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991), *cert. denied sub nom., Committee of Unsec. Creditors v. Mellon Bank, N.A.*, 503 U.S. 937 (1992) (reasoning that because fraudulent conveyance laws are intended to protect the debtor's creditors, lender in a leveraged buyout "cannot hide behind the position, although sympathetic, that it has parted with reasonable value," since the question "whether the debtor received reasonable value" must be determined from the debtor's creditors' standpoint).

227.  Where, as here, NSSC transferred assets to or for the benefit of NSI, its wholly-owned subsidiary, the transfer is deemed to be for less than reasonably equivalent value if NSI was hopelessly insolvent at the time of the transfer.  *Official Comm. of Unsec. Creds. v. DVI Business Credit, Inc.*, 326 B.R. 301 (Bankr. D. Del. 2005) (denying motion to dismiss fraudulent conveyance claim where Committee sufficiently pled subsidiary to whom transfer was given was insolvent at the time of the transfer, as required to prove debtor-parent did not receive "reasonably equivalent value"); *Murphy v. General Elec. Credit of Tennessee (In re Duque Rodriguez)*, 77 B.R. 939, 941-42 (Bankr. S.D. Fla. 1987), *aff'd*, 895 F.2d 725

(11th Cir. 1990); *In re Chase & Sanborn Corp.*, 68 B.R. 530, 532 33 (Bankr. S.D. Fla. 1986), *aff'd*, 848 F.2d 1196 (11th Cir. 1988).

228. As is clearly demonstrated throughout this Motion, NSI was woefully insolvent at all relevant times. Under these circumstances, NSSC (the parent) received no indirect benefit from consideration running to NSI (the subsidiary) because NSSC's equity in NSI was still worthless. Mere diminution of NSI's negative net worth is not tangible and realizable by NSSC and its creditors, and thus, consistent with *Rubin*, not fair consideration.

229. A fraudulent conveyance claim against Gottex, either as the initial, immediate, or mediate transferee, or the entity for whose benefit the transfer was made (to the extent that Gottex's collateral was preserved or augmented) is another claim which current management of the Debtors cannot be relied on to pursue.

230. Among other fraudulent transfers that should be investigated and pursued by the estate are as follows:

- Before NSI became a wholly-owned subsidiary of NSSC on June 1, 2007,[97] NSSC transferred to NSI, upon information and belief, $51,953,421 of insurance-related loans for no apparent consideration. *See* 2006 NSSC Financials, Note 4, page 12 (this line item was never thereafter included among the NSSC loans receivable).

- Before NSI became a wholly-owned subsidiary of NSSC, NSSC transferred to NSI, upon information and belief, funds to pay NSI's life insurance premiums or other liabilities of NSI.

- On or about March 26, 2008, NSC executed the March 2008 NSSC CAA on behalf of the US/Cayman Feeders pursuant to which the Bermuda Fund, theretofore *pari passu* with the US/Cayman Feeders' lien under the November 2007 NSSC CAA, was granted a senior lien in NSSC's assets. That granting of a senior lien by the US/Cayman Feeders is an actual or constructive fraudulent conveyance.

---

[97] NSSC first purchased 40% of NSI in 2006, *see* 2006 NSSC Financials, Note 5, p. 13 (Ex. 45) and acquired the final installment of 43% equity on June 1, 2007. *See* 2007 NSSC Financials, Note 5, p. 15 (Ex. 41).

**(5) Whether the Bermuda Fund Properly Perfected its
Alleged Security Interest in NSI's and NSSC's
Life Insurance Policies Must Be Examined**

231.  The sources of the Bermuda Fund's allegedly senior security interest in the

life insurance policies owned by NSI and NSSC are so-called "Loan and Security Agreements"

between certain segregated classes of the Bermuda Fund and either NSI or NSSC, and the

Second Amended and Restated Notes made by NSSC to Classes B, E, H, K, L, N and O of the

Bermuda Fund as supplemented by the NSSC CAA, dated October 5, 2006.[98]

232.  As explained at n.25 above, the CAAs say nothing about the priority of

claims.  They do not create security interests.  They merely clarify the priority of existing liens,

and are of no force or effect to the extent that the security interests are unperfected.

233.  The security interests granted by NSI and NSSC to Classes C, F, and I of the

Bermuda Fund were allegedly perfected by the filing of a UCC financing statement by

Wilmington Trust Company, as collateral agent.  *See* Disclosure Statement, § V.C.4(a), p. 60

(Ex. 13); 4th Lai Aff, ¶¶ 11-12, p. 4 (Ex. 40).  The mode of perfection of the security interests

allegedly granted by NSSC to the other Classes of the Bermuda Fund is not disclosed in the

Disclosure Statement, except by reference to the NSSC CAA.  *See* discussion at ¶ 74 n.25

above.

234.  Yet a security interest in a life insurance policy cannot be perfected by the

filing of a UCC financing statement.  Section 9-109(d)(8) of the Delaware Code says plainly

that Article 9 of the UCC does not apply to "a transfer of an interest in or an assignment of a

---

[98] *See* Disclosure Statement, § V.C.4, p. 60 (primary debt obligations of NSI are Loan and Security Agreements
between NSI and Bermuda Segregated Accounts C, F, and I); § V.C.2, p. 58-59 (primary debt obligations of
NSSC arise from the Second Amended and Restated Notes made by NSSC to Classes B, E, H, K, L, N and O, as
supplemented by CAA dated October 5, 2006 (Ex. 13); 4th Lai Aff., ¶¶ 11-12, p. 4 (referring to Gottex's security
interests in NSI's and NSSC's assets:  "These were perfected US security interests under the Uniform Commercial
Code ("UCC") of a type that is very familiar in the US") (Ex. 40).  *See generally* discussion at ¶ 76, n.27 above.

claim under a policy of insurance, other than an assignment by or to a health-care provider of a health-care insurance receivable and any subsequent assignment of the right to payment, but Sections 9-315 and 9-322 apply with respect to proceeds and priorities in proceeds." 6 Del. Code § 109(d)(8).[99] The same result obtains if Connecticut law, the law governing the Loan and Security Agreements, applies. *See New England Mut. Life v. Porcumac Mold & Tool Corp.*, 38 Conn. Sup. 98, 263 A.2d 259 (1983) (holding that Article 9 of the UCC does not apply to interests in any policy of insurance, except with reference to proceeds and priority in proceeds); Disclosure Statement, § V.A.1, p. 38 (Ex. 13).

235.  In conclusion, a Chapter 11 trustee is required to investigate the alleged security interests held by the Bermuda Fund and the estates' causes of action against third parties.  Because of conflicts of interest, inappropriate relationships, and involvement in the underlying transactions, however, New Stream's management cannot be relied upon to pursue claims or conduct an inquiry on behalf of any estate as a disinterested fiduciary.  Moreover, New Stream's utter silence concerning these potential causes of action against third parties provides all the evidence necessary to conclude that it has no intention of investigating or pursuing any of these claims.  *See* discussion at ¶¶ 239-40 below.  Accordingly, it is essential that an impartial Chapter 11 trustee be appointed to investigate potential claims and causes of action of the New Stream entities.

---

[99] Neither exception applies to these alleged security interests.  Section 9-315 concerns rights in insurance proceeds payable by loss or damage to secured collateral, not proceeds from the policy when the policy itself was the collateral.  Section 9-322 deals with priorities with respect to proceeds only.  6 Del. Code §§ 315, 322.

**(c) The Proposed Disclosure Statement and the Prepackaged Plan, A Sweetheart Deal Among New Stream Management, the Bermuda Investors, and MIO, by Which All Malfeasance is Released but Claims Are Not Disclosed, is Further Evidence of the Need for a Chapter 11 Trustee**

236. The prepackaged Plan envisages a sale of the Life Settlement Assets and premium finance loan portfolio owned by NSI to a nominee of MIO, itself an affiliate of McKinsey & Co., for $127.5 million, with the sale proceeds being distributed to the Bermuda Investors. The sale will be implemented under the Plan if the parties can obtain sufficient support among the US/Cayman Investors to confirm a fully-consensual prepackaged Plan. *See generally* Disclosure Statement, § V.C.5, pp. 62-68 (Ex. 13); Joint Plan, Art. 7.1, pp. 49-51 (Ex. 14). The Plan provides releases to all New Stream entities, all New Stream management, all New Stream principals, MIO, the Liquidators, Gottex, all parties to the so-called "plan support agreement," and all of their professionals. *See* Disclosure Statement, §§ IV.F, p. 36; XV.A, p. 117; XV.C, pp. 118-19; Joint Plan, Art. 12.1, pp. 69-70. It is a sweetheart deal which, if confirmed, would bless all of the impropriety and inequity, all of the actual and constructive fraud by which US/Cayman Investors' assets were taken from them for the principal benefit of the Bermuda Investors and New Stream management.

237. If the Plan is confirmed, the only entities to which New Stream would ever be required to account would be the FBI and the SEC. The FBI, upon information and belief, is investigating the circumstances of the undisclosed senior lien retained by the Bermuda Fund under the 2007 Restructuring. *See* 4th Lai Aff., ¶¶ 86-88 (Ex. 40). And the Debtors have been under SEC investigation since July 2010. *See* Disclosure Statement, § IV.D., p. 34 (Ex. 13). In fact, the Debtors propose to dedicate $2 million of creditors' funds to fending off the SEC investigation, *see id.*, § X.M, p. 106, and to do all necessary to preserve the attorney-client privilege, despite a complete lack of showing of benefit to the estates. *See id.*, § V.C.7.c, p. 70.

Finally, whatever the outcome, the Debtors will assume their obligations to indemnify their managers, officers, directors and employees, thus elevating an otherwise unsecured claim that is out of the money.

238. Under the Plan, the US/Cayman Investors will receive (a) the common stock of Northstar, valued by Gillies as recently as March 17, 2010 at negative $40 to $75 million; (b) a "basket of long-dated, zero marked assets"; (c) a $5 million "gift" from MIO, provided the US/Cayman Investors vote in favor of the Plan (and nothing if the Plan has to be crammed down on the US/Cayman Investors); (d) a $5 million "gift" from the Bermuda non-C, F, and I Classes (provided investors vote in favor of the Plan), reduced to $2.5 million if the Plan has to be crammed down on the US/Cayman Investors, of which only half need be escrowed for the Plan to become effective; and (e) a $5 million "gift" from the Bermuda C, F, and I Classes limited to the US/Cayman Investors who vote in favor of the Plan, and only then if the Bermuda court supervising liquidation of the Bermuda Fund decides that all investors in the Bermuda non-C, F, and I Classes are entitled to distributions from each Class on a *pari passu* basis. This works out to a potential distribution to the US/Cayman Investors of approximately two to four cents on the dollar.

239. The irony that the Plan proponents ignore is that virtually the entire pittance offered the US/Cayman Investors – $10 to $15 million in gifts, much of which they get only if they support the Plan – is derived from assets supplied by US/Cayman Investors themselves. New Stream has conceded this, indeed has argued it at length with its witness and legal expert in the Gottex Proceeding. There are numerous theories under which these assets can be reached by the US/Cayman Investors, ranging from substantive consolidation to equitable subordination to fraudulent conveyance to unjust enrichment to constructive trust. Pursuit of these actions does

101

not require that the US/Cayman Investors issue valuable releases, that they turn their backs on the wrongs and injustices done them, as confirmation of the Plan would.

240.  The overwhelming portion of the value being distributed under the Plan will go to the Bermuda Investors.  Because a Chapter 7 trustee would assert rather than release the causes of action described herein and distribute assets more equitably, the Plan has not been proposed in good faith and will not satisfy the "best interests" test under § 1129(a)(7) of the Code which mandates that the US/Cayman Investors receive at least as much as they would in a liquidation under Chapter 7 of the Code.  And although all of these claims would be released under New Stream's Plan, the Disclosure Statement contains no mention of these causes of action, no analysis of their value, nor even a statement of the underlying facts.

241.  Moreover, neither the Plan nor its proponents have complied with the Code, including classification and voting provisions.  Finally, assuming the class of US/Cayman Investors vote to reject the Plan, in order for the Plan to be confirmed, it would have to be "crammed down."  In a cram down, the proponent must demonstrate that the Plan is fair and equitable and does not discriminate unfairly.  The Movants will successfully oppose any attempt to "cram down" the Plan on the grounds that the Plan fails to adequately compensate the US/Cayman Investors for their money that was improperly diverted to benefit other parties including the Bermuda investors.

242.  Finally, one improper solicitation practice of New Stream's merits mention here, for it is probative of "cause" for the appointment of a Trustee.  In a written presentation which New Stream principals displayed in face-to-face meetings with US Investors in an effort to gain their support for the Plan, New Stream sought to frighten the US Investors into supporting the Plan by representing that "US investors could be exposed to a large tax liability

due to *cancellation of debt* in a non-consensual plan." *See* Presentation entitled "New Stream Capital Proposed Restructuring," dated January 2011, p. 7 (Ex. 57). Yet nowhere in the Disclosure Statement is that statement repeated, because it is not true. *See* Disclosure Statement, § XXI.B, p. 165 ("Federal Tax Consequences to the Claims and Equity Interests") (Ex. 13). Whether the false statement served its intended *In terrorem* effect is unknown.

243. Indeed, the Plan is but a continuation of the prepetition scheme by which New Stream management and the Bermuda Receivers, having been funded by almost $3 million, have worked together to benefit themselves at the expense of US/Cayman Investors. Only the appointment of a Chapter 11 trustee or examiner, or the conversion of these cases to Chapter 7 so that a Chapter 7 trustee can investigate these causes of action, can assure that the sweetheart deal embodied in the Plan does not receive this Court's blessing and pervert the benevolent purposes of Chapter 11.

### 3. Even if the Court Determines that "Cause" Does Not Exist, Appointing a Chapter 11 Trustee is in the Creditors' Best Interests Under Section 1104(a)(2) of the Code

244. Section 1104(a)(2) provides a "flexible standard for appointment of a trustee even when no cause exists." *In re Bellevue Place Assocs.*, 171 B.R. at 623; *see also In re V. Savino Oil*, 99 B.R. at 527 n.11 ("factors constituting a basis for appointing a trustee under § 1104(a)(2) are amorphous, diverse, and necessarily involve a great deal of judicial discretion"). The standard affords the Bankruptcy Court "particularly wide discretion" to "look to the practical realities and necessities" involved in appointing a trustee. *In re Bellevue Place Assocs.*, 171 B.R. at 623; *In re Hotel Assocs., Inc.*, 3 B.R. 343, 345 (Bankr. E.D. Pa. 1980). The traditional factors used to determine whether appointment of a Chapter 11 trustee is in the best interests of the creditors include: (1) the debtor's trustworthiness; (2) the debtor's past and present performance and prospects for the debtor's rehabilitation; (3) the confidence, or lack

thereof, of the business community and creditors in present management; and (4) the benefits derived by the trustee's appointment balanced against the cost of appointment. *See In re Ionosphere Clubs, Inc.*, 113 B.R. at 168; *In re Madison Management*, 137 B.R. 275, 282 (Bankr. N.D. Ill. 1992); *In re Colorado-Ute Electric Ass'n*, 120 B.R. 164, 176 (Bankr. D. Colo. 1990).

245. For all of the reasons discussed above, (i) the current management of the new Stream entities, NSC, is not trustworthy, (ii) past performance reflects gross mismanagement, incompetence, misuse of assets, commingling of assets, lack of disclosure, dishonesty, fraud, conflicts of interest and inappropriate relations between corporate parents and subsidiaries, (iii) there is a lack of confidence of the business community and the creditors in present management; and (iv) the benefit of a Chapter 11 trustee is clearly outweighed by the cost of such an appointment if only because current management will not investigate and pursue the estates' claims and causes of action against third parties, like Gottex, who had a role in the downfall of the New Stream enterprise.

246. Thus, it is in the interest of these estates and their creditors that a Chapter 11 trustee be appointed to preside over these estates impartially. The evidence is overwhelming that New Stream management is biased and conflicted, its priorities are skewed, and its primary interest is its own personal benefit.

247. Pursuant to 11 U.S.C. § 1107, the Debtors have the obligations and duties of a trustee serving in a case under Chapter 11, including the duty to protect and conserve property in their possession for the benefit of creditors. *Ionosphere Clubs*, 113 B.R. 164, 169; Microwave Products, 102 B.R. at 670 (the debtor-in-possession has a fiduciary duty to exercise business judgment for the benefit of the estate). "The job of a debtor-in-possession remains

under the Code as that described by Judge Friendly – to get the creditors paid." *Ionosphere Clubs*, 113 B.R. at 169 *quoting In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 727 (Bankr. S.D.N.Y. 1984). Fiduciaries may not partake in self-dealing or negligent behavior. Thus, the debtor-in-possession must refrain from acting in a manner that could harm the estate and interfere with a successful reorganization. *See Ionosphere Clubs*, 113 B.R. 164, 169. When, as here, the debtor fails or is incapable of doing so, a trustee must be appointed. *See Ionosphere Clubs*, 113 B.R. 164, 169; *Nautilus of New Mexico*, 83 B.R. 784, 789.

248. In short, the appointment of a Chapter 11 trustee will bring stability and continuity to these reorganization cases. A trustee would provide objective, competent leadership and instill confidence in the eyes of creditors, prospective purchasers, and the community at large.

## C. ALTERNATIVELY, THE COURT SHOULD APPOINT AN EXAMINER UNDER 11 U.S.C. § 1104(C)

249. If the Court were to find that the elements of Section 1104(a) are not met, the US/Cayman Investors respectfully request that this Court appoint an examiner pursuant to Section 1104(c) of the Code. Section 1104(c) provides as follows:

(a) If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court *shall order* the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if –

(1) such appointment is in the interests of creditors, and equity security holders, and other interests of the estate; **or**

(2) *the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.*

11 U.S.C. § 1104(c) (*emphasis* added).

250.  Section 1104(c) requires that an examiner be appointed in one of two situations:  (1) when the "appointment is in the interests of creditors" or (2) when the fixed, liquidated, unsecured debt exceeds $5 million.  Both of these conditions are present here.

251.  Where the requirements of subsection 1104(c)(2) are satisfied, the appointment of an examiner is mandatory.  *See In re Revco D.S., Inc.*, 898 F.2d 498, 500 01 (6th Cir. 1990).  Because the Debtors' fixed, liquidated unsecured debts, other than those for goods, services or taxes, or owing to an insider, exceed $5 million, the appointment of an examiner is required.

252.  The Movants who have claims against the US Feeder invested more than $19 million and have crystallized debts against the US Feeder of more than $6 million.  The Movant who invested in New Stream Secured Capital Fund P1 (Cayman), Ltd. invested more than $8 million and has crystallized debts against that debtor of more than $8 million.  The Movant who invested in New Stream Secured Capital Fund K1 (Cayman), Ltd. invested more than $15 million and has crystallized debts against that debtor of more than $3.3 million.  These debts are unsecured and can easily be proven.

253.  The discretionary appointment of an examiner under Section 1104(c)(1) is called for when, as in this case, allegations of corporate misconduct, mismanagement, or irregularity in management affairs are substantiated by credible evidence.  *See In re 1243 20th Street, Inc.*, 6 B.R. 683, 686 (Bankr. D.C. 1980); *In re Gilman Services, Inc.*, 46 B.R. at 327.

254.  Pursuant to Section 1106 of the Code, an examiner appointed under Section 1104(d) is empowered with the ability to "investigate the acts, conduct, assets,

liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter related to the case or to the formulation of a plan." *See* 11 U.S.C. § 1106(a)(3).

255.  For the reasons set forth above, it is in the interests of creditors that an examiner be appointed to "investigate the acts, conduct, assets, liabilities and financial condition" of these Debtors.

WHEREFORE, the Movants respectfully request that this Court enter an Order in the form attached hereto:  (i) authorizing and directing the United States Trustee to appoint a Chapter 11 trustee for the above-captioned debtors prior to the entry of order for relief pursuant to §§ 1104(a), 105 and by analogy 303(g) of the Code and Bankruptcy Rule 2007.1; or, alternatively, (ii) authorizing and directing the United States Trustee to appoint an examiner for the above-captioned debtors pursuant to section 1104(c) of the Code and Bankruptcy Rule 2007.1; and (iii) granting such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated:  March 7, 2011               STEVENS & LEE, P.C.

*/s/ Joseph H. Huston, Jr.*
Joseph H. Huston, Jr. (No. 4035)
Maria Aprile Sawczuk (No. 3320)
Meghan A. Cashman (No. 5463)
1105 North Market Street, 7th Floor
Wilmington, DE  19801
Telephone: (302) 425-3310; -3306; -3307
Facsimile: (610) 371-7972
Email: jhh/masa/maca@stevenslee.com

-and-

107

Beth Stern Fleming
1818 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (215) 575-0100
Email: bsf@stevenslee.com

-and-

Nicholas F. Kajon, Esq.
David M. Green, Esq.
Constantine Pourakis, Esq.
485 Madison Avenue, 20th Floor
New York, NY 10022
Telephone: (212) 319-8500
Email: nfk@stevenslee.com
      dmg@stevenslee.com
      cp@stevenslee.com

-and-

TOPTANI LAW OFFICES
Edward Toptani, Esquire
127 E. 59th Street, 3rd Floor
New York, NY 10022
Telephone: (212) 699-8930
Email: edward@toptanilaw.com

-and-

MAZZEO SONG & BRADHAM LLP
John M Bradham, Esquire
David Hartheimer, Esquire
708 Third Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 599-0700
Email: jbradham@mazzeosong.com
      dhartheimer@mazzeosong.com


*Counsel for Movants*

SL1 1042350v16/106114.00001